**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| UNITED HEALTHCARE SERVICES, INC., UNITEDHEALTHCARE INSURANCE COMPANY, AND UMR, INC.<br><br>          Plaintiffs,<br><br>   vs.<br><br>TEAM HEALTH HOLDINGS, INC., AMERITEAM SERVICES, LLC, and HCFS HEALTH CARE FINANCIAL SERVICES, LLC,<br><br>          Defendants. | **Case No.**<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

United HealthCare Services, Inc., UnitedHealthcare Insurance Company, and UMR, Inc. (collectively, the "United Plaintiffs") bring this action against Team Health Holdings, Inc., AmeriTeam Services, LLC, and HCFS Health Care Financial Services, LLC (collectively, "TeamHealth"), and further allege as follows:

## NATURE OF THE ACTION

1. Since at least 2016, TeamHealth has covertly and methodically engaged in a classic form of healthcare fraud called upcoding. Upcoding occurs when a healthcare provider submits a claim to an insurer or claim administrator utilizing a Current Procedural Terminology (CPT) code that misrepresents the services provided, thus using the code to deceive the insurer or claim administrator into overpaying. Here, TeamHealth has deliberately upcoded tens, if not hundreds, of thousands of claims to the United Plaintiffs for emergency room services, resulting in the United Plaintiffs overpaying TeamHealth by more than one hundred million dollars.

2. TeamHealth operates one of the largest emergency room staffing and billing companies in the United States. It controls thousands of emergency rooms nationwide through a complex web of subsidiaries and affiliates.

3. TeamHealth affiliates with or acquires medical groups across the county. These medical groups have contracts with hospitals or hospital systems under which the medical groups staff hospital emergency departments. But that is where the medical groups' involvement ends. From there TeamHealth handles everything related to the coding and billing of claims from its centralized billing centers. It is TeamHealth's coders who decide which codes to utilize, applying TeamHealth's policies. It is TeamHealth that submits claims to insurance companies under the names of its affiliated or acquired medical groups. And it is TeamHealth—not the medical groups or the doctors or other providers—that keeps the profits from its fraudulent billing.

4. TeamHealth's rise to market dominance has been marred by controversy. Since the company's acquisition by private equity giant Blackstone in 2017, TeamHealth's aggressive pursuit of profit has drawn the ire of patients, insurers, and the government—in particular, its use of serial litigation against patients as leverage to obtain higher payments from insurers.

5. The United Plaintiffs have recently discovered that TeamHealth's tactics have crossed the line from aggressive profit maximization to fraud. TeamHealth has steadily defrauded the United Plaintiffs, their self-funded customers, and their members out of millions of dollars through systematic upcoding.

6. When an insurer or claims administrator (like the United Plaintiffs) pays a health benefits claim, it relies on the information reflected in the claim, and particularly the CPT code, to determine the service provided to its member. CPT codes are standardized numeric codes that denote the nature and degree of treatment rendered to a patient. They are among the most

important pieces of information included in a claim to an insurer or claims administrator, and a primary determinant of the amount the member's health plan will ultimately pay.

7. There are five primary CPT codes used to bill for emergency room visits, with gradations based on the urgency and complexity of care. The highest levels among these CPT codes are reserved for true medical emergencies that pose an exigent and significant threat to the life or physiological function of a patient. This treatment typically requires the physician's immediate, sustained, and undivided attention. Insurers or claims administrators, including the United Plaintiffs, typically pay claims utilizing these highest-level CPT codes at significantly higher rates than claims with CPT codes denoting less serious emergency room visits.

8. The United Plaintiffs have reviewed tens of thousands of commercial health benefits claims submitted by TeamHealth and have determined that well over half of the claims TeamHealth submitted to United using the two highest level CPT codes for ER visits—roughly 60%—should have utilized lower-level CPT codes. The upcoded claims falsely stated that TeamHealth's physicians had rendered extensive treatment under exigent circumstances, when in reality they had treated routine health problems, such as sore throats, ear infections, dizziness, and back pain. In other words, TeamHealth systematically misrepresented the services provided to the United Plaintiffs' members across many thousands of individual commercial health benefits claims in order to obtain higher payments from the United Plaintiffs.

9. As just one example, in January of 2021, a 23-year-old man suffering from indigestion after eating a chili dog sought treatment at an emergency room staffed by TeamHealth. The doctor gave him Maalox and sent him home. TeamHealth submitted a claim to the United Plaintiffs indicating that it had provided that member with emergency medical care of particularly high complexity under exigent circumstances, and charging *$1,712.00*.

10. It is clear that TeamHealth deliberately deceived the United Plaintiffs. The rate at which it utilized incorrect CPT codes, and the degree to which many of the claims at issue plainly did not warrant the CPT code assigned, foreclose the possibility that TeamHealth merely made tens of thousands of honest mistakes.

11. The delta between what the United Plaintiffs paid on these claims and what the United Plaintiffs should have paid is substantial. The United Plaintiffs estimate that, as a result of TeamHealth's deception, they have overpaid over one hundred million dollars on TeamHealth's claims.[1]

12. Notably, no emergency room physician ever saw a dime of this extra revenue. TeamHealth pays physicians a flat hourly rate, and retains all of the revenue above costs generated by TeamHealth-affiliated medical groups. TeamHealth's inequitable conduct served only to line the pockets of TeamHealth executives and their private equity backers.

13. The United Plaintiffs bring this action to put a stop to TeamHealth's inequitable conduct, and to recoup the amounts TeamHealth obtained through its scheme from the United Plaintiffs and the plan sponsors of the United Plaintiffs' ERISA plans.

## PARTIES

14. Plaintiff United HealthCare Services, Inc. is a corporation organized under the laws of the State of Minnesota, with its principal place of business in the State of Minnesota. United HealthCare Services, Inc. is a claim administrator for health plans offered by employers.

---

[1] From January 1, 2010 to January 1, 2020, United and TeamHealth had a contract that governed United's payments for services rendered by certain of TeamHealth's medical groups. This action excludes claims submitted by those medical groups to the extent those claims were governed by the contract between United and TeamHealth during the period the contract remained in force.

4

15. Plaintiff UnitedHealthcare Insurance Company is a corporation organized under the laws of the State of Connecticut, with its principal place of business in the State of Connecticut. UnitedHealthcare Insurance Company insures and administers health plans for employers.

16. Plaintiff UMR, Inc. is a corporation organized under the laws of the State of Delaware, with is principal place of business in the State of Wisconsin. UMR, Inc. is a third-party claims administrator that administers health insurance plans offered by employers.

17. Defendants are corporate entities that sit atop a network of subsidiaries and affiliates through which they provide emergency room staffing and billing services. Defendants refer to this network as the "TeamHealth System." All three defendants share the same principal place of business: 265 Brookview Centre Way, Ste. 400, Knoxville, Tennessee 37919.

18. Defendant Team Health Holdings, Inc. is a Delaware corporation headquartered in Knoxville, Tennessee. Team Health Holdings is a holding company that serves as the ultimate corporate parent of the TeamHealth System.

19. Defendant AmeriTeam Services, LLC is a Tennessee Limited Liability Company headquartered in Knoxville, Tennessee. The sole member of AmeriTeam Services, LLC is Team Finance LLC, and the sole member of Team Finance LLC is Team Health Holdings, Inc. AmeriTeam Services employs the officers and administrators of the TeamHealth System, sets the policies that govern the TeamHealth System, and otherwise directs and supports the operations of the TeamHealth System.

20. Defendant HCFS Health Care Financial Services, LLC is Florida Limited Liability Company headquartered in Knoxville, Tennessee. The sole member of HCFS Health Care Financial Services is Team Radiology, LLC, the sole member of Team Radiology, LLC is Team Finance LLC, and the sole member of Team Finance LLC is Team Health Holdings, Inc. HCFS

5

Health Care Financial Services provides billing, coding, and collection services for the TeamHealth medical groups at issue in this litigation.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the United Plaintiffs and TeamHealth, and the amount in controversy exceeds $75,000.

22. This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under federal law. Specifically, The United Plaintiffs assert a claim under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* The United Plaintiffs have standing to bring its ERISA claims in their capacity as claims administrators for their ERISA plans. The United Plaintiffs also assert claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, *et seq*. The Court further has subject matter jurisdiction over the United Plaintiffs' state and common law claims under 28 U.S.C. § 1367, as those claims are so related to the federal claim that they form part of the same case or controversy.

23. This Court has personal jurisdiction over the defendants because each maintains its principal place of business in Tennessee, and undertook or directed the tortious conduct at issue in this case from this jurisdiction.

24. Venue is proper in this district under 28 U.S.C. § 1391 as all defendants are residents of Tennessee, with their principal place of business in this district, and because a substantial part of the events giving rise to the claims in this action occurred in this district.

6

## BACKGROUND

### The United Plaintiffs Insure or Administer Health Plans

25. The United Plaintiffs provide health care insurance or claim administration services under a variety of plans and policies. This case concerns payments made from the United Plaintiffs' fully insured and self-funded plans.

26. The United Plaintiffs both fund and administer their fully insured plans. They pay claims submitted to these plans out of their own assets.

27. The United Plaintiffs' self-funded plans, or Administrative Services Only ("ASO") plans, are funded by contributions from their respective sponsor employers and member employees. The United Plaintiffs provide claim administration services for such plans pursuant to Administrative Services Agreements ("ASAs"), which identify the rights and obligations of the United Plaintiffs and the plan sponsors.

28. The ASAs for the ASO plans at issue in this litigation confer on the United Plaintiffs the fiduciary responsibility and discretion to administer claims under the plans. In performing their duties as claims administrator, the United Plaintiffs act as ERISA fiduciaries for these plans as that term is defined in ERISA section 3(21).

29. Among other things, the ASAs give the United Plaintiffs the exclusive discretion and authority to monitor and pursue overpayments of plans funds. The ASAs state that the customers delegate to the United Plaintiffs the authority (but not the obligation) to recover overpayments resulting from fraud, waste, or abuse through litigation on behalf of the ASO plans.

