# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

UNITEDHEALTHCARE INSURANCE
COMPANY AND UNITED HEALTHCARE
SERVICES, INC.,

                Plaintiffs,

  vs.

TEAM HEALTH HOLDINGS, INC.,
AMERITEAM SERVICES, LLC, and HCFS
HEALTH CARE FINANCIAL SERVICES,
LLC,

                Defendants.

Case No. 3:21-cv-00364

---

## PLAINTIFFS' RESPONSE IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

PAINE, TARWATER & BICKERS, LLP
900 South Gay Street, Suite 2200
Knoxville, TN 37902-1821

ROBINS KAPLAN LLP
800 LaSalle Avenue
Minneapolis, MN 55402

ROBINS KAPLAN LLP
900 Third Avenue, Suite 1900
New York, NY 10022

DATED: February 9, 2022

# INTRODUCTION

In January of 2021, a 23-year-old man walked into an emergency room run by Defendants (collectively, "TeamHealth") complaining of heartburn after eating a chilidog, and a physician gave him Maalox before sending him home. Compl. ¶ 84. In March of 2021, a 62-year-old woman presented at a TeamHealth emergency room complaining of discomfort she believed to be a urinary tract infection, for which she was already taking medication, which *non*-physician medical staff confirmed before sending her home without treatment. *Id.* ¶ 78. And in June of 2021, a 23-year-old woman sought treatment at a TeamHealth emergency room for ankle pain after landing on her feet from a short drop, which a physician treated with ibuprofen before sending the patient home with crutches. *Id.* ¶ 77.

In each of these instances, TeamHealth submitted an insurance claim to Plaintiffs (collectively, "United") falsely representing that a physician had rendered life-saving treatment to the patient under exigent circumstances. *Id.* ¶¶ 77-78, 84; *see also id.* ¶¶ 74-77, 79-83, 85-86. This is billing fraud, and these examples are the tip of the iceberg. United reviewed more than 47,000 claims TeamHealth submitted since 2016 for exigent medical services and found that the majority of claims coded at the highest levels included falsehoods just like those described above. *See id.* ¶¶ 67-72. Given the rate and degree of error, this upcoding is plainly systematic and deliberate. *See id.* ¶¶ 88-101. This fraud caused United to overpay TeamHealth by more than $100 million since 2016. *See id.* ¶¶ 102-110.

United's findings are not unique. Despite TeamHealth's contention that this case concerns only benign "technical differences over coding and payment for emergency medical services," shortly before United filed suit, TeamHealth agreed to pay the United States government $42.5 million to resolve similar allegations of upcoding. *See* Declaration of Jamie R. Kurtz ("Kurtz

Decl.") Ex. A.[1] Another insurer filed suit against TeamHealth in December of 2020, setting out findings remarkably similar to United's—for example, that TeamHealth had billed for exigent, life-saving care when in reality it had treated a small bug bite, a headache, and similarly minor medical issues.[2] As much as TeamHealth would like the Court to believe this case concerns mere differences of opinion on "technical" issues, it concerns fraud, plain and simple. TeamHealth now seeks to escape much of this suit prior to discovery.[3] Its arguments lack merit:

*First*, TeamHealth contends that "part" of United's damages claim should be dismissed because United was on "inquiry notice" of TeamHealth's fraud. This argument fails both because Rule 12(b)(6) does not contemplate "partial" dismissal of claims, and because TeamHealth makes no real effort to carry its heavy burden of showing United was on "inquiry notice" at this threshold stage of the case. TeamHealth engaged in rampant billing fraud, and it did what it could to keep that fraud a secret. There is no legal or factual basis to dismiss "part" of United's damages claim.

*Second*, TeamHealth argues that United has not pled its claims with particularity as required under Rule 9(b), but cannot credibly feign ignorance as to the who, what, when, where, and how of United's claims. United alleges—throughout its 240-paragraph complaint—the precise type of fraudulent conduct at issue, the manner in which TeamHealth committed the fraud, the time period at issue, the role of each TeamHealth defendant in the fraud, representative

---

[1] The Court may take judicial notice of public records in evaluating a Rule 12(b)(6) motion. *See United States ex rel. Fry v. Guidant Corp.*, No. 3:03-0842, 2006 U.S. Dist. LEXIS 65702, at *28 (M.D. Tenn. Sep. 13, 2006).

[2] *See* Compl. ¶ 64, *Celtic Ins. Co. v. Team Health Holdings, Inc., et al.*, Case No. 3:20-cv-00523 (E.D. Tenn. Dec. 10, 2020). The Centene matter settled shortly after it was filed.

[3] TeamHealth does not move to dismiss United's unjust enrichment claim.

3

examples of the fraud, the harm caused to United, and the steps taken by Team Health to keep the scheme under wraps. These allegations easily clear the Rule 9(b) hurdle.

*Third*, TeamHealth argues that United's Racketeer Influenced and Corrupt Organizations Act ("RICO") claims are "reverse preempted" under the McCarren-Ferguson Act and inadequately pled. Under both Supreme Court and Sixth Circuit precedent, TeamHealth is wrong. Indeed, TeamHealth omits even the proper standard and governing test from its moving papers. TeamHealth's remaining challenges to United's RICO claim ignore United's allegations and resort to irrelevant factual disagreements with United's upcoding allegations.

*Finally*, United seeks equitable relief under the Employee Retirement Income Security Act ("ERISA") Section 502(a)(3), precluding TeamHealth from continuing to bill in a fraudulent manner. TeamHealth claims that United has not identified any violation of a plan document, but United specifically alleges that each plan at issue only permits reimbursement for services provided to members, and TeamHealth's billing practices violate that explicit term.

## BACKGROUND

### A. United and Its Adjudication of Claims.

United "provide[s] health care insurance or claim administration services under a variety of plans and policies." Compl. ¶ 25. United "process[es] (or 'adjudicate[s]') and pay[s] approximately one million claims every day." *Id.* ¶ 32. "Due to volume, it is impossible for [United's] employees to review each and every claim [United] receive[s]." *Id.* Similarly, providers typically do not submit medical records with claims, as it is impractical for insurers (including United) to systematically review those records prior to paying claims. *Id.* ¶ 33. Accordingly, as is standard industry practice, United largely automates its payment of claims, and relies on providers to be honest and submit accurate information. *See id.* ¶¶ 34-35. As

4

relevant here, providers like TeamHealth utilize a standard CMS-1500 claim form, which requires the provider to certify that the claim is "true, accurate and complete." *Id.* ¶ 36.

"Certain fields in claims forms are particularly important to the amount [United] pay[s] on claims." *Id.* ¶ 37. In particular, United relies heavily on the claim's CPT Code—"standardized codes that denote the type and degree of care rendered to a patient" that "are the principal way in which providers convey to insurers and claims administrators the services for which they seek payment." *Id.* ¶ 38. "Providers and billing companies (such as TeamHealth) understand that [United] and other insurers and claims administrators rely on the accuracy of the information supplied with claims," and in particular the CPT Code, in paying claims. *Id.* ¶ 40.

