UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| UNITED HEALTHCARE SERVICES, INC., UNITEDHEALTHCARE INSURANCE COMPANY, and UMR, INC., <br><br> Plaintiffs, <br><br> vs. <br><br><br> TEAM HEALTH HOLDINGS, INC., AMERITEAM SERVICES, LLC, and HCFS HEALTH CARE FINANCIAL SERVICES, LLC, <br><br> Defendants. | Case No. 3:21-cv-00364-DCLC-DCP |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>UNITED'S FIRST MOTION TO COMPEL DISCOVERY</u>**
(**Blackstone Requests**)

**I.     Introduction**

This suit involves a particular kind of healthcare fraud called upcoding. Put simply, TeamHealth falsely represented to United that its providers were rendering more intensive care and treating more severe conditions than they actually were for the purpose of extracting higher reimbursement rates.

United's First Motion to Compel seeks documents relevant to its claim that TeamHealth engaged in a fraudulent scheme to upcode claims for emergency medicine services to boost its revenue and profits (and, therefore, its returns to its private equity owner) at the expense of United, its employer-customers for whom it administers plans, and members. Specifically, United seeks an order compelling TeamHealth to produce documents that it shared with its owner

Blackstone (both pre- and post-acquisition), including materials relating to historical and projected revenue, revenue growth opportunities, and any documents discussing the impact that coding of emergency room services has on TeamHealth's historical and projected revenue and revenue growth.

These communications go to the heart of United's claims. As the Court noted in its Order Denying Defendants' Motion to Dismiss, Blackstone acquired TeamHealth for $6.1 billion in 2017. United alleges that Blackstone applies significant pressure on the companies it acquires to maximize their short-term revenue and profits. United further alleges that TeamHealth, under pressure from Blackstone to extract ever-higher profits from its submission of emergency medicine claims, did exactly that by upcoding. Given that TeamHealth's upcoding scheme reflects a coordinated effort between TeamHealth and Blackstone to maximize revenue and profits, United anticipates that there are pre-acquisition communications and analyses reflecting how code selection impacts revenue and profitability, and post-acquisition communications reflecting the same.

The documents are undeniably relevant, and they undoubtedly exist. Indeed, in March of 2024, Defendants *agreed* to search terms in response to United's document requests that explicitly targeted TeamHealth's communications with Blackstone but have now back-pedaled from that agreement. Importantly, another federal court has already compelled TeamHealth to produce these exact types of documents in a similar action brought by another payor asserting upcoding counterclaims against TeamHealth-affiliated entities because the relevance of the requested documents was apparent.

Here, the Court should do the same and grant United's Motion because it seeks the production of highly relevant documents establishing the existence of the upcoding scheme, as

well as TeamHealth's motive for the fraud. The requests at issue are also proportional to the needs of the case—particularly given that the scheme is alleged to have resulted in the United Plaintiffs overpaying TeamHealth by more than $100 million.

II.     **Factual Background & Procedural Posture**

   **A.  United, TeamHealth, and the Billing of Emergency Medicine Claims.**

The United Plaintiffs insure and administer health plans for employers. (Compl., ¶¶ 14-16.)  The TeamHealth Defendants provide emergency room staffing and billing services through a web of subsidiaries and affiliates under their control. (*Id.* ¶¶17-20.) United processes more than one million claims for payment for healthcare services every day. (*Id.* ¶ 32.) To facilitate the payment of these claims, the industry has developed systems and processes that auto-adjudicate claims without human intervention. (*Id.* ¶ 34.) One element of this is the standardization of the codes (CPT Codes) used to denote the type of service being billed. (*Id.* ¶ 38.) Within the industry, it is known and accepted that insurers like United rely on providers like TeamHealth to provide accurate information when billing claims. (*Id.* ¶ 34.)