30. The United Plaintiffs' ASAs typically state:

> Customer delegates to United the discretion and authority to develop and use standards and procedures for any recovery opportunity, including but not limited to whether or not to seek recovery, what steps to take if United decides to seek recovery, whether to initiate litigation or arbitration, the scope of such litigation or

7

arbitration, which legal theories to pursue in such litigation or arbitration, and all decisions relating to such litigation or arbitration, including but not limited to, whether to compromise or settle any litigation or arbitration, and the circumstances under which a claim may be compromised or settled for less than the full amount of the potential recovery. In all instances where United pursues recovery through litigation or arbitration, Customer, on behalf of itself and on behalf of its Plan)s_, will be deemed to have granted United an assignment of all ownership, title, and legal rights and interests in and to any and all claims that are the subject matter of the litigation or arbitration.

31. The ERISA plans at issue in this litigation include this or substantially similar language. The United Plaintiffs will identify the specific members, claims, and plans at issue following the entry of a HIPAA-qualified protective order. Beyond the authority entrusted to the United Plaintiffs under their ASAs with plan sponsors, the United Plaintiffs have a concrete business interest in paying only valid claims under the ASO plans they administer. TeamHealth's unlawful conduct directed to United's ASO plans has further injured the United Plaintiffs by forcing them to expend significant time and resources investigating and redressing TeamHealth's unlawful practices and their resulting harm.

### The United Plaintiffs' Adjudication of Claims

32. The United Plaintiffs process (or "adjudicate") and pay approximately one million claims every day. Due to volume, it is impossible for the United Plaintiffs' employees to review each and every claim the United Plaintiffs receive.

33. Providers and billing companies typically do not submit medical records with insurance claims unless the United Plaintiffs request that they do so. Again, due to volume, it is impossible for the United Plaintiffs' employees to request and review medical records for all, or even most, of the claims the United Plaintiffs receive.

34. Accordingly, by necessity, and as is common industry practice, the process by which the United Plaintiffs adjudicate claims is largely automated. To facilitate that process, the United

8

Plaintiffs rely on providers to supply truthful and accurate information with insurance claims, and require providers to attest to the accuracy of the claims they submit.

35. Providers and billing companies (including TeamHealth) understand that the United Plaintiffs and other insurers and claims administrators adjudicate most claims automatically, and rely on providers to submit accurate claims.

36. As relevant here, TeamHealth submits claims using the standardized CMS-1500 claim form or its electronic equivalent. This form includes a certification that the information reflected in the claim is "true, accurate and complete."

37. Certain fields in claims forms are particularly important to the amount the United Plaintiffs pay on claims.

38. CPT codes are among the most important information included in a claim. CPT codes are standardized codes that denote the type and degree of care rendered to a patient. They are the principal way in which providers convey to insurers and claims administrators the services for which they seek payment.

39. The type and degree of care indicated by the CPT code(s) included in a claim is a primary determinant of what the United Plaintiffs will pay on the claim. The United Plaintiffs rely on providers to represent accurately the type and degree of care provided through CPT codes. When a provider supplies an inaccurate CPT code with a claim, it can cause the United Plaintiffs to pay more than is warranted by the care provided.

40. Providers and billing companies (such as TeamHealth) understand that the United Plaintiffs and other insurers and claims administrators rely on the accuracy of the information supplied with claims. They understand that misrepresentations—including the use of CPT codes

9

that do not accurately reflect the type and degree of care provided—can cause insurers and claims administrators to overpay.

**TeamHealth's Business Model and Aggressive Pursuit of Profit**

41. TeamHealth is one of the largest emergency room staffing, billing, and collections companies in the United States. It controls as much as 17% of the emergency medical services market and operates as many as 3,400 emergency medical facilities in 47 states, employing roughly 18,000 healthcare professionals. TeamHealth is owned by the private equity firm Blackstone, which acquired it in 2017 for $6.1 billion.

42. TeamHealth has achieved its tremendous size and market dominance by seeking out and acquiring control of medical groups comprising physicians, nurse practitioners and physicians' assistants—primarily medical groups that staff hospital emergency rooms.

43. TeamHealth and its affiliated medical groups contract with hospitals to staff their emergency rooms with doctors and other medical personnel. These doctors and medical personnel are independent contractors compensated by TeamHealth at fixed hourly rates.

44. TeamHealth carries out its operations through a web of subsidiaries, affiliates, and contractors dubbed the TeamHealth System.

45. In most cases, separate professional associations serve as the medical professionals' employers. These professional associations are typically owned by licensed physicians who also serve as executives at TeamHealth. As explained during the deposition of one such TeamHealth executive, "everything about [the executives'] right to own, operate, and manage" the

10

professional associations "is dependent on [the executive] staying in the good graces of the TeamHealth organization."[2]

46. As detailed in a class action complaint filed against TeamHealth by physicians, when TeamHealth contracts with a hospital, the hospital agrees that TeamHealth will be the exclusive provider of emergency room services at that location.[3] Any emergency room physicians, nurse practitioners, or physicians' assistants in the area who wish to work at that hospital must agree to work for TeamHealth.

47. For emergency rooms staffed by TeamHealth-affiliated medical groups, TeamHealth handles billing claims to insurers and claims administrators like the United Plaintiffs through separate, non-medical staff. HCFS Health Care Financial Services, LLC is the TeamHealth entity that performs billing and coding for the medical groups that are part of the TeamHealth enterprise. It codes and submits claims to insurers and claims administrators pursuant to policies set by Team Health Holdings, Inc. and AmeriTeam Services, LLC.

48. TeamHealth blocks attempts by insurers and claims administrators to contract directly with its affiliated medical-groups, and demands independence from the hospitals within which it operates in its dealings with insurers and claims administrators. It thus intentionally interposes itself between insurers, claims administrators and medical providers.

49. As a result, TeamHealth's affiliated medical groups have little or no say in, or insight into, how TeamHealth bills for their services. Indeed, a TeamHealth-affiliated physician

---

[2] Isaac Arnsdorf, ProPublica.com, *How Rich Investors, Not Doctors, Profit From Marking Up ER Bills* (June 12, 2020), https://tinyurl.com/3bjwhv4k.
[3] *JMF Medical, LLC et al v. Team Health, LLC et al.*, No. 3:19-cv-00837 (M.D. La.).

11

interviewed regarding TeamHealth's business practices expressed concern that he had "absolutely no idea to whom or how much is billed in [his] name."[4]

50. TeamHealth has gained notoriety in recent years for its aggressive pursuit of profit at the expense of patients and insurers alike. The drive for profit at any cost comes from those at the top of TeamHealth's hierarchy.

51. Private equity firms generally, and Blackstone specifically, apply significant pressure to the companies they acquire (such as TeamHealth) to maximize near-term profits. As explained by one expert, "[p]rivate equity-backed health care has been a disaster for patients and for doctors," as "[m]any decisions are made for what is going to maximize profits for the private equity company, rather than what is best for the patient, what is best for the community."[5]

52. TeamHealth's own compensation structure amplifies this incentive. Any profits TeamHealth reaps above its costs (which include the fixed-amounts paid to medical professionals) are not shared with the medical personnel who staff TeamHealth affiliated-medical groups or re-invested in hospitals. Instead, these amounts are retained by TeamHealth and its executives as a "management fee." As explained by the CFO of TeamHealth during a deposition, "[i]f the revenues" of a medical group "exceed the expenses, that is essentially the management fee" that TeamHealth retains.[6]

53. These incentives have led TeamHealth to engage in a range of inequitable and fraudulent practices in its dealings with patients, insurers, and claims administrators.

---

[4] Isaac Arnsdorf, ProPublica.com, *How Rich Investors . . ., supra.*
[5] Gretchen Morgenson and Emmanuelle Saliba, *Private equity firms now control many hospitals, ERs and nursing homes. Is it good for health care?*, NBC News (May 13, 2020), https://tinyurl.com/447ek9p9.
[6] Isaac Arnsdorf, ProPublica.com, *How Rich Investors . . ., supra.*

54. The specific fraudulent behavior at issue in this case is just one piece of this larger culture of profit maximization at any cost, which demonstrates the extreme lengths to which TeamHealth will go in order to pad its bottom line.

**TeamHealth's Systematic Upcoding of Claims to the United Plaintiffs**

55. This lawsuit principally concerns a form of insurance fraud called "upcoding."

56. Upcoding occurs when a provider submits a claim to an insurer or claims administrator utilizing an inaccurate billing code in order to obtain higher payment. The provider uses the billing code to deceive the insurer or claims administrator into overpaying by misrepresenting the type or degree of services rendered.

57. As explained below, TeamHealth faces multiple lawsuits alleging that it has upcoded claims for emergency room services. These include detailed allegations from a *qui tam* lawsuit that TeamHealth settled on the eve of trial, after the denial of its various pre-trial motions.

58. More recently, another insurer sued TeamHealth after (like the United Plaintiffs) it discovered that TeamHealth has systematically upcoded claims for emergency room services.

59. As relevant here, providers generally bill emergency room services to insurers using consecutively numbered CPT codes from 99281 to 99285. Higher numbers indicate more extensive and complex treatment billed at higher rates.

60. The United Plaintiffs generally pay claims utilizing CPT codes 99285 and 99284 at significantly higher rates than those utilizing CPT codes 99281 through 99283. The chart below reflects the United Plaintiffs' average payments for each of these CPT codes to TeamHealth during the relevant period:

| CPT Code | Average Payment |
|----------|-----------------|
| 99281 | $57.68 |
| 99282 | $115.93 |
| 99283 | $177.42 |
| 99284 | $309.42 |
| 99285 | $446.61 |

61. CPT codes 99285 and 99284 denote treatment of especially serious issues, typically requiring the physician's immediate, sustained, and undivided attention.

62. CPT Code 99285 is reserved for relatively rare cases in which the patient is at imminent risk of death or loss of physiological function. It is appropriate only when extreme circumstances require the most urgent and extensive treatment.

63. The American Medical Association provides the following definition of CPT Code 99285:

> Emergency department visit for the evaluation and management of a patient, which requires these 3 key components within the constraints imposed by the urgency of the patient's clinical condition and/or mental status: A comprehensive history; A comprehensive examination; and Medical decision making of high complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of high severity and pose an immediate significant threat to life or physiologic function.