Claims also indicate *who* provided the services at issue. *See id.* ¶¶ 123-126. This is important in part because "[i]nsurers, including [United], typically reimburse for services performed by physician's assistants and nurse practitioners at lower rates than for services performed by doctors—usually about 85% of rates paid for doctors." *Id.* ¶ 124.

**B. CPT Codes Utilized for Emergency Room Services.**

"[P]roviders generally bill emergency room services to insurers using consecutively numbered CPT codes from 99281 to 99285." *Id.* ¶ 59. "Higher numbers indicate more extensive and complex treatment billed at higher rates." *Id.* United "generally pay[s] claims utilizing CPT codes 99285 and 99284 at significantly higher rates than those utilizing CPT codes 99281 through 99283." *Id.* ¶ 60. The chart below reflects United's average payment for each CPT Code from 99281 to 99285 to TeamHealth during the period at issue:

| CPT Code | Average Payment |
|----------|-----------------|
| 99281 | $57.68 |
| 99282 | $115.93 |
| 99283 | $177.42 |
| 99284 | $309.42 |
| 99285 | $446.61 |

5

*Id.*

"CPT Code 99285 is reserved for relatively rare cases in which the patient is at imminent risk of death or loss of physiological function." *Id.* ¶ 60. "It is appropriate only when extreme circumstances require the most urgent and extensive treatment." *Id*. Similarly, "CPT Code 99284 denotes emergency care for particularly severe and complex but non-life threating medical issues." *Id.* ¶ 64. "It is appropriate only when the patient, even if not at immediate risk of death or loss of physiological function, requires urgent and extensive treatment." *Id*. There is extensive industry-standard guidance concerning the application of these CPT Codes. *See id.* ¶¶ 63-66.

**C. TeamHealth and its Aggressive Pursuit of Profit.**

"TeamHealth is one of the largest emergency room staffing, billing, and collections companies in the United States," which "controls as much as 17% of the emergency medical services market and operates as many as 3,400 emergency medical facilities in 47 states, employing roughly 18,000 healthcare professionals." *Id.* ¶ 41. It operates by "seeking out and acquiring control of medical groups comprising physicians, nurse practitioners and physicians' assistants—primarily medical groups that staff hospital emergency rooms." *Id.* ¶ 42. "HCFS Health Care Financial Services, LLC is the TeamHealth entity that performs billing and coding for" TeamHealth's various medical groups nationwide. *Id.* ¶ 47. "It codes and submits claims to insurers and claims administrators pursuant to policies set by Team Health Holdings, Inc. and AmeriTeam Services, LLC." *Id.*

"TeamHealth's rise to market dominance has been marred by controversy." *Id.* ¶ 47. TeamHealth demands far higher rates than other providers of emergency room services, and has resorted to suing indigent patients when insurers have refused to pay its high rates in full. *See id.* ¶¶ 111-122. Despite TeamHealth's attempts to portray its aggressive pursuit of profit as intended

6

for the benefit of physicians, TeamHealth's medical staff are compensated at flat hourly rates and "[a]ny profits TeamHealth reaps above its costs . . . are retained by TeamHealth and its executives as a 'management fee'" rather than shared. *Id.* ¶ 52. Beyond this, TeamHealth has "cut doctors' pay [while] continuing to spend millions on political ads" during the pandemic. Isaac Arnsdorf, *ProPublica, Medical Staffing Companies Cut Doctors' Pay While Spending Millions on Political Ads* (Apr. 20, 2020), https://tinyurl.com/bdfunes7.

### D. TeamHealth's Systematic and Deliberate Upcoding.

"[United] began a pre-payment review of a subset of claims billed by TeamHealth" starting in 2020 to investigate whether TeamHealth was engaged in abusive billing practices. Compl. ¶¶ 67-68. United "focused [its] pre-pay review on claims billed for emergency room services utilizing the 99284-99285 CPT codes." *Id.* ¶ 68. As part of that process, United "received and reviewed medical records for 26,000 claims TeamHealth submitted to [United] in 2020." *Id.* ¶ 69. United "found that well over half of all claims TeamHealth submitted utilizing CPT Codes 99285 and 99284—**62%**—were not supported by medical records," and had been upcoded. *Id.* ¶ 70. "Those claims should have utilized lower CPT codes, which [United] would have paid at lower rates." *Id.*

"As a result of the extraordinarily high error rate uncovered with the 2020 pre-pay review, at the beginning of 2021, [United] expanded [its] pre-payment review to cover all claims for emergency room services billed by TeamHealth using the 99284 and 99285 CPT codes." *Id.* ¶ 71. United "also performed some post-payment reviews of TeamHealth claims." *Id.* United ultimately reviewed "over **47,000** claims billed by TeamHealth to its commercial insurance plans" since 2016. *Id.* ¶¶ 72, 110 (emphasis added). United found the same pattern of upcoding, including that "nearly **75%** of the claims reviewed that were billed using the 99285 CPT Code

7

were not supported by medical records and were improperly upcoded." *Id.* "These claims should have utilized lower CPT codes, which [United] would have paid at lower rates." *Id.* United similarly found evidence that TeamHealth had billed it for services performed by non-physician medical staff as if performed by physicians. *See id.* ¶¶ 78-79, 123-130.

United's complaint sets forth thirteen "examples" that "are representative of [United's] findings across the many thousands of claims it reviewed." *Id.* ¶¶ 73-87. These include instances in which TeamHealth billed United utilizing CPT Code 99285, which "is reserved for relatively rare cases in which the patient is at imminent risk of death or loss of physiological function," in the following situations involving self-evidently minor and routine medical issues. *Id.* ¶ 60.

- A 33-year-old woman with strep throat, which a physician treated with routine antibiotics. *Id.* ¶ 74.

- A 37-year-old man who "stat[ed] that he believed that his psoriatic arthritis had flared up," which a physician treated with painkillers and prednisone. *Id.* ¶ 75.

- A 23-year-old woman who reported ankle pain after landing on her feet from a short drop, which a physician treated with ibuprofen before sending the patient home with crutches. *Id.* ¶ 77.

- A 62-year-old woman who reported she "felt as if she was getting a urinary tract infection," for which she was already taking medication, and which *non*-physician medical personnel confirmed before sending the patient home without further treatment. *Id.* ¶ 78. Notably, despite the fact that no physician saw this patient, TeamHealth billed United as if a physician had treated her. *Id.*

- A 54-year-old woman with "back pain with no corresponding injury and reported a history of back pain," which *non*-physician medical staff treated with painkillers and anti-anxiety medication. *Id.* ¶ 79. Again, despite the fact that no physician saw this patient, TeamHealth billed United as if a physician had treated her. *Id.*

- A 23-year-old man who complained of heartburn "after eating a chili dog at 12 am," which a physician treated with Maalox. *Id.* ¶ 84.

*See also id.* ¶¶ 76, 80-83, 85-86 (providing similar examples of upcoded claims). "In each case, TeamHealth submitted a claim to [United] utilizing CPT code 99285 under circumstances plainly

not warranting its use," thus misrepresenting the services it performed for United's members. *Id.* ¶ 73. In some instances, TeamHealth additionally misrepresented that a physician had treated the patient when the patient had seen only *non*-physician medical personnel. *See id.* ¶¶ 78-79.