For emergency rooms staffed by TeamHealth-affiliated medical groups, TeamHealth handles billing claims to insurers and claims administrators like the United Plaintiffs through separate, non-medical staff. (*Id.* ¶ 47.) Specifically, Defendant HCFS Health Care Financial Services, LLC performs billing and coding for the medical groups that are part of the TeamHealth enterprise. (*Id.*) It codes and submits claims to insurers and claims administrators pursuant to policies set by Team Health Holdings, Inc. and AmeriTeam Services, LLC. (*Id.*)

Emergency room providers like TeamHealth's contracted physicians generally bill their services under CPT codes 99281 through 99285. (*Id.* ¶ 59.) This set of five codes represents a spectrum of care; a higher number signifies more extensive and complex treatment—and a

3

significantly higher reimbursement rate. (*Id.* ¶¶ 59-60.) For example, a typical presenting problem that would be coded as a 99821 would be an insect bite that involves no medications or home treatment. (*Id.* ¶¶ 60, 66.) United would typically pay around $57 for services coded under CPT code 99281. (*Id.*) By contrast, treatment to justify coding a claim as 99285 requires a problem of high severity that poses an immediate, significant threat to life or physiologic function, such as severe respiratory distress, critical trauma, severe burns, or hypothermia. (*Id.*) United pays closer to $450 for services coded under 99285. (*Id.*)

### B. Blackstone's acquisition of TeamHealth, and its efforts to maximize revenue.

In recent years, TeamHealth gained notoriety in the industry for a variety of tactics designed to maximize its profits, including suspected upcoding. (*Id.* ¶ 50.) This notoriety only increased after Blackstone's acquisition of TeamHealth in 2017 for $6.1 billion.[1] (*Id.* ¶¶ 41, 51.) Private equity firms generally, and Blackstone specifically, apply significant pressure to the companies they acquire (such as TeamHealth) to maximize near-term profits. (*Id.*) TeamHealth's notoriety within the industry has spawned several lawsuits relating to its billing practices, (*see id.* ¶¶ 95-101), discussed in more detail in United's Second Motion to Compel Discovery, which will be filed contemporaneously.

In addition to spawning litigation, TeamHealth's billing practices are under scrutiny by Congress. See *Peters Letter to Blackstone and TeamHealth*, April 1, 2024, available at https://www.hsgac.senate.gov/wp-content/uploads/2024.04.01-HSGAC-Chairman-Peters-Letter-to-Blackstone-TeamHealth.pdf. As Senator Peters put it, issues with the cost and quality of emergency room medicine are "exacerbated by the private equity business model, which hinges

---

[1] As the Court's Order Denying TeamHealth's Motion to Dismiss observed, Blackstone manages approximately $915 billion in assets.

4

on highly leveraged debt, little equity, and the need to obtain outsized returns within a limited time." *Id.* at 2.

Before a private equity firm like Blackstone decides to invest in a company like TeamHealth, it conducts significant diligence on the acquisition target, its historical and projected financial performance, and most importantly, opportunities to maximize revenue and increase profitability post-acquisition. (*Id.* ¶ 51.) It would very likely have communications with the target about levers available to increase profitability such as cost reductions or increasing the revenue received for the services being provided. However, in the case of a healthcare company like TeamHealth, which operates in a highly regulated industry, opportunities for cost reductions are inherently limited. Instead, private equity investments in the healthcare space have focused on revenue growth as one of the primary drivers of value creation after acquisition:



(Ex. 1, DealEdge Sector Study: Healthcare Private Equity 2022 at 8.) United expects Blackstone's acquisition of TeamHealth to follow the same pattern, and accordingly, there were almost certainly discussions internally at Blackstone and TeamHealth analyzing how TeamHealth could increase the revenue associated with the medical services that its affiliated-medical groups were providing.

5

Case 3:21-cv-00364-DCLC-DCP   Document 94   Filed 02/07/25   Page 5 of 17
PageID #: 669

Notably, for the type of medical services at issue here (doctors' visits), there are really only two ways to increase revenue per visit. One is to increase the amounts charged for the services, but that only goes so far as reimbursement rates are often not tied to the amounts billed. The other way to accomplish the goal of increasing reimbursements is to bill higher-level CPT codes reflecting more intensive care.