64. CPT Code 99284 denotes emergency care for particularly severe and complex but non-life threating medical issues. It is appropriate only when the patient, even if not at immediate risk of death or loss of physiological function, requires urgent and extensive treatment.

65. The American Medical Association provides the following definition of CPT Code 99284:

> Emergency department visit for the evaluation and management of a patient, which requires these 3 key components: A detailed history; A detailed examination; and Medical decision making of moderate complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies

14

are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of high severity, and require urgent evaluation by the physician, or other qualified health care professionals but do not pose an immediate significant threat to life or physiologic function.

66. Numerous industry sources provide guidance as to clinical examples that would warrant billing using each of the five emergency room codes. The following chart outlines clinical examples or symptoms which are appropriate for each code:

| Level | Typical Presenting Problem | Clinical Examples |
|-------|----------------------------|-------------------|
| 99281 | The presented problem(s) are typically self-limited or minor conditions with no medications or home treatment required | Insect Bite (uncomplicated)<br>Routine wound check<br>Routine blood pressure check |
| 99282 | The presented problem(s) are of low or moderate severity<br><br>Treatment with over the counter medications or treatment, simple dressing changes, patient demonstrates understanding quickly and easily | Localized skin rash, lesion, sunburn<br>Minor viral infection<br>Eye discharge (painless)<br>Urinary tract infection (simple)<br>Ear pain (otitis media, sinusitis, vertigo, swimmer's ear, TMJ<br>Minor bruises, sprains |
| 99283 | The presented problem(s) are of moderate severity<br><br>Head injury instructions, crutch training, bending, lifting, weight-bearing limitations, prescription medication with review of side effects and potential adverse reactions | Headache (resolves after initial treatment)<br>Head injury (w/o neurological symptoms)<br>Cellulitis<br>Abdominal pain w/o advanced imaging<br>Minor trauma requiring imaging or medical procedures<br>Eye pain<br>Non-confirmed overdose<br>Mental health (anxiety, simple treatment)<br>Mild asthma<br>GI bleed, fissure, hemorrhoid<br>Chest Pain (GI or muscle related)<br>Localized infection requiring (IV) antibiotics & discharge (kidney infection) |
| 99284 | The presented problem(s) are of high severity and require urgent evaluation by the physician but do not pose an immediate significant threat to life or physiologic function<br><br>Head injury instructions, crutch training, bending, lifting, weight- | Headache (with advanced imaging, >1 treatment, admission)<br>Head injury with brief loss of conscience<br>Chest pain (stable & asymptomatic or quickly asymptomatic, requires testing, home or admit to observation)<br>Intermediate trauma with limited diagnostic testing |

15

| | bearing limitations, prescription medication with review of side effects and potential adverse reactions | Dehydration requiring treatment and admission<br>Dyspnea (requiring oxygen)<br>Abdominal pain with advanced imaging<br>Kidney stone with intervention |
|---|---|---|
| 99285 | The presented problem(s) are of high severity ad pose an immediate significant threat to life or physiologic function<br><br>multiple prescription medications and/or home therapies with review of side effects and potential adverse reactions; diabetic, seizure or asthma teaching in compromised or non-compliant patients | Chest pain (unstable, acute myocardial infection)<br>Acute GI bleed (excluding fissure & hemorrhoid)<br>Severe respiratory distress (requiring diagnostic testing, 3 or more treatments, admission)<br>Epistaxis requiring complex packing and/or admission)<br>Critical trauma<br>Suspected sepsis requiring IV or IM antibiotics<br>Uncontrolled diabetes<br>Severe burns (3rd or 4th degree)<br>Hypothermia<br>Acute peripheral vascular compromise of extremities<br>Toxic ingestions<br>Suicidal or homicidal<br>New onset of neurological symptoms |

67. In light of recent allegations that TeamHealth engaged in abusive billing practices, the United Plaintiffs began a pre-payment review of a subset of claims billed by TeamHealth. The United Plaintiffs focused their pre-pay review on claims billed for emergency room services utilizing the 99284-99285 CPT codes.

68. The United Plaintiffs determined that, in 2020, TeamHealth coded over half (**51%**) of its claims to the United Plaintiffs as 99285. This is far higher than the rate at which other providers utilize CPT code 99285, which (as discussed above) is reserved for particularly severe medical issues requiring exigent treatment.

69. The United Plaintiffs requested medical records from TeamHealth to evaluate the accuracy of its CPT coding. As relevant here, the United Plaintiffs ultimately received and

reviewed medical records for 26,000 claims TeamHealth submitted to the United Plaintiffs in 2020.

70. The United Plaintiffs found that well over half of all claims TeamHealth submitted utilizing CPT Codes 99285 and 99284—**62%**—were not supported by medical records. Those claims should have utilized lower CPT codes, which the United Plaintiffs would have paid at lower rates.

71. As a result of the extraordinarily high error rate uncovered with the 2020 pre-pay review, at the beginning of 2021, the United Plaintiffs expanded their pre-payment review to cover all claims for emergency room services billed by TeamHealth using the 99284 and 99285 CPT codes. The United Plaintiffs also performed some post-payment reviews of TeamHealth claims, as they occasionally do in the ordinary course of their business to ensure that claims are properly billed and reimbursed.

72. Combined, the United Plaintiffs haves reviewed over 47,000 claims billed by TeamHealth to its commercial insurance plans. The United Plaintiffs found that nearly **75%** of the claims reviewed that were billed using the 99285 CPT Code were not supported by medical records and were improperly upcoded. These claims should have utilized lower CPT codes, which the United Plaintiffs would have paid at lower rates.

**Examples of TeamHealth's Upcoding**

73. The following are examples of TeamHealth's upcoding uncovered by the United Plaintiff's investigation. In each case, TeamHealth submitted a claim to the United Plaintiffs utilizing CPT code 99285 under circumstances plainly not warranting its use.

74. Patient 1 was a 33-year-old woman who sought treatment at an emergency room staffed by TeamHealth in October of 2019. The medical group that saw the patient was a

17

TeamHealth affiliate located in Nevada. The patient presented to the emergency room reporting a bilateral earache, body aches, and sore throat, and also reported that her children were sick at home presenting with similar symptoms. A TeamHealth physician ordered testing, and the patient was ultimately diagnosed with strep pharyngitis, or strep throat, and was prescribed antibiotics on discharge. Despite the minor severity of the patient's clinical symptoms, TeamHealth submitted a claim for this treatment utilizing CPT code 99285, the highest-severity CPT code, seeking $1,421.00. The United Plaintiffs' claims review specialists determined that the circumstances and treatment did not warrant the use of CPT code 99285.

75. Patient 2 was a 37-year-old man who sought treatment at an emergency room staffed by TeamHealth in May of 2020. The medical group that saw the patient was a TeamHealth affiliate located in Nevada. The patient presented to the emergency room stating that he believed that his psoriatic arthritis had flared up and reporting back pain. A TeamHealth physician ordered some testing and confirmed that he was experiencing a psoriatic arthritis exacerbation / flare. The physician ultimately prescribed painkillers and prednisone. Despite the minor severity of the patient's clinical symptoms, TeamHealth submitted a claim for this treatment utilizing CPT code 99285, the highest-severity CPT code, seeking $950.00. The United Plaintiffs' claims review specialists determined that the circumstances and treatment did not warrant the use of CPT code 99285.

76. Patient 3 was a 50-year-old woman who sought treatment at an emergency room staffed by TeamHealth in May of 2019. The medical group that saw the patient was a TeamHealth affiliate located in Nevada. The patient presented to the emergency room reporting dizziness, nausea, vomiting, decreased hearing and a watery sensation to her left ear. A TeamHealth physician ordered some testing and monitoring and ultimately diagnosed the patient

with otitis media, or an ear infection. Despite the minor severity of the patient's clinical symptoms and diagnosis, TeamHealth submitted a claim utilizing CPT code 99285, the highest-severity CPT code, seeking $1,428.00. The United Plaintiffs' claims review specialists determined that the circumstances and treatment did not warrant the use of CPT code 99285.

77. Patient 4 was a 23-year-old woman who sought treatment at an emergency room staffed by TeamHealth in June of 2021. The medical group that saw the patient was a TeamHealth affiliate located in New York. The patient presented to the emergency room reporting ankle and foot pain after she landed on her feet after an approximately 8 foot fall. The patient reported that she did not hit her head or lose consciousness. The patient was x-rayed, and when that showed no significant abnormalities, the physician gave the patient ibuprofen, an Ace wrap, and crutches on discharge. Despite the minor severity of the patient's clinical symptoms and diagnosis, TeamHealth submitted a claim utilizing CPT code 99285, the highest-severity CPT code, seeking $1,171. The United Plaintiffs' claims review specialists determined that the circumstances and treatment did not warrant the use of CPT code 99285.

78. Patient 5 was a 62-year-old woman who sought treatment at an emergency room staffed by TeamHealth in March of 2021. The medical group that saw the patient was a TeamHealth affiliate located in New York. The patient presented to the emergency room reporting flank pain and that she felt as if she was getting a urinary tract infection. She first went to urgent care where she was diagnosed with a urinary tract infection and prescribed Bactrim. The patient was seen by a Physician's Assistant who confirmed a urinary tract infection and was discharged from the emergency room with directions to continue with the previously prescribed antibiotic and to take ibuprofen and Norco for breakthrough pain. Despite the minor severity of the patient's clinical symptoms and diagnosis, TeamHealth submitted a claim utilizing CPT code

99285, the highest-severity CPT code, seeking $1,171. Further TeamHealth billed as if a physician had performed the service when, in fact, it was a Physicians' Assistant. The United Plaintiffs' claims review specialists determined that the circumstances and treatment did not warrant the use of CPT code 99285.

79. Patient 6 was a 54 year-old woman who sought treatment at an emergency room staffed by TeamHealth in April of 2021. The medical group that saw the patient was a TeamHealth affiliate located in Nebraska. The patient presented with lower back pain with no corresponding injury and reported a history of back pain. The patient received a CT scan of her lumbar spine without contrast. The patient received a prescription for anxiety as well as pain medication and was discharged without further treatment. The patient was seen by a Physician's Assistant. Despite the minor severity of the patient's clinical symptoms and diagnosis, TeamHealth submitted a claim utilizing CPT code 99285, the highest-severity CPT code, seeking $1,071.00. Further, TeamHealth billed as if a physician had performed the service when, in fact, a Physician's Assistant had done so. The United Plaintiffs' claims review specialists determined that the circumstances and treatment did not warrant the use of CPT code 99285.