"The rate at which TeamHealth submitted claims to [United] improperly utilizing CPT codes 99285 and 99284 was far too high to have been unintentional," and "greatly exceeded the error rate [United] ha[s] observed among other providers of emergency services for such claims." *Id.* ¶ 91. "Similarly, the degree to which many of the claims at issue clearly warranted lower CPT codes forecloses the possibility that the upcoding occurred through mistake," as "[n]o coding professional would have applied CPT codes 99285 and 99284 to these claims unless instructed to do so contrary to the proper use of those CPT codes." *Id.* ¶ 92. While "[m]uch of the direct evidence related to TeamHealth's upcoding remains solely in TeamHealth's possession," "[t]he degree and consistency of TeamHealth's upcoding of claims utilizing CPT codes 99285 and 99284 demonstrates that TeamHealth has a uniform policy or practice of upcoding such claims." *Id.* ¶¶ 93-94. In other words, TeamHealth engaged in "deliberate[ ]" fraud "to deceive [United] into overpaying for emergency room services and to reap windfall profits" at the expense of United and its members. *Id.* ¶ 88.

United's extensive findings track other allegations of upcoding against TeamHealth that have recently surfaced. For example, shortly before United filed suit, TeamHealth agreed to pay the United States government **$42.5 million** to resolve similar allegations of upcoding by falsely claiming that patients saw physicians when those patients received treatment from *non*-physician medical personnel. *See* Kurtz Decl. Ex. A. Another insurer (Celtic Insurance Company) filed suit against TeamHealth in December of 2020, setting out findings remarkably similar to United's—

for example, that TeamHealth had billed for exigent, life-saving care when in reality it had treated a bug bite, a headache, and similarly minor medical issues.[4]

**E. United's Damages.**

"Upcoding is a particularly insidious form of fraud that is difficult to uncover and resource-intensive to investigate," further concealed here by the "number of separate affiliates through which TeamHealth carried out its scheme, as well as TeamHealth's failure to disclose the identities of all of its affiliates." *Id.* ¶ 104. United "justifiably relied on the information TeamHealth presented in the claims" at issue in paying upcoded claims in light of industry norms. *Id.* ¶¶ 32-40, 106. Indeed, in each case, "TeamHealth falsely certified the information included in the claim was 'true, accurate and complete.'" *Id.* ¶ 105. "Based on [United's] investigation, [United] . . . overpaid TeamHealth on approximately 60% of its claims billed utilizing CPT Codes 99285 and 99284 due to TeamHealth's deliberate and systematic upcoding" since 2016. *Id.* ¶¶ 1, 108. But "[t]he information [United] require[s] to determine conclusively which specific claims were upcoded remains exclusively in TeamHealth's possession." *Id.* ¶ 108.

## ARGUMENT

**I.    TeamHealth's Statute-of-Limitations Arguments are both Meritless and Not Amenable to Resolution at the Rule 12 Stage.**

TeamHealth submitted false and fraudulent claims to United for years while successfully hiding its illegal conduct, as the type of fraud at issue here "is difficult to uncover and resource-intensive to investigate." *See, e.g.*, Compl. ¶ 1, 40, 67-72, 103-05, 136. TeamHealth nevertheless asks the Court to make a summary ruling at this threshold stage that United's claims are barred *in part* because United should have uncovered TeamHealth's sophisticated fraud at some

---

[4] *See* Compl. ¶ 64, *Celtic Ins. Co. v. Team Health Holdings, Inc., et al.*, Case No. 3:20-cv-00523 (E.D. Tenn. Dec. 10, 2020).

unspecified earlier date. *See* TeamHealth Mem. ("Mem.") at 10-16. This argument is both legally and factually baseless.

TeamHealth's "partial motion to dismiss based on the statute of limitations does not seek to dismiss claims in their entirety, but rather goes to the extent of relief available." *FTC v. Zurixx, LLC*, 441 F. Supp. 3d 1216, 1227 (D. Utah 2020). "A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015); *see also FTC v. Nudge, LLC*, 430 F. Supp. 3d 1230, 1246 (D. Utah 2019) ("As many courts have recognized, parties may not use rule 12(b)(6) to dismiss only parts of a claim," including based on statutes of limitations.); *Redwind v. W. Union, LLC*, No. 3:18-cv-02094, 2019 U.S. Dist. LEXIS 118297, at *8 (D. Or. June 21, 2019) (collecting cases). TeamHealth acknowledges that none of United's claims is entirely time-barred. *See* Mem. at 10-16. Accordingly, because United "state[s] plausible claim[s] for relief[,]" Team Health's "piecemeal" approach to its limitations argument fails as a matter of law. *See BBL, Inc.*, 809 F.3d at 325.

Regardless, this argument is meritless on its face. TeamHealth argues "public records and United's own allegations demonstrate that United was at least on inquiry notice of its causes of action in this case by 2016, if not earlier." Mem. at 13. But TeamHealth makes no effort to explain or support that statement. In any event, inquiry notice is generally "a question of fact that

is inappropriate for resolution on a motion to dismiss." *SunTrust Bank v. Stoner*, No. 3:07-cv-397, 2008 U.S. Dist. LEXIS 75247, at *12 (E.D. Tenn. Sep. 26, 2008). Such is the case here.[5]

TeamHealth principally relies on its own serial litigation against United, contending its own lawsuits concerning "proper rates of payment for TeamHealth's services" should have put United on notice of its fraud "by 2016, if not earlier." Mem. at 11-12. But every filing TeamHealth cites to support its argument dates from 2019 or later. *See* Mem. at 12 n.6. Indeed, TeamHealth filed all but one of the lawsuits it cites in 2019 or 2020; the one exception dates from 2017. *See id*. It is unclear how these lawsuits put United on notice of TeamHealth's fraud "by 2016," years before TeamHealth filed them.

Nor does TeamHealth explain why these cases would put United on notice that TeamHealth had systematically falsified the services for which it billed United. TeamHealth's own characterization of these cases is that they focus on United's "*rates of payment*" for specific CPT codes, not whether TeamHealth falsified those CPT codes in its claims to United. *Id.* Indeed, TeamHealth has successfully resisted producing medical records in its litigation against United on this basis. *See, e.g.*, Kurtz Decl. Ex. B (order holding that TeamHealth need not produce medical records as "[t]he relevant inquiry in this action is the proper rate of reimbursement"). The same is true of TeamHealth's "payment rate disputes" with another insurer, which TeamHealth likewise cites for its argument. Mem. at 13. And while TeamHealth

---

[5] TeamHealth also claims to be unsure whether a footnote in United's complaint "limit[s] the claims in this action primarily to conduct occurring after January 2020." *See* Mem. at 10-11. United's complaint explains repeatedly, including in its very first paragraph, that TeamHealth's tortious conduct has been ongoing "[s]ince at least 2016." Compl. ¶¶ 1, 110, 147, 159, 174, 187, 197, 223. The footnote TeamHealth cites as the source of its confusion states only that United has excluded the TeamHealth medical groups previously covered by a contract between United and TeamHealth from the scope of this litigation. *See id.* ¶ 11 n.1. TeamHealth plainly understands this, as TeamHealth makes clear later in its brief. *See* Mem. at 13 n.8.

notes the filing of a *qui tam* action involving upcoding allegations in 2016, it fails to acknowledge that litigation was not unsealed and made public until 2018—and that even unsealed filings remained heavily redacted. *See* Am. Compl. (ECF No. 2), *United States ex rel. Hernandez v. Team Health, Inc.*, No. 2:16-CV-00432 (E.D. Tex. Nov. 12, 2018).