### C. United's pursuit of discovery relating to Blackstone's acquisition of TeamHealth.

With the somewhat limited levers of increasing profitability discussed above, it is beyond debate that the impact of coding was assessed by Blackstone both in the diligence phase pre-acquisition and in post-acquisition reporting to Blackstone. To the extent such documents exist, they are unquestionably relevant to United's claims. In light of the clear relevance of discovery into Blackstone, and whether and how its acquisition of TeamHealth has resulted in continued or increased upcoding, United served two RFPs specifically targeting TeamHealth's communications with Blackstone (the "Blackstone Requests"):

> **REQUEST NO. 39**: All Documents You provided to Blackstone in connection with its acquisition of You, relating to Your historical and projected revenue, including financial Documents, Documents discussing revenue growth opportunities, and Documents relating to the impact that coding for emergency room services has on Your annual revenue and profits attributable to ER services.
>
> **REQUEST NO. 40**: All Documents You have provided to Blackstone since its acquisition of You related to its continued valuation of You, including any financial Documents provided to Blackstone, Documents discussing revenue growth opportunities, Documents related to the impact that coding has on Your annual revenue and profits attributable to ER services, and any communications related to the same.

(Ex. 2, United's First Set of RFPs.) TeamHealth objected to the production of any documents in response to the Blackstone Requests on grounds that: (1) documents provided to Blackstone were not relevant to the claims and defenses; (2) the documents would disclose trade secrets or

6

confidential financial and commercial information; and (3) that the requests were not proportionate under Rule 26. (Ex. 3, TH Supplemental Response to First Set of RFPs.)

Critically, however, in subsequent meet and confer discussions TeamHealth *agreed to run* search terms related to these requests, reserving only their right to "object to the breadth" of the search terms at issue.[2] (Ex. 4, Collins 3/6/24 Email.) That term hit on 11,114 documents, and thus it is clear that documents exist relating communications with Blackstone discussing coding and billing in the context of revenue/profit projections and modeling. Importantly, TeamHealth makes no claim that such documents do not exist. And yet, months later, TeamHealth informed United that it was standing on its objections and refusing to produce any documents in response to the Blackstone Requests. (Ex. 5, Collins 10/25/2024 Email.) United now moves to compel the production of the Blackstone documents responsive to its Request Nos. 39 and 40.

### III. Legal Standard

"[T]he scope of discovery is broad, and a trial court generally has broad discretion" to determine its scope. *Northend Invs., LLC v. S. Tr. Ins. Co.*, No. 1:16-CV-1137, 2017 WL 11494659, at *2 (W.D. Tenn. June 15, 2017) (citing *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998)). Federal Rule of Civil Procedure 26 allows discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1).

Relevant evidence in this context is that which "'has any tendency to make a fact more or less probable than it would be without the evidence,' if 'the fact is of consequence in determining the action.'" *Grae v. Corr. Corp. of Am.*, 326 F.R.D. 482, 485 (M.D. Tenn. 2018) (quoting Fed. R.

---

[2] The search term TeamHealth agreed to run is: Blackstone AND (diligen* OR report OR model* OR analy* OR goal* OR expect* OR revenue* OR profit OR target) AND (cod* OR bill*).

7

Evid. 401). "The party moving to compel discovery bears the initial burden of proving the relevance of the information sought." *St. Clair Cty. Employees' Ret. Sys. v. Acadia Healthcare Co.*, No. 3:18-CV-00988, 2022 WL 4095387, at *3 (M.D. Tenn. Sept. 7, 2022). "This threshold is low, and evidence is relevant if it advances the ball one inch." *United States v. Betro*, 115 F.4th 429, 449 (6th Cir. 2024) (cleaned up).

"Upon a showing of relevance, the burden shifts to the party opposing discovery to show, with specificity, why the requested discovery is not proportional to the needs of the case." *Avanos Med. Sales, LLC v. Medtronic Sofamor Danek USA, Inc.*, No. 19-CV-02754-JPM-TMP, 2021 WL 848177, at *2 (W.D. Tenn. Mar. 5, 2021). Six factors are relevant to proportionality: (1) "the importance of the issues at stake in the action;" (2) "the amount in controversy;" (3) "the parties' relative access to relevant information;" (4) "the parties' resources;" (5) "the importance of the discovery in resolving the issues;" and (6) "whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). The proportionality requirement "ensures that the parties and courts share the 'collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes.'" *Helena Agri-Enters., LLC v. Great Lakes Grain, LLC*, 988 F.3d 260, 273 (6th Cir. 2021) (quoting Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment).