80. Patient 7 was a 63-year-old man who sought treatment at an emergency room staffed by TeamHealth in April of 2021. The medical group that saw the patient was a TeamHealth affiliate located in Arizona. The patient presented to the emergency room complaining of a right kidney stone and associated flank pain and intermittent chest tightness. The patient received laboratory testing as well as imaging. The patient was diagnosed with a kidney stone and was discharged with prescriptions for Flomax and Norco and with instructions to follow-up with his family medicine doctor and an urologist. Despite the relatively minor severity of the patient's clinical symptoms and diagnosis, TeamHealth submitted a claim utilizing CPT code 99285, the

20

highest-severity CPT code, seeking $1,411.00. The United Plaintiffs' claims review specialists determined that the circumstances and treatment did not warrant the use of CPT code 99285.

81. Patient 8 was a 44 year-old man brought for treatment to an emergency room staffed by TeamHealth in April of 2021. The medical group that saw the patient was a TeamHealth affiliate located in New York. The day before, the patient was arrested for a DWI and failed a jail screening exam. The purpose of the visit was a psychological evaluation. During triage, the patient reported that he did not feel like hurting himself or anyone else. A physician evaluated him and cleared him for discharge without further treatment. Despite the fact that the patient presented with minor clinical symptoms and diagnosis, TeamHealth submitted a claim utilizing CPT code 99285, the highest-severity CPT code, seeking $1,257.00. The United Plaintiffs' claims review specialists determined that the circumstances and treatment did not warrant the use of CPT code 99285.

82. Patient 9 was a 56-year-old woman brought for treatment to an emergency room staffed by TeamHealth in July of 2021. The medical group that saw the patient was a TeamHealth affiliate located in Texas. She presented with a low fever and headache. The physician ordered laboratory testing and a chest x-ray, both of which showed no abnormalities, and gave the patient Tylenol. The patient's headache resolved in the emergency room. After the physician diagnosed the patient with viral syndrome (*i.e.*, the symptoms of a viral infection), the patient was discharged with instructions to schedule an appointment with her family medicine doctor. Despite the fact that the patient presented with minor clinical symptoms and diagnosis, TeamHealth submitted a claim utilizing CPT code 99285, the highest-severity CPT code, seeking $1,566. The United Plaintiffs' claims review specialists determined that the circumstances and treatment did not warrant the use of CPT code 99285.

21

83. Patient 10 was a 64 year-old man who sought treatment at an emergency room staffed by TeamHealth in June of 2021. The medical group that saw the patient was a TeamHealth affiliate located in Florida. The patient presented to the emergency room complaining of left flank pain. The physician ordered laboratory testing and an abdominal CT scan, which confirmed that the patient had a kidney stone. The patient was discharged with prescriptions for pain and vomiting and was instructed to follow-up with an urologist. Despite the fact that the patient presented with minor clinical symptoms and diagnosis, TeamHealth submitted a claim utilizing CPT code 99285, the highest-severity CPT code, seeking $ 2,266.00. The United Plaintiffs' claims review specialists determined that the circumstances and treatment did not warrant the use of CPT code 99285.

84. Patient 11 was a 23-year-old man who sought treatment at an emergency room staffed by TeamHealth in January of 2021. The medical group that saw the patient was a TeamHealth affiliate located in Texas. The patient presented to the emergency room complaining of epigastric pain after eating a chili dog at 12 am. The patient was administered a GI cocktail which included Maalox to neutralize stomach acid and was discharged without further treatment. Despite the fact that the patient presented with minor clinical symptoms and diagnosis, TeamHealth submitted a claim utilizing CPT code 99285, the highest-severity CPT code, seeking $1,712.00. The United Plaintiffs' claims review specialists determined that the circumstances and treatment did not warrant the use of CPT code 99285.

85. Patient 12 was a 17-year-old woman who sought treatment at an emergency room staffed by TeamHealth in January of 2021. The medical group that saw the patient was a TeamHealth affiliate located in Texas. The patient presented with mild lower back pain and a missed period. The patient received laboratory testing which confirmed pregnancy and was

22

diagnosed with lumbar back pain associated with muscle strain. The patient was prescribed over the counter Tylenol and was directed to follow-up with an obstetrician. Despite the fact that the patient presented with minor clinical symptoms and diagnosis, TeamHealth submitted a claim utilizing CPT code 99285, the highest-severity CPT code, seeking $1,566.00. The United Plaintiffs' claims review specialists determined that the circumstances and treatment did not warrant the use of CPT code 99285.

86. Patient 13 was a 19-year-old man who sought treatment at an emergency room staffed by TeamHealth in April of 2021. The medical group that saw the patient was a TeamHealth affiliate located in Ohio. The patient presented to the emergency room with flank pain radiating to his lower abdomen. The patient received laboratory testing and an abdominal CT scan. The patient received pain medication and medication for nausea during his time in the emergency room. The patient was diagnosed with mild nephrocalcinosis (calcium deposits in the kidney) and was discharged without medication with instructions to schedule an appointment with a nephrologist. Despite the fact that the patient presented with minor clinical symptoms and diagnosis, TeamHealth submitted a claim utilizing CPT code 99285, the highest-severity CPT code, seeking $1,391.00. The United Plaintiffs' claims review specialists determined that the circumstances and treatment did not warrant the use of CPT code 99285.

87. The foregoing examples are representative of the United Plaintiffs' findings across the many thousands of claims it reviewed in the course of uncovering TeamHealth's systematic upcoding.

### TeamHealth's Upcoding was Deliberate and Fraudulent

88. TeamHealth deliberately upcoded claims utilizing CPT codes 99285 and 99284 as discussed above in order to deceive the United Plaintiffs into overpaying for emergency room

services and to reap windfall profits at the United Plaintiffs' and their customers' and members' expense.

89. TeamHealth employs a dedicated staff that prepares and submits insurance claims based on medical records received from physicians. Many of these individuals are not certified professional coders. Instead, TeamHealth itself trains these individuals in the use of CPT codes. These individuals are guided by and implement TeamHealth policies.

90. Medical coding can be complex. It requires training to identify the appropriate CPT codes to ensure appropriate and accurate billing. Certified professional coders undergo extensive training and certification in order to ensure that they make clinically justified coding decisions. That TeamHealth opts not to use certified professional coders demonstrates TeamHealth's focus on maximization of revenue rather than clinical discipline.

91. The rate at which TeamHealth submitted claims to the United Plaintiffs improperly utilizing CPT codes 99285 and 99284 was far too high to have been unintentional. It greatly exceeded the error rate the United Plaintiffs have observed among other providers of emergency services for such claims.

92. Similarly, the degree to which many of the claims at issue clearly warranted lower CPT codes forecloses the possibility that the upcoding occurred through mistake. No coding professional would have applied CPT codes 99285 and 99284 to these claims unless instructed to do so contrary to the proper use of those CPT codes.

93. The degree and consistency of TeamHealth's upcoding of claims utilizing CPT codes 99285 and 99284 demonstrates that TeamHealth has a uniform policy or practice of upcoding such claims.

94. Much of the direct evidence related to TeamHealth's upcoding remains solely in TeamHealth's possession. But evidence put forward in other litigation further demonstrates the existence of TeamHealth's uniform policy or practice of upcoding.

95. For example, documents unearthed by a whistleblower action against TeamHealth demonstrate that TeamHealth maintains and enforces policies designed to inflate its bills for emergency services in similar contexts.

96. These documents show that TeamHealth has imposed quotas with respect to claims utilizing CPT codes 99291 and 99292—codes that denote increments of time spent rendering "critical care" to "critically ill or critically injured" patients.[7]

97. TeamHealth's policies require physicians to certify that treatment rendered met the criteria for CPT Codes 99291 and 99292, which are only appropriate in extreme circumstances, with respect to at least 6% of patients. This is far higher than the percentage of claims that may properly utilize these codes.[8]

98. The whistleblower complaint explains further: "TeamHealth instructs its coders and billers (who follow those instructions) to code and submit claims to CMS for payment for critical care services based on medical records and documentation that TeamHealth knows do not establish that the services provided met CMS' criteria and payment conditions for 'critical care' services and, therefore, do not support claiming reimbursement for such services at CMS' elevated rate of reimbursement for true critical care services."[9]

---

[7] Third Am. Compl. (Dkt. 162) ¶¶ 129-134, *United States ex rel. Hernandez v. Team Health, Inc.*, No. 2:16-CV-00432-JRG, 2020 WL 731446 (E.D. Tex. Sept. 15, 2020).
[8] *Id.*
[9] *Id.* ¶ 150.

25

99. TeamHealth recently settled the whistleblower lawsuit described above on the eve of trial, having lost its bid for summary judgement and a variety of pretrial motions.

100. Moreover, the United Plaintiffs are not the only insurers and claims administrators to have observed TeamHealth's pattern of upcoding claims utilizing CPT Codes 99285 and 99284. Another insurer recently filed suit against TeamHealth after determining that TeamHealth had systematically upcoded 62% of such claims—a rate of upcoding strikingly similar to that discovered by the United Plaintiffs.[10]

101. That insurer similarly found many instances in which TeamHealth submitted claims utilizing CPT codes 99285 and 99284 when plainly not warranted. For example, it found that TeamHealth submitted claims utilizing CPT code 99285 when patients presented with routine medical problems such as a headache, a bug bite, and a fever, when those claims warranted (at most) CPT code 99283.[11]

### The United Plaintiffs were damaged by TeamHealth's Upcoding

102. As discussed above, the United Plaintiffs (like all health insurers and claims administrators) rely on providers to submit accurate information with insurance claims, and particularly accurate CPT Codes.

103. This is because the United Plaintiffs (like all health insurers and claims administrators) cannot review or investigate all of the claims they receive without the United States' healthcare system grinding to a halt.