Beyond the foregoing, TeamHealth cites only various statutes that it contends give United the duty and incentive to investigate fraud. *See* Mem. at 11. But it makes no effort to explain how those statutes could have put United on notice of the specific fraud at issue here. The fact that United has a general interest in fraud prevention hardly puts it on notice of every fraud committed against it. This is especially true in this case, where a complex and sophisticated fraud, developed and implemented by well-financed defendants utilizing a web of physician groups scattered across the country, is by nature "difficult to uncover and resource-intensive to investigate." Compl. ¶ 104. And "TeamHealth's failure to disclose the identities of all of its affiliates[ ] further obscured TeamHealth's systematic upcoding." *Id.*

"Where a plaintiff has inquiry notice, that notice is 'notice of all the facts to which inquiry will lead, when prosecuted with reasonable diligence and good faith.'" *Parris v. Regions Bank*, No. 09-2462, 2011 U.S. Dist. LEXIS 92167, at *12 (W.D. Tenn. Aug. 17, 2011) (quoting *Estate of Darnell v. Fenn*, 303 S.W.3d 269, 280 (Tenn. Ct. App. 2009)); *see also id.* at *14 (denying summary judgment on the issue of inquiry notice). "It is well-established that the discovery rule ordinarily raises issues of fact as to whether a plaintiff should have known of a claim for relief, and whether a plaintiff exercised 'reasonable diligence,' prohibiting resolution of the issue on either a motion to dismiss or motion for summary judgment." *Craft v. Vanderbilt Univ.*, 18 F. Supp. 2d 786, 796–97 (M.D. Tenn. 1998) (quoting *Foster v. Harris*, 633 S.W.2d

304, 305 (Tenn. 1982)).[6] TeamHealth provides no reason to deviate from that general rule here. It makes no effort to pinpoint what facts would have put United on notice, when United knew or should have known of those facts, or why United's labor-intensive pre-suit investigation in 2020 and 2021 did not constitute reasonable diligence.

As United explains at length in its complaint, upcoding "is difficult to uncover and resource-intensive to investigate," and United was forced to review many thousands of individual claims across dozens of medical groups before it could confirm TeamHealth's systematic fraud. *See* Compl. ¶¶ 67-72, 102-106. TeamHealth does not and cannot show that United could have or should have discovered this fraud earlier through other means.

## II. United Has Pled Its Claims with Particularity as Required under Rule 9(b).

"[T]he purpose undergirding the particularity requirement of Rule 9(b) is to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading." *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir. 1988). "Rule 9(b) does not require omniscience; rather, the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Id.* "So long as a [plaintiff] pleads sufficient detail—in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b)

---

[6] *See also SunTrust Bank v. Stoner*, No. 3:07-cv-397, 2008 U.S. Dist. LEXIS 75247, at *12 (E.D. Tenn. Sep. 26, 2008) (inquiry notice is generally "a question of fact that is inappropriate for resolution on a motion to dismiss"); *Munson Hardisty, LLC v. Legacy Pointe Apartments, LLC*, 359 F. Supp. 3d 546, 566 (E.D. Tenn. 2019) ("Determining the applicable statute of limitations period is a question of fact under statutes that have adopted the discovery rule.")

14

will generally be met." *United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008).

United's complaint more than satisfies the requirements of Rule 9(b). It specifies the timeframe of TeamHealth's fraud, which began in 2016 and continues to the present day. *See, e.g.*, Compl. ¶¶ 1, 10, 147, 159, 174, 187, 197, 223. It explains that, from TeamHealth's base of operations in Nashville, Tennessee, Defendant HCFS Health Care Financial Services, LLC systematically submitted many thousands of insurance claims to United that included false information, and did so "pursuant to policies set by [Defendants] Team Health Holdings, Inc. and AmeriTeam Services, LLC." *Id.* ¶¶ 47, 55-72. The complaint details at length the nature of those falsehoods: (1) TeamHealth's use of CPT codes 99285 and 99284 to misrepresent the services for which it billed United; and (2) TeamHealth's false representations that physicians performed services provided by *non*-physician medical personnel. *Id.* ¶¶ 55-101, 123-130. In addition to describing those misrepresentations generally, United provides more than a dozen representative examples of specific fraudulent claims. *Id.* ¶¶ 73-87. The complaint alleges the foregoing misrepresentations to be deliberate, and details why it is virtually certain that TeamHealth acted with fraudulent intent. *See id.* ¶¶ 88-101. And the complaint explains that, because United reasonably relied on these misrepresentations in paying the claims TeamHealth submitted, United was injured in that it overpaid TeamHealth by many millions of dollars. *See id.* ¶¶ 102-110. Courts in similar cases have routinely denied motions to dismiss based on allegations comparably or less detailed than United's.[7]

---

[7] *Aetna Inc. et al. v. People's Choice Hosp., LLC et al.*, No. 18-cv-00323, 2019 WL 12536916, at *9-16 (W.D. Tex. Mar. 28, 2019) (finding plaintiff asserted facts to support fraudulent billing and RICO claims under Rule (9)); *United States ex rel. Borges v. Doctor's Care Med. Ctr., Inc.*, No. 01-8112-CIV, 2007 WL 9702639, at *14 (S.D. Fla. Jan. 29, 2007)

15

TeamHealth cannot feign a lack of notice as to the who, what, when, why, or how of United's claims. The allegations are plainly sufficient "to allow [TeamHealth] to prepare a responsive pleading." *United States ex rel. Snapp, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008). Contrary to TeamHealth's contention that United does not specify "the time period at issue," Mem. at 17, United explains as early as the first sentence of its complaint that the relevant time period is 2016 to the present. Compl. ¶ 1; *see also id.* ¶¶ 110, 147, 159, 174, 187, 197, 223. And while TeamHealth complains that United has not identified every one of the tens, if not hundreds, of thousands of fraudulent claims submitted on behalf of the dozens of medical groups at issue, *see* Mem. at 17, Rule 9(b) does not require that United do so. In cases of "complex schemes involving numerous false statements, . . . a plaintiff can satisfy [Rule 9(b)] by describing the scheme and providing 'representative' examples, rather than listing every wrongful act," as United has done here. *Ciccio v. SmileDirectClub, LLC*, No. 3:19-cv-00845, 2020 U.S. Dist. LEXIS 96568, at *32 (M.D. Tenn. June 2, 2020).

Moreover, as United explains, TeamHealth retains sole possession of much of the evidence of its own fraud, including the records United requires to determine the precise universe of claims at issue in this case. *See* Compl. ¶¶ 94, 148, 160-161, 175, 188, 198. The requirements of Rule 9(b) "may be relaxed where information is only within the opposing party's knowledge." *Michaels Bldg. Co.*, 848 F.2d at 680.