**IV.     Argument**

The Court should order the TeamHealth Defendants to produce all responsive documents in their possession relating to their communications to Blackstone pre- and post-acquisition that relate to TeamHealth's historical and projected revenue, revenue growth, and the impact that coding for emergency room services has on their annual revenue and profits because all such documents are relevant and proportionate to the needs of the case.

8

Case 3:21-cv-00364-DCLC-DCP   Document 94   Filed 02/07/25   Page 8 of 17
PageID #: 672

***First***, the Blackstone Requests are relevant because they will provide insight into how TeamHealth self-assessed its revenue and growth leading up to the Blackstone acquisition, how these assessments changed (or did not change) over time after the Blackstone acquisition, and the extent to which coding strategies impacted those assessments and were part of the Defendants' revenue growth strategy. To the extent that TeamHealth and Blackstone identified coding strategies as a way to increase revenue and profitability, that would be circumstantial evidence of upcoding and would also be evidence of motive and intent which are relevant to United's fraud and RICO claims. *See, e.g.*, *State Farm Mut. Ins. Co. v. Policherla*, No. 08–13939, 2009 WL 2170183, *2 (E.D. Mich. July 20, 2009) (granting discovery of financial information to assess the financial relationship among the defendants, the structure of the enterprise, measure the scope and extent of defendants' fraud, prove motive, identify other witnesses who may have participated in the scheme and to prove damages on fraud and RICO claims). Further, TeamHealth has already tacitly acknowledged the relevance of these Requests through prior meet and confer efforts by agreeing to Blackstone-related search terms to identify responsive documents for production, while reserving only the "right to object to the breadth" of the proposed terms.

***Second***, the Blackstone Requests are proportional to the needs of the case, and TeamHealth's boilerplate objections to the contrary should be overruled. TeamHealth has more-than-adequate resources to produce the requested materials, which are uniquely within its possession, and critical to proving its motive and opportunity to engage in the alleged upcoding scheme. In a case where the amount in controversy may exceed $100 million, United's requests for documents relating to TeamHealth's revenue projections, opportunities for growth, and its internal analyses of its emergency room coding policies are plainly relevant and proportional to the litigation. Indeed, in just the first round of ESI discovery, TeamHealth agreed to review over

9

100,000 documents for production—including the 11,000 or so documents that hit on the Blackstone search term. Thus, the Blackstone documents are a small percentage of what TeamHealth has already agreed to review.

***Third***, TeamHealth's objection that the Blackstone Requests would require it to disclose trade secrets or confidential financial and commercial information is not a basis to withhold responsive documents. The parties have had a Stipulated Confidentiality and Protective Order in this matter since December 2022. The Protective Order allows TeamHealth to produce any sensitive business information as either "Confidential" or "Attorneys' Eyes Only," and it includes significant restrictions on the disclosure of any document so designated. The Protective Order adequately protects whatever proprietary information may be disclosed within the responsive documents, and TeamHealth has not demonstrated otherwise.

### A. TeamHealth's relevance objections should be overruled.

Discovery relating to TeamHealth's revenue, growth, and projections—particularly as they relate to the coding of emergency room services—as part of TeamHealth's acquisition by Blackstone, as well as post-acquisition assessments and communications, are highly relevant to United's claims. As discussed above, TeamHealth is one of the largest emergency medicine providers in the United States. Blackstone purchased TeamHealth for $6.1 billion in 2017. Blackstone is known for squeezing companies it acquires to maximize their short-term profits before flipping the company either via sale to another private equity firm or by taking the company public. TeamHealth appears to be more of the same: United contends that Blackstone acquired TeamHealth with the expectation that it could wring higher profits from it through its aggressive and fraudulent upcoding of emergency room services. United alleges that TeamHealth has engaged in a fraudulent scheme to extract additional profits from its submission of emergency room claims

10

by falsely representing the intensity of the care it provided and the severity of the condition treated. This scheme resulted in TeamHealth billing the highest-level CPT code for emergency room care in more than half of its claim submissions to United, a rate far exceeding the industry norm.