104. Upcoding is a particularly insidious form of fraud that is difficult to uncover and resource-intensive to investigate. In this case, the number of separate affiliates through which

---

[10] *Celtic Insurance Co. v. Team Health Holdings, Inc., et al.*, Case No. 3:20-cv-00523 (E.D. Tenn. Dec. 10, 2020).
[11] *Id.* ¶ 64.

TeamHealth carried out its scheme, as well as TeamHealth's failure to disclose the identities of all of its affiliates, further obscured TeamHealth's systematic upcoding.

105. Moreover, with respect to each of the claims at issue in this litigation, TeamHealth falsely certified the information included in the claim was "true, accurate and complete."

106. The United Plaintiffs justifiably relied on the information TeamHealth presented in the claims it submitted to the United Plaintiffs utilizing CPT Codes 99285 and 99284, and its attestations as to the accuracy of that information.

107. Exhibit A sets out a representative sample of claims where TeamHealth upcoded the services actually performed or where TeamHealth represented that a physician performed the service when in fact the service was performed by a mid-level provider. The United Plaintiffs have anonymized these claims to preserve the medical privacy of the patients at issue but will provide that the patient information to TeamHealth upon entry of a HIPAA Qualified Protective Order.

108. Based on the United Plaintiffs' investigation, the United Plaintiffs have overpaid TeamHealth on approximately 60% of its claims billed utilizing CPT Codes 99285 and 99284 due to TeamHealth's deliberate and systematic upcoding. The information the United Plaintiffs require to determine conclusively which specific claims were upcoded remains exclusively in TeamHealth's possession.

109. Given the large volume of information, as well as its medically sensitive nature, the United Plaintiffs will produce information identifying the universe of claims at issue in this litigation following the entry of a HIPAA-qualified protective order.

110. The United Plaintiffs estimate, based on their investigation of the rate and degree of TeamHealth's upcoding, that they overpaid TeamHealth by over one hundred million dollars between 2016 and the present.

**TeamHealth's Billing at Inflated Rates**

111. TeamHealth has increased the United Plaintiffs' damages by submitting claims with extravagantly high billed charges. TeamHealth consistently bills insurers and patients at inflated rates, demanding far more than other providers.

112. According to the deposition testimony of TeamHealth's Senior Vice President of Revenue Management, Kent Bristow, TeamHealth sets rates for services without regard to the actual cost of providing them. This has resulted in TeamHealth charging rates as much as nine times the rates set by Medicare.[12]

113. TeamHealth's abusive billing practices affect both patients and insurers. Indeed, TeamHealth currently faces a class action lawsuit brought by patients related to its practice of billing patients wildly inflated prices.

114. The lawsuit explains that TeamHealth's billed charges are frequently three or four times higher than the median rates among providers of emergency services. It alleges that TeamHealth systematically demands payments from patients at inequitably high rates—rates at which TeamHealth knows it is not entitled to payment, as they have no basis in the value of the services rendered or prevailing market rates.[13]

---

[12] *Id.*
[13] *See* Complaint, *Fraser v. Team Health Holdings, Inc.*, 4:20-cv-04600 (N.D. Cal. July 10, 2020).

115. TeamHealth's artificially inflated pricing hurts consumers both directly where TeamHealth pursues payments directly from patients, and indirectly by driving up the cost of health care.

116. The allegations of the lawsuit related to TeamHealth's artificially inflated pricing are consistent with how TeamHealth priced the claims for reimbursement that it has submitted to the United Plaintiffs during the period at issue in this litigation.

**TeamHealth's Serial Litigation against Patients**

117. When insurers have declined to pay TeamHealth's inflated rates, it has historically pursued patients for the balance—particularly following its 2016 acquisition by Blackstone.

118. Among other things, TeamHealth concealed sources of debt relief from patients. Former TeamHealth employees confirmed in interviews that TeamHealth "had policies in place that made it difficult for patients to access charity care, a form of financial assistance for low-income patients," and instructed its employees "not to mention the term charity care when patients called with questions about their bills." According to those employees:

> A lot of times, a patient would call in and say, "Hey, can you give us a discount?" But we had to say, "No, I can't do that," because we weren't allowed to say, "Well, did you apply for charity care at the hospital?" . . . They didn't want us doing that.[14]

119. Rather than write off amounts owed by low-income patients like most providers, TeamHealth filed thousands of lawsuits. Indeed, TeamHealth filed 4,800 lawsuits in Tennessee between 2017 and 2019 alone. Many of the patients TeamHealth sued were poor individuals who simply could not pay TeamHealth's exorbitant prices.[15]

---

[14] Wendi Thomas, et al., NPR.org, *A Private Equity-Owned Doctors' Group Sued Poor Patients Until It Came Under Scrutiny* (Nov. 27, 2019), https://tinyurl.com/we42xwpr.
[15] *Id.*

120. But the object of TeamHealth's serial litigation was not to recover the debts of patients. Rather, TeamHealth used the above tactics to pressure insurers to enter into contracts with its affiliates at inflated rates. Indeed, TeamHealth frankly admitted that it pursued patients primarily as a "source of contract negotiating leverage" with insurers.[16]

121. During the course of contract negotiations with the United Plaintiffs in 2019, in a presentation that TeamHealth made to the United Plaintiffs, TeamHealth made clear that it was using litigation against patients as a tactic to extract higher reimbursement rates from insurers:



122. Public outcry following a series of news articles regarding TeamHealth's practices eventually forced TeamHealth to cease its serial litigation against patients in 2019.[17]

**TeamHealth Falsely Billed for Services Performed by Non-Physicians
as if Performed by Physicians**

---

[16] https://www.documentcloud.org/documents/6568825-TeamHealth-Letter.html
[17] Wendi Thomas, et al., NPR.org, *A Private Equity-Owned Doctors' Group . . .*, *supra*.

123. As discussed above, the United Plaintiffs have learned that, in some instances, TeamHealth has billed the United Plaintiffs for services performed by non-physician medical staff members as if performed by a physician.

124. Insurers, including the United Plaintiffs, typically reimburse for services performed by physician's assistants and nurse practitioners at lower rates than for services performed by doctors—usually about 85% of rates paid for doctors.

125. By submitting claims falsely representing services to have been performed by doctors, TeamHealth further deceived the United Plaintiffs into overpaying on claims.

126. United's observations are consistent with multiple lawsuits that have alleged TeamHealth has falsely submitted claims for services performed by physician's assistants and nurse practitioners as if performed by doctors.

127. A *qui tam* action (which recently settled on the eve of trial) alleged that TeamHealth submits every single claim as if an actual doctor performed the services, even when that is not the case.

128. Emails and policies referenced in the *qui tam* complaint show that TeamHealth requires physician's assistants and nurse practitioners to add physicians to patient charts, and physicians to sign those charts, even when the physician never saw the patient at issue. HCFS Health Care Financial Services then prepares insurance claims based on inadequate and falsified medical records, seeking higher payments than those to which TeamHealth is entitled.[18]

129. Indeed, Mr. Bristow recently testified at a trial in a case brought by TeamHealth-affiliated medical groups that physicians at TeamHealth-affiliated medical groups often do not

---

[18] *See, e.g.*, Third Am. Compl. (Dkt. 162) ¶¶ 6-9, *United States ex rel. Hernandez v. Team Health, Inc.*, No. 2:16-CV-00432-JRG, 2020 WL 731446 (E.D. Tex. Sept. 15, 2020).

see patients, leaving their treatment to non-physician medical personnel. This testimony calls into question why most, if not all, of the claims TeamHealth has submitted to the United Plaintiffs reflect that physicians performed the services rendered.

130. Another insurer, Celtic Insurance Company, recently brought suit against TeamHealth based (in part) on the same conduct. Celtic found that TeamHealth submitted virtually every claim to Celtic as if performed by a physician. But, as Celtic observed, this was statistically improbable in the extreme—analysis of claims submitted by other providers of emergency services to Medicare showed that "ER providers typically submit insurance claims under a doctor's name only about 82% of the time, and under a physician's assistant's name about 18% of the time."[19]

### TeamHealth's Pass-through Billing to Maximize Reimbursement Rates

131. TeamHealth has further resorted to a practice called pass-through billing in order to maximize its payments from insurers.

132. Pass-through billing occurs when one provider bills for medical services that were in reality rendered by another provider. Typically, the billing provider has a contract with an insurer while the rendering provider does not. Pass-through billing deceives the insurer into paying for services performed by the non-contracted provider at rates it has negotiated with the contracted provider when it might otherwise pay less or not at all.

133. Some of the individual medical groups affiliated with TeamHealth have or had contracts with insurers, often established long before the medical group became affiliated with TeamHealth.

---

[19] Compl. ¶ 81, *Celtic Insurance Co. v. Team Health Holdings, Inc., et al.*, Case No. 3:20-cv-00523 (E.D. Tenn. Dec. 10, 2020).

134. In such cases, TeamHealth will sometimes implement what it refers to as a "sub-TIN" arrangement.[20] As explained by Kent Bristow during his deposition testimony in another matter, when there is "a contract in place" with a health insurer, and TeamHealth wants to "access . . . that health plan contract with a group that is not contracted," it will begin submitting claims for services performed by the non-contracted medical group using the billing credentials of the contracted group. Often the link between the medical group and TeamHealth is not apparent, and so the insurer may not know that the contracted entity is affiliated with TeamHealth.

135. TeamHealth has used "sub-TIN" arrangements when insurers, like the United Plaintiffs, have refused to contract with TeamHealth directly. It has thus clandestinely obtained payments for non-contracted medical groups at rates it knows that insurers are unwilling to pay for services performed by those groups.

## TOLLING

136. To the extent any limitations periods may apply to the United Plaintiffs' claims, those limitations periods were tolled during the period before the United Plaintiffs uncovered TeamHealth's systematic upcoding. Until that point, the United Plaintiffs lacked knowledge of the fact that TeamHealth had deliberately and systematically deceived them into overpaying on claims for emergency room services. Additionally, TeamHealth intentionally hid from the United Plaintiffs the list of medical groups with which it was affiliated until the middle of 2019, making

---

[20] A "TIN" in this context means a tax identification number, which is one of the primary ways in which a provider identifies itself in submitting a claim to an insurer.

it difficult or impossible for the United Plaintiffs to connect the conduct of various medical groups with TeamHealth.