---

(denying motions where defendants upcoded claims submitted to Medicare and the Federal Employees Health Benefits Program); *Aetna Inc. v. Mednax, Inc.*, No. 18-2217, 2018 WL 5264310, at *1, *7-8 (E.D. Pa. Oct. 23, 2018) (denying motion where defendant submitted upcoded claims that exaggerated the care needed and performed); *U.S. v. Assocs. in Eye Care*, P.S.C., No. 13-27-GFVT, 2014 WL 414231, at *6-7 (E.D. Ky. Feb. 4, 2014) (denying motion where defendant upcoded claims to Medicare or Medicaid); *United States ex rel. Lovett v. Holzer Clinic*, No. 2:08-cv-312, 2014 WL 12767601, at *11 (S.D. Ohio Mar. 26, 2014) (denying motion as to relators' FCA claim based on upcoding scheme).

16

TeamHealth further complains that United does not specify the details of its methodology in uncovering TeamHealth's fraud, such as "how United derived its two samples, how many claims in the sets included 99285 or 99284 codes, and why the sets are believed to be representative of the body of claims United includes in its causes of action." Mem. at 17-18. But TeamHealth fails to identify any authority requiring United to plead the technical details of its review process—a topic better addressed through expert discovery than a motion to dismiss. *See, e.g.*, *United States v. Assocs. in Eye Care, P.S.C.*, No. CIV. 13-27-GFVT, 2014 WL 414231, at *5 (E.D. Ky. Feb. 4, 2014) (denying a motion to dismiss claims of upcoding, and stating that determining whether "examples" listed in the complaint "are not representative would require factual inquiries more appropriate for later stages of litigation and outside the scope of what the Court must consider for purposes of a motion to dismiss").

Moreover, it is unclear how these details would matter if pled. At this stage, the Court must credit United's allegations and draw all reasonable inferences in United's favor. United's allegations include, for example, that United "reviewed medical records for 26,000 claims TeamHealth submitted . . . in 2020" utilizing CPT Codes 99285 and 99284, and found that TeamHealth had upcoded **62%** of those claims. Compl. ¶¶ 70-71. United also alleges that it expanded its investigation to include **47,000** claims TeamHealth submitted since 2016 and found a similar pattern of upcoding, including that TeamHealth had upcoded "nearly **75%** of the claims reviewed that were billed using the 99285 CPT Code." *Id.* ¶ 73. United explains that this "greatly exceeded the error rate" it "ha[s] observed among other providers of emergency services for such claims," and that "the degree to which many of the claims at issue clearly warranted lower CPT codes forecloses the possibility that the upcoding occurred through mistake." *Id.* ¶¶ 91-92. In

17

short, United alleges that it reviewed tens of thousands of TeamHealth's claims billed using CPT Codes 99285 and 99284, and found most of them to be fraudulent.

Were that not enough, United provides more than a dozen specific examples that it explains are "representative of" its "findings across the many thousands of claims it reviewed in the course of uncovering TeamHealth's systematic upcoding." *Id.* ¶¶ 73-87. Incredibly, TeamHealth attacks these examples as reflecting a mere difference of opinion as to the proper coding of a claim. *See* Mem. at 18. The examples include patients presenting with heartburn, a sprained ankle, a urinary tract infection, and routine aches and pains, and in each case, TeamHealth represented in claims to United that it had rendered life-saving treatment under exigent circumstances. Compl. ¶¶ 73-87. There is no room for reasonable disagreement as to whether these claims were accurate, as United explains at length in its complaint. *See, e.g.*, *id.* ¶¶ 61-66. But even if there were, the Court is bound to draw the eminently reasonable inference in United's favor that, for example, the administration of Maalox to an individual who complained of heartburn after eating a chili dog did not rise to the level of exigent treatment to prevent "imminent risk of death or loss of physiological function." *See id.* ¶¶ 62-63, 84.

TeamHealth proceeds to assert, with little additional analysis, that United's claims for fraud, negligent misrepresentation, fraudulent insurance acts, unlawful insurance acts, and various state consumer protection statutes fail because United has not satisfied Rule 9(b). *See* Mem. at 17-23. For the reasons discussed above, that argument fails. TeamHealth further contends that United's claim under Tennessee's Insurance Fraud Act should be dismissed because "Tennessee law does not allow . . . unsupported and sweeping extrapolation," citing a state-court case construing Tennessee Rule of Civil Procedure 9.02. Mem. at 20. But in federal court, "federal law governs procedural issues" such as the applicable pleading standard.

18

*G'Francisco v. Gofit, LLC*, No. 3:13-1084, 2015 U.S. Dist. LEXIS 199594, at *3 (M.D. Tenn. May 11, 2015). It is unclear what bearing Tennessee's Rules of Civil Procedure have here.

Finally, TeamHealth contends that United's consumer protection claims fail to the extent that United has not provided a specific exemplar claim from the states at issue. *See* Mem. at 22-23. United explains in its complaint that TeamHealth operates nationwide, and that United "overpaid claims TeamHealth submitted for services performed in each of the . . . jurisdictions" at issue. *See, e.g.*, Compl. ¶¶ 2-3, 41, 200. United underscores these allegations with numerous examples of specific claims it received from TeamHealth submitted in the name of medical groups from around the United States. *See, e.g.*, Compl. ¶¶ 73-87. As another court explained in rejecting a similar argument TeamHealth made in another upcoding case, allegations of unlawful conduct in multiple states support the reasonable "inference that TeamHealth engaged in the alleged fraudulent conduct nationwide." *United States v. Team Fin., L.L.C.*, No. 2:16-CV-00432-JRG, 2020 U.S. Dist. LEXIS 26608, at *25 (E.D. Tex. Feb. 12, 2020). TeamHealth cites no authority for the proposition that United must nonetheless plead a specific false claim from a specific state in order to maintain an action under that state's consumer protection law

III.     **United has Adequately Pled its RICO Claim.**

     **a.   United's RICO Claims Are Not Subject to "Reverse Preemption."**

TeamHealth first contends that the McCarran–Ferguson Act preempts United's RICO claim due to the existence of Tennessee's Insurance Act (the "Tennessee Act").[8] Mem. at 25. The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, . . .  unless such Act specifically relates to the business of insurance[.]"

---

[8] United asserts two claims under the Tennessee Act.  *See* Compl. Counts III-IV.

19

*Genord v. Blue Cross & Blue Shield of Michigan*, 440 F.3d 802, 805 (6th Cir. 2006) (quoting 15 U.S.C. § 1012(b)) (first alteration in original). Courts refer to this as "McCarran-Ferguson reverse preemption." *Id.* To determine whether reverse preemption applies, courts first ask whether the federal statute at issue "specifically relates to the business of insurance." If it does, the claim is preempted. Here, TeamHealth concedes that is not the case. Mem. at 25. Thus, the question for the Court is whether the application of the RICO statute would "invalidate, impair, or supersede" the Tennessee Act. *Genord*, 440 F.3d at 805-06. The answer is no.