United believes that the discovery will reveal that as part of the due diligence process, TeamHealth provided Blackstone with detailed financial information, including its historical and projected revenues, which resulted in its sale. Blackstone would not have purchased TeamHealth unless it believed that it could generate additional profit to increase TeamHealth's valuation and then seek a return on its investment of more than $6 billion. United anticipates that TeamHealth possesses documents responsive to the Blackstone Requests that communicate Blackstone's gameplan for doing so, as well as post-acquisition communications reflecting the progress towards these profitability goals. Accordingly, any such documents would go directly toward establishing United's claims because they will tend to show that TeamHealth embarked on a scheme to aggressively upcode its claims to increase the amounts it received from insurers like United— wildly inflating healthcare costs without any corresponding increase in the quality of care.

The relevance of the Blackstone Requests was decided long ago when TeamHealth agreed to run search terms proposed by United that explicitly targeted TeamHealth's communications with Blackstone: Blackstone AND (diligen* OR report OR model* OR analy* OR goal* OR expect* OR revenue* OR profit OR target) AND (cod* OR bill*). (Ex. 4, Collins 3/6/24 Email.) TeamHealth's counsel, in agreeing to run this search term, noted that they "do not waive and expressly reserve[d] [their] rights to object to the breadth" of United's search terms, but did not challenge their relevance. (*Id.*) TeamHealth's agreement to run the search terms means that it cannot now, at this later date, object to the relevance of the search terms themselves, although they may review the documents that hit upon the Blackstone search term for responsiveness to United's

11

Requests. *See, e.g.*, *Total Safety U.S., Inc. v. Rowland*, No:13-6109, 2014 WL 1691551 *8 (E.D. La. Apr. 29, 2014) (finding that the parties' agree-to ESI protocols waived relevance objection by agreeing to search term). Accordingly, TeamHealth forfeited its ability to challenge the relevance of the Blackstone Requests.

This is also not the first time that a federal court will have ordered TeamHealth affiliates to produce documents regarding their relationship with Blackstone in litigation by a payor regarding TeamHealth's upcoding, either. As mentioned above, TeamHealth has been embroiled in litigation relating to its aggressive and fraudulent billing tactics for years. In one such case, TeamHealth sued Aetna in the Northern District of Ohio claiming breach of an implied-in-fact contract and unjust enrichment for allegedly underpaying for the value of out-of-network emergency room services, and Aetna counterclaimed with various causes of action relating to upcoding. *See Emergency Room Professional Servs., Inc. v. Aetna Health Inc.*, No. 1:19-CV-1224 (N.D. Ohio) (the "Aetna Litigation"). A discovery dispute arose in the litigation over whether Aetna was entitled to documents relating to TeamHealth's organizational structure, including its relationship with Blackstone. The relevant requests included the following:

- RFP No. 85: Produce all Documents received by you from Team Health, Tennessee Parent, Tennessee Merger, and/or Blackstone concerning Team Health's acquisition of you, including but not limited to, all documents, marketing materials, and proposals describing the benefits (financial and otherwise), costs, and requirements for your affiliation with Team Health.

- RFP No. 86: Produce all Documents relating to your communications with Team Health, Tennessee Parent, Tennessee Merger, and/or Blackstone concerning Team Health's acquisition of and/or affiliation with you.

(Ex. 6, Aetna's Brief in Support of its Motion to Compel, at PageID 1240.) The court's appointed special master compelled the production of these documents, and the special master's order was upheld by the district court over TeamHealth's objections, which were premised on relevance and

12

Case 3:21-cv-00364-DCLC-DCP   Document 94   Filed 02/07/25   Page 12 of 17
PageID #: 676

proportionality grounds—just as it objected in this matter. (*See* Ex. 7, Special Master's Order at PageID 692-97; Ex. 8, District Court Order Overruling TeamHealth's Objections to Special Master's Order ECF No. 87 at PageID 1545-46, 1550.)