## <u>COUNT I</u>: FRAUD

137. The United Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein and further allege as follows.

138. TeamHealth deliberately and systematically misrepresented the nature of the services it rendered to the United Plaintiffs' insureds by submitting claims to the United Plaintiffs that (1) utilized CPT codes 99285 and 99284 when not justified and / or (2) falsely represented that a physician rather than a mid-level provider had rendered the services at issue.

139. TeamHealth further falsely certified that the information reflected in each claim it submitted to the United Plaintiffs was "true, accurate and complete."

140. TeamHealth made these misrepresentations pursuant to policies set by AmeriTeam Services, LLC and Team Health Holdings, Inc., and carried out by HCFS Health Care Financial Services.

141. The false information included in the claims at issue was material to the United Plaintiffs' decision as to the amount it would pay. CPT codes 99285 and 99284 denote services that the United Plaintiffs reimburse at higher rates than typical emergency room services. Likewise, physicians are entitled to higher reimbursement rates than mid-level providers. Had TeamHealth utilized accurate CPT codes, and accurately represented the qualifications of the individual performing the services, the United Plaintiffs would have paid less.

142. TeamHealth knew that the claims at issue in this litigation should not have utilized CPT codes 99285 and 99284, that services had been performed by mid-level practitioners rather than physicians, and that the certifications it made in connection with these claims were false. It

nonetheless employed CPT codes 99285 and 99284, misrepresented the medical personnel who performed services, and certified the accuracy of its claims in order to obtain higher payments from the United Plaintiffs than those to which it was entitled.

143. Alternatively, TeamHealth acted recklessly in including these misrepresentations in the claims at issue in this litigation, and in certifying their accuracy.

144. TeamHealth further knew and intended that the United Plaintiffs would rely on the information included in the claims at issue in this litigation when determining the amount they would pay on those claims.

145. The United Plaintiffs justifiably relied on the information TeamHealth included in the claims it submitted to the United Plaintiffs. The United Plaintiffs are not able to review all of the claims they receive individually, or to request and review medical records for all claims. Providers understand that insurers rely on the accuracy of claims and certify the accuracy of the claims they submit. And because TeamHealth engaged in a subtle form of fraud involving deliberate exaggeration rather than outright fabrication, its fraud was difficult to detect, investigate, and confirm.

146. The United Plaintiffs were damaged by TeamHealth's misrepresentations in that TeamHealth deceived the United Plaintiffs into overpaying on TeamHealth's claims. Had the United Plaintiffs understood that the claims did not merit CPT codes 99285 and 99284, or that mid-level providers had performed the services, they would have paid less.

147. The United Plaintiffs estimate that TeamHealth deceived them into overpaying by over one hundred million dollars on claims submitted by TeamHealth since 2016.

148. Exhibit A sets forth representative claims where TeamHealth upcoded the services actually performed or where TeamHealth represented that a physician performed the service

when in fact the service was performed by a mid-level provider. Further evidence necessary to determine the full universe of TeamHealth's fraudulent claims remains solely in TeamHealth's possession.

## COUNT II: NEGLIGENT MISREPRESENTATION

149. The United Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein and further alleges as follows.

150. TeamHealth deliberately and systematically misrepresented the nature of the services it rendered to the United Plaintiffs' insureds by submitting claims to the United Plaintiffs that (1) utilized CPT codes 99285 and 99284 when not justified and / or (2) falsely represented that a physician rather than a mid-level provider had rendered the services at issue.

151. TeamHealth further falsely certified that the information reflected in each claim it submitted to the United Plaintiffs was "true, accurate and complete."

152. TeamHealth made these misrepresentations pursuant to policies set by AmeriTeam Services, LLC and Team Health Holdings, Inc., and carried out by HCFS Health Care Financial Services.

153. TeamHealth acted in the course of its business in making these misrepresentations to the United Plaintiffs, and further made these misrepresentations to the United Plaintiffs in connection with transactions in which it had a pecuniary interest.

154. TeamHealth intended the false information it supplied with its claims to guide the United Plaintiffs in their payment of those claims.

155. The false information included in the claims at issue was material to the United Plaintiffs' decision as to the amount it would pay. CPT codes 99285 and 99284 denote services that the United Plaintiffs reimburse at higher rates than typical emergency room services.

36

Likewise, physicians are entitled to higher reimbursement rates than mid-level providers. Had TeamHealth utilized accurate CPT codes, and accurately represented the qualifications of the individual performing the services, the United Plaintiffs would have paid less.

156. TeamHealth failed to exercise reasonable care in utilizing CPT codes 99285 and 99284 on the claims at issue in this litigation, which did not merit their use, and in falsely indicating that services performed by mid-level practitioners had been performed by physicians.

157. The United Plaintiffs justifiably relied on the information TeamHealth included in the claims it submitted to the United Plaintiffs. The United Plaintiffs are not able to review all of the claims they receive individually, or to request and review medical records for all claims. Providers understand that insurers rely on the accuracy of claims and certify the accuracy of the claims they submit. And because TeamHealth engaged in a subtle form of fraud involving deliberate exaggeration rather than outright fabrication, its fraud was difficult to detect, investigate, and confirm.

158. The United Plaintiffs were damaged by TeamHealth's misrepresentations in that TeamHealth deceived the United Plaintiffs into overpaying on TeamHealth's claims. Had the United Plaintiffs understood that the claims did not merit CPT codes 99285 and 99284, or that mid-level providers had performed the services, they would have paid less.

159. The United Plaintiffs estimate that TeamHealth deceived them into overpaying by over one hundred million dollars on claims submitted by TeamHealth since 2016.

160. Exhibit A sets forth representative claims where TeamHealth intentionally or negligently upcoded the services actually performed or where TeamHealth represented that a physician performed the service when in fact the service was performed by a mid-level provider.

Further evidence necessary to determine the full universe of TeamHealth's fraudulent claims remains solely in TeamHealth's possession.

161. Further evidence necessary to determine the full universe of TeamHealth's fraudulent claims remains solely in TeamHealth's possession.

## <u>COUNT III</u>: FRAUDULENT INSURANCE ACT (TENN. CODE §§ 56-53-102, 56-53-107)

162. The United Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein and further alleges as follows.

163. Tenn. Code § 56-53-102(b) states that it "shall be unlawful for any person to commit, or to attempt to commit, or aid, assist, abet or solicit another to commit, or to conspire to commit a fraudulent insurance act."

164. Tenn. Code § 56-53-102(a) defines "fraudulent insurance act" to include "knowingly and with intent to defraud, and for the purpose of depriving another of property or for pecuniary gain," "[p]resent[ing], caus[ing] to be presented, or prepar[ing] with knowledge or belief that it will be presented . . . any information that contains false representations as to any material fact, or that withholds or conceals a material fact concerning" a "claim for payment or benefit pursuant to any insurance policy."

165. Tenn. Code § 56-53-107(b) provides a private right of action for "[a]ny person injured in the person's business or property" by a "fraudulent insurance act" as defined in Tenn. Code § 56-53-102. A prevailing plaintiff is entitled to "(A) Return of any profit, benefit, compensation or payment received by the person violating § 56-53-102 directly resulting from the violation; (B) Reasonable attorneys' fees, related legal expenses, including internal legal expenses and court costs; (C) All other economic damages directly resulting from the violation of § 56-53-102; (D) Reasonable investigative fees based on a reasonable estimate of the time

38

and expense incurred in the investigation of the violation or violations of § 56-53-102 proved at trial; and (E) A penalty of no less than one hundred dollars ($100) and no greater than ten thousand dollars ($10,000)."

166. Tenn. Code Ann. § 56-53-107(c) provides that if the plaintiff demonstrates the defendant's "fraudulent insurance act" was "part of a pattern or practice of such violations," the plaintiff "shall be entitled to recover threefold the injured person's economic damages."

167. TeamHealth committed a "fraudulent insurance act" within the meaning of Tenn. Code § 56-53-102 each time it deliberately submitted a claim to United (1) utilizing CPT codes 99285 and 99284 when not justified and / or (2) falsely representing services to have been performed by a physician rather than a mid-level practitioner. Each such claim constituted a "false representation[ ] as to [a] material fact" related to a "claim for payment or benefit pursuant to any insurance policy."

168. TeamHealth similarly committed a "fraudulent insurance act" within the meaning of Tenn. Code § 56-53-102 each time it falsely certified such a claim to be "true, accurate and complete."

169. As discussed above, TeamHealth submitted these false and misleading insurance claims "knowingly and with intent to defraud, and for the purpose of depriving [the United Plaintiffs] of property or for pecuniary gain."

170. The false information included in the claims at issue was material to the United Plaintiffs' decision as to the amount it would pay. CPT codes 99285 and 99284 denote services that the United Plaintiffs reimburse at higher rates than typical emergency room services. Likewise, physicians are entitled to higher reimbursement rates than mid-level providers. Had

TeamHealth utilized accurate CPT codes, and accurately represented the qualifications of the individual performing the services, the United Plaintiffs would have paid less.

171. The United Plaintiffs justifiably relied on the information TeamHealth included in the claims it submitted to the United Plaintiffs. The United Plaintiffs are not able to review all of the claims they receive individually, or to request and review medical records for all claims. Providers understand that insurers rely on the accuracy of claims and certify the accuracy of the claims they submit. And because TeamHealth engaged in a subtle form of fraud involving deliberate exaggeration rather than outright fabrication, its fraud was difficult to detect, investigate, and confirm.

172. The United Plaintiffs were damaged by TeamHealth's misrepresentations in that TeamHealth deceived the United Plaintiffs into overpaying on TeamHealth's claims. Had the United Plaintiffs understood that the claims did not merit CPT codes 99285 and 99284, or that mid-level providers had performed the services, they would have paid less.

173. TeamHealth's submission of claims fraudulently utilizing CPT codes 99285 and 99284, and misrepresenting that physicians rather than mid-level practitioners had provided services, was "part of a pattern or practice of such violations." TeamHealth systematically submitted false and misleading to the United Plaintiffs in the manner discussed above for at least five years. A recent lawsuit by another insurer shows that TeamHealth engaged in the same fraudulent behavior toward insurers besides the United Plaintiffs as well.