The Supreme Court's ruling in *Humana Inc. v. Forsyth* provides the framework for this Court's analysis. 525 U.S. 299, 119 (1999). There—in concluding a Nevada insurance law did not preempt a federal RICO claim—the Supreme Court reasoned that "[w]hen federal law is applied in aid or enhancement of state regulation, and does not frustrate any declared state policy or disturb the State's administrative regime, the McCarran–Ferguson Act does not bar the federal action." *Id.* at 303. The Sixth Circuit has interpreted *Humana* to require that courts weigh seven factors to make this determination:

> (1) the availability of a private right of action under the state insurance scheme; (2) the availability of a state common law remedy; (3) the possibility that other state statutes provide the basis for suit; (4) the availability of punitive damages; (5) whether the damages available under the state insurance scheme could exceed the damages recoverable under RICO, even taking into account RICO's treble damages provision; (6) the absence of a position by the State regarding any interest in state policy or the administrative scheme; and (7) the fact that insurers have relied on RICO to eliminate insurance fraud

*See Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 517 (6th Cir. 2010). TeamHealth does not expressly tie any of its arguments to these factors (nor does it mention them in its moving papers). Nevertheless, each weighs in favor of United's position.

*First*, where the state statute in question includes a private cause of action, the first factor weighs against reverse preemption because it is a clear signal the state did not intend to limit

remedies to administrative or regulatory ones. The Tennessee Act includes a private cause of action. *See* Tenn. Code § 56-53-107(a). United has asserted such a claim in its complaint, demonstrating that any RICO claim is "aiding" and "enhancing" its separate state law rights. *Humana*, 525 U.S. at 303. The existence of the private right of action here also distinguishes this case from *Riverview*, which TeamHealth relies upon. In *Riverview*, the Ohio prompt pay law at issue did "not afford a private right of action." 601 F.3d at 517.

The *second* and *third* factors focus on whether the Tennessee Act demonstrates an intent by its legislature to preclude other claims under state statutory or common law. The Tennessee Act does no such thing. As in *Humana*, the Tennessee Act is not "hermetically sealed" and "it does not exclude application of other state laws, statutory or decisional." *Humana*, 525 U.S. at 312; *see also Weiss v. First Unum Life Ins. Co.*, 482 F.3d 254, 269 (3d Cir. 2007) (concluding that "in light of the common law and statutory remedies available, we do not read New Jersey's scheme as intended to be exclusive"). Tellingly, TeamHealth does not contend that the Tennessee Act forecloses claims for common law fraud or violations of Tennessee's Consumer Protection law, two "statutory or decisional" claims that United is pursuing in this case. Compl. at Counts III-V. This is again in sharp contrast to the ruling in *Riverview*, where Ohio's prompt pay law was the "exclusive source of remedies" for the alleged delay in certain payments. 601 F.3d at 517; *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 68 F. Supp. 3d 744, 752 (E.D. Mich. 2014) (distinguishing *Riverview* on the same grounds and denying attempt by defendant to apply reverse preemption).

TeamHealth, in passing, argues that the Tennessee Act is "the exclusive and sole" remedy for its fraud, citing a portion of Section 56-53-108 of the Tennessee Act. Mem. at 26 (emphasis omitted). That provision, however, only clarifies that courts cannot imply or allow

21

damages for a Section 56-53-107(a) claim that do not already exist in Section 56-53-107—it does not bar all other statutory and common law claims arising from fraudulent or improper conduct. *See* Tenn. Code. § 56-53-108 (stating "no additional remedies *shall be implied*") (emphasis added). In fact, TeamHealth ignores the next sentence in the provision, which prohibits litigants from using the Tennessee Act as a way to "duplicate recovery for the same element of damage." *Id.* In other words, Section 56-53-108 expressly envisions litigants bringing multiple claims under Tennessee law, including under Section 56-53-107, but makes clear that parties cannot use it to obtain duplicative or windfall recoveries. The second and third *Humana* factors weigh in United's favor. 525 U.S. at 311.

The *fourth* and *fifth* factors center on whether the damages sought under RICO are comparable to those available under the Tennessee Act, or "greatly exceed" them. *Riverview*, 601 F.3d at 518. Here, the relevant remedies are comparable and complimentary. Under RICO and the Tennessee Act, United can recover largely the same type of damages. *Compare* Tenn. Code § 56-53-107 (permitting recovery of "profit, benefit, compensation, or payment" received in violation of the act, together with "[r]easonable attorneys' fees, related legal expenses . . . and court costs[,]" and treble damages, with one-third returned to the state) *with* 18 U.S.C. § 1964(c) (permitting recovery of "threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fees"). This is again different from the circumstances in *Riverview*, where the court found that RICO's treble damages clause "greatly exceed[ed] the administrative remedies available under Ohio law." *Riverview*, 601 F.3d 518; *see State Farm*, 68 F. Supp. 3d at 753 (contrasting *Riverview* on this point and reasoning that damages under RICO would not "greatly exceed" or be "grossly different in character" than those permitted under Michigan law).

TeamHealth argues that the Tennessee Act requires a litigant to return one-third of any

treble damages award to the state and, therefore, TeamHealth concludes a RICO claim would conflict with this provision and somehow impair the state's ability to investigate insurance fraud. Mem. at 26-27. Team Health does not explain why this is the case. Regardless, the argument is wrong. Minor differences in available remedies do not trigger application of reverse preemption. Both the Supreme Court and the Sixth Circuit have concluded that even material differences would not automatically trigger reverse preemption. The *Humana* Court made this very point, when it engaged the question of "whether a federal law, which proscribes the same conduct as state law, but provides materially different remedies, [would] 'impair' state law under the McCarran–Ferguson Act?" 525 U.S. at 305. The *Humana* Court answered this question in the negative. *Brown v. Cassens Transp. Co.*, 546 F.3d 347, 362 (6th Cir. 2008) (noting that the only factor that could weigh in favor of reverse preemption "is the difference in remedies" between RICO and the state law at issue, and concluding that any such difference did not "impair" application of the state statute).[9]

*Sixth*, courts evaluate whether the state has taking a public position as to whether a federal RICO claim would impair or frustrate its insurance statute. *See Humana*, 525 U.S. at 312 (noting "that Nevada filed no brief at any stage of this lawsuit urging that application of RICO to the alleged conduct would frustrate any state policy, or interfere with the State's administrative regime"). By permitting claimants to bring other state common law and statutory claims together with a claim under the Tennessee Act, Tenn. Code § 56-53-108, the state has signaled that it does not consider the Tennessee Act an exclusive remedy. The state has not filed any brief in this case supporting TeamHealth's position, nor does TeamHealth point to any other case in which it has.

---

[9] Indeed, this case is at the starting blocks. The parties will address issues concerning the selection of damages questions at trial and through the jury instructions.

And TeamHealth does not even mention this factor in its motion.

*Finally*, the court must weigh the fact "that insurers, too, have relied on the [RICO] statute when they were the fraud victims." *Humana*, 525 U.S. at 314. This has not changed since the Supreme Court's *Humana* ruling, including in healthcare cases where providers submit false and fraudulent claims for reimbursement. *See e.g.*, *People's Choice Hosp., LLC,* 2019 WL 12536916, at *16-17 (finding plaintiff asserted valid RICO claim centering on billing fraud). This final factor weighs in United's favor as well.