The Court should follow the same approach here and overrule TeamHealth's objections because the Blackstone Requests are plainly relevant to United's claims.

### B. The Blackstone Requests meet the proportionality standard.

TeamHealth next raises boilerplate proportionality objections. These generic and non-specific objections "are forbidden by the Federal Rules of Civil Procedure." *Durbin v. C&L Tiling Inc.*, No. 3:18-CV-334-RGJ, 2019 WL 4615409, at *5 (W.D. Ky. Sept. 23, 2019) (citing Fed. R. Civ. P. 34(b)(2)(B)). "Boilerplate objections are legally meaningless and amount to a waiver of an objection." *Siser N. Am., Inc. v. Herika G. Inc.*, 325 F.R.D. 200, 209-10 (E.D. Mich. 2018); *see also In re Caterpillar Inc.*, No. 3:19-MC-0031, 2020 WL 1923227, at *16 (M.D. Tenn. Apr. 21, 2020) ("[I]f Respondents rely on outdated, boiler-plate objections that do not inform the Court's determination of discoverability, including as to proportionality, they may not like the outcome.").

Boilerplate is defined as "[r]eady-made or all purpose language that will fit in a variety of documents." Boilerplate, Black's Law Dictionary (11th ed. 2019). United's First Set of Requests for Production included 44 specific Requests. (Ex. 2.) TeamHealth objected to 33 of them as being "disproportionate" or "not proportionate" to the needs of the case with little or no elaboration—the very definition of a "boilerplate" objection. In fact, "[a]sserting a general, identical objection to so many discovery requests violates Rule 33(b)(4)." *Durbin*, 2019 WL 4615409, at *5. Accordingly, the Court should overrule TeamHealth's proportionality objections to the Blackstone Requests. Nonetheless, on the merits, Defendants' proportionality objections should be overruled based on an application of the Rule 26(b)(1) factors:

13

**The importance of the issues at stake in the action.** TeamHealth's aggressive billing tactics, including its intentional upcoding of emergency room claims has injured United, the employers whose healthcare plans United administers, and the policyholders that are ultimately forced to pay higher premiums because of TeamHealth's concerted effort to artificially inflate the cost of healthcare. Accordingly, this factor weighs in United's favor.

**The amount in controversy.** It will require expert testimony to establish the precise amount that United has been harmed by TeamHealth's illicit upcoding scheme. However, United estimated in its initial disclosures that its actual damages exceed $100 million, which may be trebled under RICO. Accordingly, the amount in controversy weighs in United's favor.

**The parties' relative access to relevant information.** United seeks documents that TeamHealth generated during and after its acquisition by Blackstone relating to its financials. Such documents are peculiarly within the possession of TeamHealth, and United otherwise will not be able to access them unless TeamHealth is compelled to produce them. This factor weighs in United's favor.

**The parties' resources**. TeamHealth is the among the largest emergency medicine providers in the country. It is represented by sophisticated counsel and has adequate resources to undertake this production of documents in a reasonable amount of time if compelled by the Court.

**The importance of the discovery in resolving the issues**. This factor weighs in United's favor because it is seeking important internal documents generated by TeamHealth that are indicative of how they presented their emergency room billing policies and procedures to Blackstone prior to the acquisition, and how those policies may have changed after Blackstone assumed control over TeamHealth. United requires these documents, which are uniquely within

14

Case 3:21-cv-00364-DCLC-DCP  Document 94  Filed 02/07/25  Page 14 of 17
PageID #: 678

TeamHealth's control, to prove up TeamHealth's knowledge that it was falsely billing emergency rooms claims under incorrect CPT codes, as well as its fraudulent intent and motive for doing so.