174. The United Plaintiffs estimate that TeamHealth deceived them into overpaying by over one hundred million dollars on claims submitted by TeamHealth since 2016.

175. Exhibit A sets forth representative claims where TeamHealth upcoded the services actually performed or where TeamHealth represented that a physician performed the service

when in fact the service was performed by a mid-level provider. Further evidence necessary to determine the full universe of TeamHealth's fraudulent claims remains solely in TeamHealth's possession.

**COUNT IV: UNLAWFUL INSURANCE ACT (TENN. CODE §§ 56-53-103, 56-53-107)**

176. The United Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein and further alleges as follows.

177. Tenn. Code § 56-53-103(b) states that it "shall be unlawful for any person to commit, or to attempt to commit, or aid, assist, abet or solicit another to commit, or to conspire to commit an unlawful insurance act."

178. Tenn. Code § 56-53-103(a) defines "unlawful insurance act" to include "[p]resent[ing], caus[ing] to be presented, or prepar[ing] with knowledge or belief that it will be presented . . . any information that the person knows to contain false representations, or representations the falsity of which the person has recklessly disregarded, as to any material fact, or . . . withhold[ing] or conceal[ing] a material fact, concerning" a "claim for payment or benefit pursuant to any insurance policy."

179. Tenn. Code § 56-53-107(a) provides a private right of action for "[a]ny person injured in the person's business or property" by an "unlawful insurance act" as defined in Tenn. Code § 56-53-103. A prevailing plaintiff is entitled to "(A) Return of any profit, benefit, compensation or payment received by the person violating § 56-53-103 directly resulting from the violation; and (B) Reasonable attorneys' fees, related legal expenses, including internal legal expenses and court costs."

180. TeamHealth committed an "unlawful insurance act" within the meaning of Tenn. Code § 56-53-103 each time it recklessly submitted a claim to United (1) utilizing CPT codes

41

99285 and 99284 when not justified and / or (2) falsely representing services to have been performed by a physician rather than a mid-level practitioner. Each such claim constituted a "false representation[ ] as to [a] material fact" related to a "claim for payment or benefit pursuant to any insurance policy."

181. TeamHealth similarly committed an "unlawful insurance act" within the meaning of Tenn. Code § 56-53-103 each time it falsely certified such a claim to be "true, accurate and complete."

182. As discussed above, TeamHealth submitted these false and misleading insurance claims "know[ing] [them] to contain false representations," or at the very least, "representations the falsity of which [TeamHealth] . . . recklessly disregarded."

183. The false information included in the claims at issue was material to the United Plaintiffs' decision as to the amount it would pay. CPT codes 99285 and 99284 denote services that the United Plaintiffs reimburse at higher rates than typical emergency room services. Likewise, physicians are entitled to higher reimbursement rates than mid-level providers. Had TeamHealth utilized accurate CPT codes, and accurately represented the qualifications of the individual performing the services, the United Plaintiffs would have paid less.

184. The United Plaintiffs justifiably relied on the information TeamHealth included in the claims it submitted to the United Plaintiffs. The United Plaintiffs are not able to review all of the claims they receive individually, or to request and review medical records for all claims. Providers understand that insurers rely on the accuracy of claims and certify the accuracy of the claims they submit. And because TeamHealth engaged in a subtle form of fraud involving deliberate exaggeration rather than outright fabrication, its fraud was difficult to detect, investigate, and confirm.

185. The United Plaintiffs were damaged by TeamHealth's misrepresentations in that TeamHealth deceived the United Plaintiffs into overpaying on TeamHealth's claims. Had the United Plaintiffs understood that the claims did not merit CPT codes 99285 and 99284, or that mid-level providers had performed the services, they would have paid less.

186. TeamHealth's submission of claims fraudulently utilizing CPT codes 99285 and 99284, and misrepresenting that physicians rather than mid-level practitioners had provided services, was "part of a pattern or practice of such violations." TeamHealth systematically submitted false and misleading to the United Plaintiffs in the manner discussed above for at least five years. A recent lawsuit by another insurer shows that TeamHealth engaged in the same fraudulent behavior toward insurers besides the United Plaintiffs as well.

187. The United Plaintiffs estimate that TeamHealth deceived them into overpaying by over one hundred million dollars on claims submitted by TeamHealth since 2016.

188. Exhibit A sets forth representative claims where TeamHealth upcoded the services actually performed or where TeamHealth represented that a physician performed the service when in fact the service was performed by a mid-level provider. Further evidence necessary to determine the full universe of TeamHealth's fraudulent claims remains solely in TeamHealth's possession.

## <u>COUNT V</u>: TENNESSEE CONSUMER PROTECTION ACT & OTHER STATE CONSUMER PROTECTION STATUTES

189. Tenn. Code § 47-18-104(a) declares that "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce constitute unlawful acts or practices."

190. Under Tenn. Code § 47-18-104(b), the enumerated "unfair or deceptive acts or practices" that are "unlawful and in violation of this part" include "[r]epresenting that . . .

43

services have . . . characteristics . . . or quantities that they do not have," and "[r]epresenting that . . . services are of a particular standard, quality or grade . . . if they are of another."

191. Tenn. Code § 47-18-109(a)(10) defines "[s]ervices" to include "any work, labor, or services including services furnished in connection with the sale or repair of goods or real property or improvements thereto."

192. Tenn. Code § 47-18-109 provides a private right of action for violations of the law, stating that "[a]ny person who suffers an ascertainable loss of money . . . as a result of the use or employment by another person of an unfair or deceptive act or practice . . . may bring an action individually to recover actual damages." Moreover, if a violation is "willful or knowing . . . the court may award three (3) times the actual damages sustained and may provide such other relief as it considers necessary and proper."

193. TeamHealth misrepresented the "characteristics," "qualities," and "standard" of its services within the meaning of Tenn. Code § 47-18-104(b) each time it submitted a claim to the United Plaintiffs (1) improperly utilizing CPT codes 99285 and 99284 and / or (2) falsely claiming that a physician rather than a mid-level practitioner had performed services. Each such claim conveyed that a physician had rendered exigent treatment of an especially serious condition for one of the United Plaintiffs' insureds, meriting payment at higher rates than typical emergency room services. In reality, TeamHealth had not performed such services, and the patient had not been seen by a physician.

194. The false information included in the claims at issue was material to the United Plaintiffs' decision as to the amount it would pay. CPT codes 99285 and 99284 denote services that the United Plaintiffs reimburse at higher rates than typical emergency room services. Likewise, physicians are entitled to higher reimbursement rates than mid-level providers. Had

44

TeamHealth utilized accurate CPT codes, and accurately represented the qualifications of the individual performing the services, the United Plaintiffs would have paid less.

195. The United Plaintiffs justifiably relied on the information TeamHealth included in the claims it submitted to the United Plaintiffs. The United Plaintiffs are not able to review all of the claims they receive individually, or to request and review medical records for all claims. Providers understand that insurers rely on the accuracy of claims and certify the accuracy of the claims they submit. And because TeamHealth engaged in a subtle form of fraud involving deliberate exaggeration rather than outright fabrication, its fraud was difficult to detect, investigate, and confirm.

196. The United Plaintiffs suffered "an ascertainable loss of money" due to TeamHealth's false and misleading claims in that TeamHealth deceived the United Plaintiffs into overpaying on those claims. Had the United Plaintiffs understood that the claims did not merit CPT codes 99285 and 99284, and that the member had seen a mid-level practitioner rather than a physician, they would have paid less.

197. The United Plaintiffs estimate that TeamHealth deceived them into overpaying by over one hundred million dollars on claims submitted by TeamHealth since 2016.

198. Exhibit A sets forth representative claims where TeamHealth upcoded the services actually performed or where TeamHealth represented that a physician performed the service when in fact the service was performed by a mid-level provider. Further evidence necessary to determine the full universe of TeamHealth's fraudulent claims remains solely in TeamHealth's possession.

199. The foregoing conduct further violated the similar consumer protection laws of the following states:

a. Cal. Bus. & Prof. Code § 17200, *et seq.* (California);

b. Colo. Rev. Stat. § 6-1-101, *et seq.* (Colorado);

c. Fla. Stat. § 501.201, *et seq.* (Florida);

d. 815 Ill. Comp. Stat. 505/1, *et seq.* (Illinois);

e. Mich. Comp. Laws § 445.901, *et seq.* (Michigan);

f. Minn. Stat. § 325F.68, *et seq.* (Minnesota);

g. Neb. Rev. Stat. § 59-1601, *et seq.* (Nebraska);

h. Nev. Rev. Stat. § 41.600, *et seq.* (Nevada);

i. N.H. Rev. Stat. Ann. § 358-A:1, *et seq.* (New Hampshire);

j. N.Y. Gen Bus. Law § 349, *et seq.* (New York); and

k. N.C. Gen. Stat. § 75-1.1, *et seq.* (North Carolina).

200. The United Plaintiffs overpaid claims TeamHealth submitted for services performed in each of the foregoing jurisdictions.

201. TeamHealth's false insurance claims hurt not only the United Plaintiffs, but also the United Plaintiffs' individual members and healthcare consumers generally. The United Plaintiffs, like all insurers, generally require their members to bear some portion of the cost of their care—a feature of the United Plaintiffs' plans called "cost-sharing obligations." For each claim that TeamHealth upcoded on which the United Plaintiffs' member owed cost-sharing obligations, that member bore higher costs as a result of TeamHealth's fraud. And when that member was unable to pay, TeamHealth frequently filed suit.

## COUNT VI: DECLARATORY AND INJUNCTIVE RELIEF
## UNDER ERISA § 502(a)(3) and 28 U.S.C. §§ 2201 and 2202

202. The United Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein and further alleges as follows.

46

203. The United Plaintiffs act as claims administrators and have been delegated the authority to pursue recovery of payments made by the United Plaintiffs on behalf of certain self-funded plans covered by ERISA. the United Plaintiffs have standing to sue under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), for declaratory and injunctive relief to enjoin any acts or practices that violate the provisions of the plans and to obtain other appropriate relief to redress violations of and enforce plan terms.

204. Each of the ERISA plans administered by the United Plaintiffs at issue in this litigation only permit reimbursement of services that were actually provided to the member.