All of the *Humana* factors weigh in favor of United. "In sum [there is] no frustration of state policy in the RICO litigation at issue here" and, in fact, "RICO advances the State's interest in combating insurance fraud" and impairs no Tennessee policy. *Humana*, 525 U.S. 313-14.

### b. United has Alleged Specific Facts Support its RICO Claim.

Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). United's detailed allegations satisfy each of these elements. TeamHealth asserts a mix of generic case law and its own factual positions to argue United has not met its pleading burden. Mem. at 29-32. Its arguments lack merit.

*First*, TeamHealth first argues that United did not plead allegations as to each Defendant and merely "lumped" them together. Mem. at 29. TeamHealth's one-paragraph argument on this point cites only Paragraph 3 of the complaint, and ignores the 237 paragraphs that follow. To be sure, each of the Defendants engaged in the gross misconduct that gives rise to this case, and United identified their respective roles in detail:

- "TeamHealth Holdings and AmeriTeam Services set policies requiring or encouraging the falsification of insurance claims" that are at the heart of United's

RICO and fraud allegations. Compl. ¶¶ 47, 215. The falsification and upcoding of those claims is detailed at length in the Complaint, complete with specific examples. *E.g.*, Compl. ¶¶ 55-87.

- "HCFS Health Care Financial Services, LLC is the TeamHealth entity that performs billing and coding for the medical groups that are part of the TeamHealth enterprise. It codes and submits claims to insurers and claims administrators pursuant to policies set by TeamHealth Holdings, Inc. and AmeriTeam Services, LLC." *Id.* ¶ 47; *see also id.* ¶¶ 128, 215. United details this upcoding at length in the Complaint. *Id.* ¶¶ 55-72.

- "The various medical groups affiliated with TeamHealth supplied medical services to provide the basis for upcoded claims, and, on information and belief, at times provided false or misleading documentation to support those claims." *Id.*

- The coordinated conduct of these entities had its intended impact, as detailed throughout United's 240 Paragraph Complaint. *Id.* ¶¶ 67-79; *see also supra* Background §§ B-E.

TeamHealth fails to address these allegations, which expressly set forth the respective role of each Defendant.[10]

*Second*, TeamHealth contends that United has not alleged a "distinct RICO enterprise." Mem. at 29-30. The "enterprise" required for a § 1962(c) violation may take the form of "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A plaintiff can prove such an enterprise with evidence of "an ongoing organization, formal or informal," whose "associates function as a continuing unit" for a "common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Here, United

---

[10] Moreover, while United identifies the respective roles of each Defendant, TeamHealth's argument would fail anyway because a plaintiff may plead that multiple defendants played the same or similar roles in perpetuating a fraud. *See United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016) ("There is no flaw in a pleading, however, where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct."); *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1056–57 (E.D. Mich. 2018) ("Although the precise identity of the subsidiary and/or employee which may have taken certain actions is unclear, that level of detail is unnecessary to put the [] Defendants on notice of the claims made against them.").

alleges an association-in-fact enterprise, the very concept of which "is expansive." *Boyle v. United States*, 556 U.S. 938, 944 (2009). "TeamHealth Holdings, AmeriTeam Services, and HCFS Health Care Financial Services entered into separate association-in-fact enterprises (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4) with each other, and with each of the nominally independent medical groups that they affiliate with throughout the United States." Compl. ¶ 213. "The Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity[,]" *see id.*, which included violation of federal wire and mail fraud statutes, *id.* ¶ 220. These allegations satisfy the enterprise requirement. *See Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 793 (6th Cir. 2012).

*Third*, Team Health asserts that United has not alleged that the enterprise is "separate" from the "persons" participating in its affairs. Not so. In interpreting RICO, courts have applied a "distinctness" requirement, which requires the person charged with violating RICO be a separate entity from the enterprise. *Davis v. Mut. Life Ins. Co.*, 6 F.3d 367, 377 (6th Cir. 1993). Here, United alleges "TeamHealth Holdings, AmeriTeam Services, HCFS Health Care Financial Services and the medical groups are each 'persons' distinct from the Enterprise." *Id.* ¶¶ 212, 220. As noted above, United also alleges the specific role of each separate "person." *Id.* ¶¶ 47, 215; *see also id.* ¶ 16 (alleging that the Enterprise could not have succeeded absent their coordinated efforts" and that "the members of the Enterprise functioned as a unit in pursuit of their common purpose"). And even earlier in the Complaint, United alleges the relationship between this series of entities. *See, e.g., id.* ¶¶ 218-20. These allegations meet the "distinctness requirement."

TeamHealth's own authority on this point—*In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 493 (6th Cir. 2013)—favors United. There, the Sixth Circuit reasoned "the distinctness requirement may be satisfied when the parent corporation uses the separately incorporated nature

26

of its subsidiaries to perpetrate a fraudulent scheme." *Id.* at 493.[11] "It would be strange indeed to absolve a parent corporation of liability for doing precisely what RICO was designed to prevent: the use of an association of legally distinct entities "as a vehicle through which unlawful . . . activity is committed." *Id.* The Sixth Circuit went on to hold that a parent corporation, GeoStar, was distinct from an enterprise consisting of that corporation and its subsidiaries "[b]ecause the enterprise successfully carried out its fraudulent scheme by enlisting the participation of GeoStar *and* its separately incorporated subsidiaries, with each playing a key role." *Id.* at 493. The same rationale applies here to United's allegations.

*Fourth*, TeamHealth contends that United did not allege enterprise conduct separate from the pattern of racketeering activity. Mem. at 32. An enterprise must have an existence "separate and apart from the pattern of racketeering in which it engages." *United States v. Sutton*, 700 F.2d 1078, 1082 (6th Cir. 1983). United has alleged sufficient facts to demonstrate an association-in-fact enterprise, *see supra*. United has also alleged a pattern of racketeering activity involving rampant mail and wire fraud. *See* Compl. ¶¶ 214, 220-22. TeamHealth does not challenge United's pattern of racketeering allegations. Finally, United alleges that the identified enterprise performs legitimate business operations, separate from the racketeering activities, such that TeamHealth's suggestion that the enterprise overlaps entirely with the pattern of racketeering is incorrect. *E.g.*, *id.* ¶ 217.

---

[11] *See Bucklew v. Hawkins, Ash, Baptie & Co.,* 329 F.3d 923, 934 (7th Cir. 2003) (finding corporate defendant is distinct from an enterprise consisting of itself and its subsidiaries when "the enterprise's decision to operate through subsidiaries rather than divisions somehow facilitate[s] its unlawful activity"); *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 263–64 (2d Cir. 1995) (finding that related corporations with distinct markets and roles in the scheme were distinct from the RICO enterprise comprised of each of them together).