**Whether the burden or expense outweighs its likely benefit**. TeamHealth has not supported its proportionality argument by identifying the cost or expense associated with producing documents in connection with the Blackstone Requests. However, as discussed above, the discovery is crucial to United's claims, and specifically, its ability to prove elements of its fraud and fraud-adjacent claims.

### C. Any proprietary or confidential responsive documents will be adequately guarded by the existing Protective Order.

Finally, TeamHealth objects that the Blackstone Requests call for the production of its proprietary business information and/or trade secrets. The Court should overrule this objection because TeamHealth has not identified any confidential information or trade secret that would be responsive to these Requests, nor has it explained how the Stipulated Confidentiality and Protective Order is insufficient to protect any such information that would be produced.

In Tennessee, a trade secret is defined as information that:

> (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
>
> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tenn. Code Ann. § 47-25-1702. "Several factors are relevant to determining whether information falls within this statutory definition, including the extent of public knowledge; measures taken to guard its secrecy; the value of the information both to the business and to its competitors; money that was spent to develop the information; and the ease or difficulty with which it could be acquired by outsiders." *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 F. App'x 969, 973

15

(6th Cir. 2007). Where a party establishes that information constitutes a trade secret, the district court has the discretion "to decide whether trade secrets are relevant and whether the need outweighs the harm of disclosure.... [I]f the trade secrets are deemed relevant and necessary, the appropriate safeguards that should attend their disclosure by means of a protective order are also a matter within the trial court's discretion." *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 269 (6th Cir. 2010) (internal quotation marks and citation omitted).

TeamHealth has not identified or demonstrated that any of its trade secrets or highly-sensitive business information would be produced in connection with the Blackstone Requests. This is fatal to its objections. *See, e.g.*, *Sungjin Fo–Ma, Inc. v. Chainworks, Inc.*, No. 08-12393, 2009 WL 2022308, at *2–3 (E.D. Mich. July 8, 2009) (overruling confidentiality and trade secret objections where party made no showing in support of the same and made no request for protective order); *End Prod. Results, LLC v. Dental USA, Inc.*, No. 12-CV-11546, 2012 WL 13014636, at *2 (E.D. Mich. Oct. 23, 2012) (same).

However, even if TeamHealth had made such a showing, it has not demonstrated that the existing protective order is insufficient to protect any such information. This, too, should result in the Court overruling TeamHealth's objection and compelling the production of documents. *See, e.g.*, *McNaughton-McKay Elec. Co. v. Linamar Corp.*, No. 09-CV-11165, 2010 WL 2560047, at *3 (E.D. Mich. June 14, 2010) (finding a stipulated protective order sufficient to protect trade secret or other confidential information); *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 2:06-MC-0034, 2006 WL 2871834, at *2 (S.D. Ohio, Aug. 7, 2006) (denying a motion to quash because existing protective order was sufficient to preserve party's interest in maintaining proprietary trade secret information). Accordingly, TeamHealth's stated concern for producing confidential information or trade secrets is not a basis to resist discovery.

## V. Conclusion

Based on the foregoing, United respectfully requests that its Motion to Compel be **GRANTED** and that TeamHealth be compelled to produce documents responsive to United's Requests for Production 39 and 40 within fourteen days of the Court's Order.

Dated: February 7, 2025

By: /s/ Jamie R. Kurtz

Michael J. King (BPR 015523)
Kendell G. Vonckx (BPR 035139)
**Paine Tarwater Bickers, LLP**
900 South Gay Street, Suite 2200
Knoxville, Tennessee 37902-1821
T: (865) 525-0880
mjk@painbickers.com
kgv@paintarwater.com

Jamie R. Kurtz (MN BPR 391792)
Marcus A. Guith (MN BPR 0399520)
**Robins Kaplan LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402–2015
T: (612) 349–8500
jkurtz@robinskaplan.com
mguith@robinskaplan.com

Paul D. Weller (PA BPR 61175)
**Robins Kaplan LLP**
900 Third Avenue
Suite 11900
New York, New York 10022
T: (212) 980-7400
pweller@robinskaplan.com

*Counsel for Plaintiffs UnitedHealthcare Insurance Company, United Healthcare Services, Inc., and UMR Inc.*