205. TeamHealth has engaged in a scheme to defraud the United Plaintiffs into paying sums in excess of what was owed (for services not actually rendered) under the relevant ERISA plans by systematically and fraudulently upcoding claims, and by falsely representing that a physician rather than a mid-level practitioner had treated the member, as discussed above.

206. TeamHealth's practice is deceptive, unfair, and unlawful.

207. Any claims that have been denied, are pending, or may be submitted in the future that TeamHealth has falsified in the foregoing manner are not payable and void.

208. There is a *bona fide*, present need for a declaration as to the unlawfulness of TeamHealth's conduct. The United Plaintiffs are entitled to a judgment declaring that TeamHealth's practices are illegal, and that any claims for payments of benefits submitted as a result of TeamHealth's scheme are not payable and void.

209. The United Plaintiffs seek an order: (1) declaring that claims TeamHealth has submitted that remain pending or that may be submitted in the future are not payable and void to the extent TeamHealth inappropriately utilized CPT codes 99285 and 99284, or falsely claimed

47

that a physician performed services rendered by a mid-level practitioner; and (2) enjoining TeamHealth from submitting further such claims to its ERISA plans.

210. The United Plaintiffs also seek recovery of their reasonable attorney fees and costs, under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

## COUNT VII: VIOLATION OF CIVIL RICO, 18 U.S.C. § 1962(c)

211. The United Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein and further alleges as follows.

212. Team Health Holdings, Inc., AmeriTeam Services, LLC, and HCFS Health Care Financial Services, LLC and the nominally independent medical groups with whom they affiliate are "persons" within the meaning of 18 U.S.C. § 1961(3) that conducted the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

213. Team Health Holdings, AmeriTeam Services, and HCFS Health Care Financial Services entered into separate association-in-fact enterprise (the "Enterprises") within the meaning of 18 U.S.C. § 1961(4) with each other, and with each of the nominally independent medical groups that they affiliate with throughout the United States. The Enterprise was an ongoing organization that functioned as a continuing unit. The Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity, and the Enterprise had the common purpose of doing the same. Team Health Holdings, AmeriTeam Services, HCFS Health Care Financial Services and the medical groups are each "persons" distinct from the Enterprise.

214. TeamHealth established the Enterprise in order to reap windfall profits from the United Plaintiffs and other insurers through a pattern of fraudulent upcoding. The Enterprise worked to deceive insurers like the United Plaintiffs into overpaying for emergency room services by means of fraud perpetrated over the wires or by mail.

215. Each participant in the Enterprise played a distinct and indispensable role, and the participants joined as a group to execute the scheme and further the Enterprise's goals. Team Health Holdings and AmeriTeam Services set policies requiring or encouraging the falsification of insurance claims as explained above. HCFS Health Care Financial Services carried out those policies by systematically submitting false and misleading claims to the United Plaintiffs for emergency room services. The various medical groups affiliated with TeamHealth supplied medical services to provide the basis for upcoded claims, and, on information and belief, at times provided false or misleading documentation to support those claims.

216. The Enterprise could not have succeeded, and its members could not have enjoyed the substantial financial benefits described above, absent their coordinated efforts. The members of the Enterprise functioned as a unit in pursuit of their common purpose.

217. The relationships between the members of the Enterprise extended beyond the unlawful predicate acts at issue in this case. In particular, some portion of the insurance claims generated by the Enterprise and submitted to the United Plaintiffs were not upcoded. The illegal scheme at issue in this litigation was and is distinct from any legitimate business activities undertaken by the members of the Enterprise.

218. Each participant in the Enterprise, and in particular Team Health Holdings, AmeriTeam Services, and HCFS Health Care Financial Services, knew their scheme violated federal and state laws, and acted with the specific intent to defraud the United Plaintiffs and other insurers.

219. The Enterprise engaged in and affected interstate commerce because, among other things, it operated emergency rooms nationwide in to support its scheme, accounting for 17% of the emergency services market in the United States.

220. Team Health Holdings, AmeriTeam Services, and HCFS Health Care Financial Services and the medical groups conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), and 1952 (use of interstate facilities to conduct unlawful activity).

221. Predicate acts of racketeering that Team Health Holdings, AmeriTeam Services, and HCFS Health Care Financial Services engaged in include, but are not limited to:

    a.   The use of wires and mails to submit fraudulent claims to the United Plaintiffs and other insurers;

    b.   The use of wires and mails to coordinate the unlawful activities of the Enterprise, including the dissemination of relevant policies and the transmission of medical records from medical groups to coding staff;

    c.   The use of the wires and mails to obtain payments from the United Plaintiffs, and to distribute the proceeds of the scheme amongst its members.

222. Exhibit A, attached hereto, includes specific and representative examples of the fraudulent insurance claims the Enterprise submitted to the United Plaintiffs using the wires and mails.

223. The above-described acts reveal a sustained pattern of racketeering activity, in addition to the threat of continued racketeering activity.

    a.   As discussed above, the racketeering activity commenced in 2016 (at the latest) and continued for years thereafter to the present. During

50

this period, the Enterprise operated continuously, submitting upcoded claims to the United Plaintiffs and other insurers on a daily basis.

b. The pattern and policy of submitting fraudulent claims for emergency services has become the regular manner in which Team Health Holdings, AmeriTeam Services, HCFS Health Care Financial Services, and their affiliated medical groups conduct their business.

224. The purpose and effect of the Enterprise's racketeering activity was to defraud the United Plaintiffs and other insurers out of substantial sums of money by deceiving them into significantly overpaying on claims. The Enterprise caused this result by systematically submitting upcoded claims for emergency room services that deliberately misrepresented the nature and degree of services rendered, as well as claims falsely representing that a physician had performed services that had been performed by a mid-level practitioner.

225. The United Plaintiffs suffered injuries when they overpaid on fraudulent claims for emergency room services, losing many millions of dollars as a result of the Enterprise's racketeering activity.

226. The United Plaintiffs' injuries were directly and proximately caused by the racketeering activities as described above.

227. By virtue of these violations of 18 U.S.C. § 1962(c), Team Health Holdings, AmeriTeam Services, and HCFS Health Care Financial Services are jointly and severally liable to the United Plaintiffs for three times the damages the United Plaintiffs have sustained in an amount to be determined at trial, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT VIII: CONSPIRACY TO VIOLATE CIVIL RICO, 18 U.S.C. § 1962(d)

228. The United Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein and further alleges as follows.

229. 18 U.S.C. § 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

230. Team Health Holdings, AmeriTeam Services, and HCFS Health Care Financial Services have violated 18 U.S.C. § 1962(d) by conspiring with each other and with TeamHealth-affiliated medical groups to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise described herein through a pattern of racketeering activity.

231. Team Health Holdings, AmeriTeam Services, HCFS Health Care Financial Services, and their affiliated medical groups have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy.

232. The nature of the above acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but also that they were aware that their ongoing acts have been and are part of an overall pattern of racketeering activity.

233. As a direct and proximate result of Team Health Holdings, AmeriTeam Services, and HCFS Health Care Financial Services' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), the United Plaintiffs have been injured in its business and property as set forth more fully above.

234. The purpose and effect of the conspiracy was to deceive the United Plaintiffs and other insurers into overpaying for emergency room services through the systematic submission of fraudulent claims.

235. The United Plaintiffs suffered injuries when they overpaid on these upcoded claims for emergency room services.

236. By virtue of these violations of 18 U.S.C. § 1962(d), Team Health Holdings, AmeriTeam Services, and HCFS Health Care Financial Services are jointly and severally liable to the United Plaintiffs for three times the damages the United Plaintiffs have sustained in an amount to be determined at trial, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT IX: UNJUST ENRICHMENT

237. The United Plaintiffs incorporate the foregoing paragraphs as if fully set forth herein and further allege as follows.

238. The United Plaintiffs conferred a benefit on TeamHealth in the form of payments for emergency room services.

239. TeamHealth appreciated and retained the payments rendered by the United Plaintiffs for emergency room services billed to the United Plaintiffs.

240. TeamHealth received those payments under circumstances in which it would be unjust to permit TeamHealth to retain the full amounts paid. The claims at issue were improperly coded as 99285 and 99284, or falsely represented that a physician had treated the member at issue, resulting in the United Plaintiffs making higher payments than warranted. As discussed above, TeamHealth acted inequitably in submitting these claims.

## PRAYER FOR RELIEF

WHEREFORE, the United Plaintiffs respectfully request an award in their favor and granting the following relief:

a.      An award of compensatory damages as requested herein;

b.      Equitable relief as requested herein;

c.      Declaratory relief as requested herein;

d.      Injunctive relief as requested herein;

e.      Treble damages as permitted under RICO and any other applicable state statutes;

f.      Costs of court;

g.      Reasonable attorney fees;

h.      Prejudgment and post-judgment interest; and

i.      An award of any other relief in law or equity that the Court deems just and proper.

Date:  October 27, 2021                     Respectfully submitted,


**PAINE, TARWATER & BICKERS, LLP**


*/s/ Dwight E. Tarwater*

Dwight E. Tarwater (BPR #007244)
det@painetarwater.com
Michael J. King (BPR #015523)
mjk@painebickers.com
Kendell G. Vonckx (BPR #035139)
kgv@painetarwater.com
900 South Gay Street, Suite 2200
Knoxville, TN  37902-1821
Telephone:  865-525-0880
Facsimile:   865-521-7441

and

Jeffrey S. Gleason (*pro hac vice* to be filed)
jgleason@robinskaplan.com
Jamie R. Kurtz (*pro hac vice* to be filed)
jkurtz@robinskaplan.com
Charley C. Gokey (*pro hac vice* to be filed)
cgokey@robinskaplan.com
Robins Kaplan LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402–2015
T: (612) 349–8500

and

Paul D. Weller (*pro hac vice* to be filed)
pweller@robinskaplan.com
Gregory S. Voshell (*pro hac vice* to be filed)
gvoshell@robinskaplan.com
900 Third Avenue
Suite 11900
New York, New York 10022
T: (212) 980-7400

*Counsel for the United Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2021, a copy of the foregoing ***Complaint*** was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

*/s/ Dwight E. Tarwater*
Dwight E. Tarwater (BPR #007244)