*Finally*, as it does throughout its motion, TeamHealth advances numerous factual arguments aimed at downplaying its misconduct. For example, Team Health argues that this case merely involves how "doctors treat patients, coders review medical records, billers send claims" and so forth. Mem. at 30. The Court, however, must accept United's allegations as true at this stage, and draw all reasonable inferences in United's favor. United has alleged that TeamHealth's submitted false and fraudulent bills to United for the purpose of reaping windfall payments. Compl. ¶¶ 1-13, 55-72, 88-101. United further includes specific and damning examples of this fraud. *Id.* ¶¶ 73-87. United details the harm Team Health's conduct caused to United, as well as how TeamHealth attempted to keep its scheme a secret as long as possible. *Id.* ¶¶ 102-10. And even were one to look beyond United's complaint, TeamHealth's argument cannot bear scrutiny—as demonstrated by the fact that TeamHealth recently paid the United States **$42.5 million** to resolve similar allegations of upcoding. Kurtz Decl. Ex. A.

TeamHealth also argues that this case merely an ordinary business dispute between "sophisticated corporate entities." Mem. at 32. United's complaint alleges that TeamHealth has submitted tens of thousands of fraudulent insurance claims since 2016, detailing specific representative examples, and explaining in detail why it is virtually certain that this conduct was deliberate and calculated to defraud United. It strains credulity that TeamHealth downplays this sweeping fraud as merely business as usual. In any event, TeamHealth can try to spin its misconduct as just "ordinary business" before a jury, but that spin has no place at the Rule 12 stage. *See, e.g.*, *Trice v. Com. Union Assurance Co.*, 334 F.2d 673, 677 (6th Cir. 1964) ("A party's intent is a quintessential jury question, not something to be construed in favor of the defendant at the motion to dismiss stage.).

c. **United Pleads a RICO Conspiracy Claim under 18 U.S.C. § 1962.**

In Count VIII, United pleads a RICO conspiracy claim under 18 U.S.C. § 1962(d). TeamHealth argues that the claim should be dismissed because United has not alleged a valid RICO claim under 18 U.S.C. § 1962(c). As discussed in the preceding Sections, United has asserted a detailed claim under § 1962(c). Therefore, the Court should reject TeamHealth's final argument.

IV. **United Alleged an Entitlement to Equitable Relief under ERISA Section 502(a)(3).**

Section 502(a)(3) of ERISA authorizes plan fiduciaries to obtain appropriate equitable relief to redress violations of ERISA or enforce the terms of ERISA-governed benefit plans. United "act[s] as a claims administrator and ha[s] been delegated to authority" to pursue overpayments on behalf of self-funded plans and to obtain "declaratory and injunctive relief to enjoin any acts to practices that violate the provisions" of United's health benefit plans. Compl. ¶ 203. "Each of the ERISA plans administered by the United Plaintiffs at issue in this litigation only permit reimbursement of services that were actually provided to the member." *Id.* ¶ 204. United further asserts that medical care justifying high level CPT codes (99284, 99285) was not provided—*i.e.*, the care, services, and/or procedures actually provided to United members was different in kind than TeamHealth represented on its bills. *Id.* ¶¶ 59-87. TeamHealth's improper and fraudulent billing tactics continue to this day. United, therefore, seeks appropriate equitable relief under ERISA Section 502(a)(3). *Id.* ¶ 209.

TeamHealth asserts that United's ERISA claim should be dismissed because United has not alleged what plans are at issue, or the terms at issue. United, however, alleges that *each* plan at issue only permits reimbursement for services rendered, and United alleges that TeamHealth billed for service levels that were not ever supported by actual care provided to United's

29

members. *Id.* ¶ 59-87, 204. Further, TeamHealth assert that "United does not complain that TeamHealth failed to provide services to members[.]" Mem. at 24. This is not true. As United explains in its complaint, industry-standard guidance makes clear that the different CPT codes at issue denote different kinds of treatment for different kinds of problems. *See id.* ¶ 66. For example, CPT code 99282 denotes care for routine medical issues such as "[u]rinary tract infection[s]" and "sprains." *Id.* But as United explains in its complaint, TeamHealth submitted claims for treatment of these very medical issues utilizing CPT code 99285, which denotes exigent care for life-threatening medical problems such as "[s]evere respiratory distress" or "[c]ritical trauma." *Id.* ¶¶ 66, 77-78. TeamHealth simply did not perform the services it claimed to have performed. And United generally pays *four times* as much for the services 99285 denotes than it does for the services indicated by 99282. *Id.* ¶ 60. Section 502(a)(3) permits United to seek equitable relief to halt these improper billing practices and to recover the fraudulently induced overpayments.[12]

## CONCLUSION

For the foregoing reasons, United respectfully requests that the Court deny TeamHealth's motion to dismiss in its entirety.

---

[12] *See, e.g.*, *Asbestos Workers Loc. No. 23 Health & Welfare Plan ex rel. Jordan v. Mackowiak,* No. 3:cv-91-416, 1991 WL 502504, at *2 (M.D. Pa. Dec. 4, 1991), *aff'd,* 983 F.2d 1049 (3d Cir. 1992) (unpublished table opinion); *RightCHOICE Managed Care, Inc. v. Hosp. Partners, Inc.,* No. 5:18-cv-06037-DGK, 2019 WL 302515, at *6 (W.D. Mo. Jan. 23, 2019); *Conn. Gen. Life Ins. Co. v. Elite Ctr. for Minimally Invasive Surgery LLC,* No. 4:16-CV-00571, 2017 WL 607130, at *7 (S.D. Tex. Feb. 15, 2017), amended and superseded on other grounds, 2017 WL 1807681 (May 5, 2017); *Conn. Gen. Life Ins. Co. v. Sw. Surgery Ctr., LLC,* No. 14 CV 08777, 2015 WL 6560536, at *5 (N.D. Ill. Oct. 29, 2015); *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.,* No. 14-cv-3053, 2015 WL 12778048, at *46 (C.D. Cal. Oct. 23, 2015); *Conn. Gen. Life Ins. Co. v. True View Surgery Ctr. One, LP*, 128 F. Supp. 3d 501, 511–12 (D. Conn. 2015).

30

Dated: February 9, 2022

By: _/s/ Kendell G. Vonckx_

Dwight E. Tarwater (TN BPR #007244)
det@painetarwater.com
Michael J. King (TN BPR #015523)
mjk@painebickers.com
Kendell G. Vonckx (TN BPR #035139)
kgv@painetarwater.com
900 South Gay Street, Suite 2200
Knoxville, TN 37902-1821
T: 865-525-0880

Jeffrey S. Gleason (MN # 396190)
jgleason@robinskaplan.com
Jamie R. Kurtz (MN # 391792)
jkurtz@robinskaplan.com
Charley C. Gokey (MN # 402225)
cgokey@robinskaplan.com
Robins Kaplan LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402–2015
T: (612) 349–8500

Paul D. Weller (PA # 61175)
pweller@robinskaplan.com
Gregory S. Voshell (PA # 208566)
gvoshell@robinskaplan.com
900 Third Avenue
Suite 11900
New York, New York 10022
T: (212) 980-7400

**_Counsel for the United Plaintiffs_**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 9, 2022, a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

*/s/ Kendell G. Vonckx*
Kendell G. Vonckx