# Exhibit 6

# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
NORTHERN DIVISION

EMERGENCY PROFESSIONAL
SERVICES, INC., *et. al.*

      Plaintiffs,

v.

AETNA HEALTH INC., *et al.*,

Defendants.

CASE NO. 1:19-cv-1224

Hon. J. Philip Calabrese

Special Master Marisa Darden

## DEFENDANTS' BRIEF IN SUPPORT OF
## THEIR POSITION ON OUTSTANDING DISCOVERY ISSUES

On May 29, 2019, Plaintiffs[1] filed their $41 million Complaint against Aetna[2] asserting claims for breach of implied-in-fact contracts and equitable claims for unjust enrichment/quantum meruit. They claim Aetna is obligated to pay Plaintiffs the "reasonable value" of their 53,341 professional services – an amount they claim equals over $52 million in billed charges. Yet, they seek to thwart any meaningful discovery into those claims. The crux of their claims is the same. They claim that *they* are the emergency ("ER") physicians who[3] provided ER services to members of Aetna administered self-funded and fully insured health plans, *they* were not reimbursed in full for the *costs incurred* when providing said services, *they* are the "front-line" heroes providing services required by EMTALA and their contracts with hospitals, and *they* must be paid by Aetna the "reasonable value" of their services, which they claim equals their billed charge as a matter of equity/fairness. Those are Plaintiffs' claims set forth in their Complaint, Rule 26 Disclosures, and sworn discovery responses. (ECF # 1; ECF # 27; Resp. to 2nd ROG No. 2.)

Rule 26 allows parties to obtain discovery of any matter relevant to a party's claim or defense and proportional to the needs of the case. In the Sixth Circuit, the scope of discovery is broad. Aetna seeks discovery of matters relevant to Plaintiffs' claims and has served the following discovery requests that were refined as a part of the meet and confer process and tailored to the needs of this case but that Plaintiffs are resisting:

(i)   *Discovery regarding the costs Plaintiffs incurred in providing the ER services at issue.* Plaintiffs specifically allege as a basis of their unjust enrichment claim that Aetna failed to pay them "in full for the costs incurred in rendering necessary treatment to the insurer's enrollees." (ECF # 1, ¶ 49, PageID #10; ¶ 60, PageID #12.) This discovery is relevant to questions of reasonable value, the elements of unjust enrichment including quantifying any detriment to Plaintiffs, and the equities in this case. (Ex. 1.)

---

[1] Plaintiffs are five separate staffing corporations. The relevant discovery requests defined each "Plaintiff" as including its "owners, …, subsidiaries, affiliates, parents …" of Plaintiffs. Plaintiffs never objected to this broad definition which included all TeamHealth entities.

[2] "Aetna" includes each of the named defendants.

[3] In the Complaint, Plaintiffs define themselves as "Physicians" and allege that "they" practice and performed the emergency services for Aetna members. (ECF # 1, PageID #1.)

1

(ii)   *Discovery regarding Plaintiffs' and TeamHealth's organizational structure and the contractual relationships between and amongst them, including operating agreements, management agreements, financial statements and the analysis and studies of Plaintiffs and the Ohio ER market before acquisition.* This discovery is relevant to reasonable value, Plaintiffs' billing and coding practices, and who owns and controls Plaintiffs and this lawsuit. Also, this information would allow discovery into Plaintiffs' claims as to whom receives the benefits of a successful recovery, and Plaintiffs' claims that the actual doctors (not Plaintiff staffing companies nor TeamHealth) are Plaintiffs. (Ex. 2.)

(iii)  *Discovery regarding Plaintiffs' contractual relationship with the 52 hospitals where Plaintiffs staff the ER – including copies of contracts and compensation received from the hospitals.* This discovery is relevant to reasonable value, Plaintiffs' allegations that they are not being reimbursed in full for their costs and that the hospital contracts are the source of Plaintiffs' alleged EMTALA duties forcing them to provide care, who receives the benefit of their services (an element of the unjust enrichment claim), the duties owed to Aetna members and payors, and the required qualifications of the ER doctors. (Ex. 3.)

(iv)  *Discovery regarding the contracts and compensation paid to the ER physicians independently contracted or employed by Plaintiffs.* Among other things, this discovery is relevant to reasonable value, the claim that Plaintiffs are the practicing "Physicians" performing the ER services, the claim that ER doctors were underpaid by Aetna, and Plaintiffs' standing to collect the alleged professional fees. (Ex. 4.)

(v)   *Discovery regarding Plaintiffs' and/or TeamHealth's market analyses or studies on Ohio ER professional market reimbursements,* which is relevant to reasonable value. (Ex. 5.)

(vi)  *Discovery regarding policies on challenging claims payments,* which is relevant to Plaintiffs' claim that the parties' course of dealing created the implied contract. (Ex. 6.)

(vii)  *Discovery regarding Plaintiffs' analysis of Medicare rates in comparison with costs,* which is relevant to reasonable value, unjust enrichment, and Plaintiffs' claims regarding not being paid in full for their costs. (Ex. 7.)

(viii) *Discovery regarding Plaintiffs' disputes with other MCO payers in Ohio,* which is relevant to the reasonable value claim and implied contract claims. (Ex. 8.)

(ix)  *Discovery regarding alleged industry practices on assignments of benefits,* which is relevant to Aetna's express contract defense. (Ex. 9.)

(x)   *Discovery regarding evidence of implied contracts,* relevant to Plaintiffs' claims. (Ex. 10.)

The foregoing discovery is narrowly tailored to seek discovery on the parties' claims and defenses. It is proportional as it is easily accessible by Plaintiffs. They are owned by data-driven companies that have published cost data like average cost per encounter. They can easily access

documents on contracts with physicians and hospitals, organizational structure, financial statements, and billing policies. Under Rule 26(b)(1), this discovery does not need to be admissible at trial. Moreover, this is a $41 million lawsuit and litigation which Plaintiffs' counsel asserts is of national importance. (ECF # 71, PageID #456.) And Plaintiffs have obtained broader discovery from Aetna – including all health plan contracts and administrative services agreements with the plan sponsors for the 912 number sampled claims, shared savings fees for any of the 53,451 Disputed Claims, and broad inquiries into Aetna's payment and reimbursement policies—each of which Aetna is working to satisfy. On the other hand, Plaintiffs have stonewalled and resisted discovery central to the allegations in the Complaint and Aetna's defenses.

As such, the foregoing information is relevant, proportional to the needs of the case, and discovery should be ordered to be produced as requested in Exhibits 1-10.

## BACKGROUND

### I.  Plaintiffs' Claims in the Complaint and This Lawsuit.

Plaintiffs are owned by TeamHealth, Inc. ("TeamHealth"),[4] a national staffing company that operates roughly 3,400 hospital ER departments and provides staffing, administrative, and billing services to ER departments. Plaintiffs define themselves as the "Physicians" who provided the ER care to health plan members. (ECF # 1 Intro, ¶¶1, 10, 54-60, 77-78, 97.) But they refuse to produce the contracts and compensation with the actual physicians who practiced and provided the services, many if not all of whom were independent contractors already paid in full. They refuse to produce documents showing the contractual relationships between and among each Plaintiff and TeamHealth entities even though the Special Master has correctly observed that TeamHealth is controlling the lawsuit.[5] Plaintiffs base their implied contract claims on alleged EMTALA duties

---

[4] Since 2017, The Blackstone Group Inc., a $571.1 billion global investment firm, has owned TeamHealth. (ECF # 71, PageID #460; ECF # 41, ¶ 9, PageID #243.)

[5] Tellingly, the only witnesses disclosed by TeamHealth in the Initial Disclosures are

that they specifically allege are mandated by the 52 hospital contracts, but they refuse to produce the contracts. (*Id.*, ¶47, PageID #9-10.) Plaintiffs also base their equitable theories of unjust enrichment on Aetna's failure to pay them "in full *for the costs incurred in rendering* necessary *treatment to* the *insurer's enrollees.*" (ECF # 1, ¶ 49, PageID #10; ¶ 60, PageID #12) (emphasis added). Plaintiffs cannot wait 6 years after services were rendered, file a $41 million lawsuit for 53,000 claims with allegations that they are the ER physicians, unjustly not being reimbursed their full costs, and obligated to perform EMTALA duties under hospital contracts while stonewalling discovery on those very claims. Aetna is entitled to full discovery on these issues.

## II.     Plaintiffs' Deficient Discovery Production to Date.

Plaintiffs resist discovery into their core claims. While they will claim an 84,082 page production to date, they refuse to produce documents relevant to the Complaint's core allegations. They have limited production to (i) spreadsheets/charts with Plaintiffs' own reimbursement data, chargemasters, and listing Fair Health charge percentiles data, (ii) claim files of remittance advice, medical records, and patient registration files for the 912 sample claims, (iii) copies of payor contracts for in-network payors, (iv) exemplar registration documents for ER facilities, (v) 128 documents relating to TeamHealth coding policies, code of conduct, coding minutes, and PowerPoints on coding, (vi) TeamHealth's own health plan documents, and (vii) seven "form" physician agreements that contain no identifying or compensation information. That is the large majority of the production. The remaining production is (i) 173 e-mails, most of which are limited to either negotiations of in-network contracts with Aetna in Ohio and nationally from 2015 to 2017, (ii) four letters on the termination of the contract Plaintiffs had with other payors, including UnitedHealthcare ("UHC"), (iii) four Aetna related website documents, (iv) Plaintiffs' Fair Health contract, and (v) two non-coding policies – one on appealing claims and the other on completing

TeamHealth executives. (ECF # 27.)

a CMS 1500 claim form—approximately 468 pages.

## ARGUMENT

### I.    Standard of Review

Rule 26(b)(1) allows parties to obtain discovery regarding any nonprivileged matter that is relevant to any parties' claim or defense and proportional to the needs of the case and its scope is broad. *Meredith v. United Collection Bureau, Inc.*, 319 F.R.D. 240, 242 (N.D. Ohio 2017) (J. Gaughan) (quoting *Lewis v. ACB Bus. Serv., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998)); *see also Branning v. Romeo's Pizza, Inc.*, No. 1:19 CV 2092, 2021 WL 4202571, at *2 (N.D. Ohio Aug. 2, 2021); *In re Sonic Corp. Customer Data Sec. Breach Litig.*, No. 1:17MD02807, 2018 WL 11255772, at *6 (N.D. Ohio Apr. 17, 2018) (J. Greenberg) ("Rule 26 is to be liberally construed to permit broad discovery."). "Relevance is to be construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any party's claim or defense." *Burgie v. Walmart Inc.*, No. 520CV00119BJBLLK, 2021 WL 4060398, at *1 (W.D. Ky. Sept. 7, 2021) (internal quotations omitted)). The scope is not limited by admissibility. *Lewis*, 135 F.3d at 402. As such matters pled in the Complaint are "clearly 'relevant to any party's claim or defense,'" *In re Sonic*, 2018 WL 11255772, at *7 (J. Greenberg), and the "appropriate points of reference" are "the claims and defenses set forth in the pleadings." *Fuse Chicken, LLC v. Amazon.com, Inc.*, No. 5:17-CV-1538, 2019 WL 5420210, at *3 (N.D. Ohio Jan. 15, 2019).

Aetna's requests seek relevant discovery of matters set forth in the Complaint and proportional discovery, considering (i) the burden/expense of the discovery sought here does not outweigh its likely benefit, (ii) the needs of this case, (iii) the amount in controversy, (iv) the parties' resources, (v) the importance of the issues at stake in the action, and (vi) the importance of the discovery in resolving the issues. Thus, the Court should order Plaintiffs to produce documents and discovery sought in Exhibits 1 to 10.

## II.     Plaintiffs' and TeamHealth's Affiliates Have Been Ordered to Produce Similar Discovery in a Similar Recent Case

There are numerous independent reasons why these categories of documents are independently discoverable in this Ohio case. But recent Texas court orders in a payor case where TeamHealth was the plaintiff and represented by the same counsel further supports Aetna's right to discovery here. That case was captioned as *ACS Primary Care Physicians Southwest, PA (TeamHealth), et. al. v. Molina Healthcare, Inc.*, Case No. 2017-77084, District Court for Harris County, Texas. On July 18, 2022, Plaintiffs' counsel selectively[6] picked cases from other jurisdictions where they claim payors have been denied the discovery on "costs" – a term they broadly define to include costs, hospital contract, corporate structure, and ER doctor information. Plaintiffs' counsel asserted that no Court has ever ordered TeamHealth to produce "cost" information. But Plaintiffs' counsel failed to disclose or circulate copies of the discovery orders from the *Molina* Texas case where they were lead counsel for TeamHealth and where the payor obtained the discovery sought here.[7] A demonstrative is attached as Exhibit 11 and shows each of the requests for which TeamHealth was ordered to produce discovery similar to that sought by Aetna. TeamHealth in *Molina*, like the Plaintiffs, claimed their billed charge equaled its damages on implied contract claims. Plaintiffs make the same claim that "reasonable value" equals billed charges on implied contract claims. So, this on point case law shows that Plaintiffs should be ordered to produce the similar discovery sought here.[8]

---

[6] Plaintiffs were instructed to produce a complete list of cases/arbitrations on ER service reimbursements in which a TeamHealth affiliate was a party. Despite follow-up, Plaintiffs did not produce that list until 2:21 P.M. EST on September 2, 2022. It is difficult to independently search for such cases/arbitrations because the named parties are not TeamHealth. Exhibit 13 lists reported cases Aetna located.

[7] In *Molina*, the jury awarded Plaintiffs only $1.58 million of actual damages on their billed charges contract theory. Plaintiffs sought $100 million of actual and punitive damages.

[8] The orders which Plaintiffs did circulate are unpersuasive and inapposite here for the reasons set forth in the chart attached as Exhibit 12.

6

14003857.1

### III.  **The Discovery Sought by Aetna Is Discoverable**.

    **i.  Discovery Related to Plaintiffs' Costs of Providing ER Services Is Relevant to Specific Claims Alleged in the Complaint and Proportional.**

In the Complaint, Plaintiffs claim that "an insurer is unjustly enriched if it fails to pay the out-of-network provider in full for the costs incurred in rendering the necessary treatment to the insurer's enrollees." (ECF # 1, ¶ 49, PageID #10; ¶ 60, PageID #12.) Thus, they claim Aetna is unjustly enriched by not reimbursing the full costs incurred in providing the services. At Science Day, Plaintiffs' counsel agreed costs are relevant: "[s]o high level, and obviously, the Court is going to break the tie in understanding that discoverability perhaps is a bit broader than admissibility. We are not naive to that, but *it is our view that costs are relevant*. And in-network rates are relevant." (ECF # 71, 120:21-121:1.) Plaintiffs take issue with proportionality of the discovery. (*Id.* 121:8-12.) They must concede costs are directly relevant and the relevance of costs under Ohio law as a measure of reasonable value is reasonable costs incurred in providing a service plus a reasonable profit. *J-Way Leasing, Ltd. v. Am. Bridge Co.,* No. 1:07-CV-3031, 2010 WL 703075, at *5 (N.D. Ohio Feb. 23, 2010); *see also Taylor v. United Auto Workers*, No. 09-CV-2186, 2010 WL 3254437, at *4 (N.D. Ohio Aug. 3, 2010).[9] Costs are clearly discoverable and questions of admissibility can wait until the close of discovery and expert opinions.

Plaintiffs are also claiming that their unilaterally set billed charges equal reasonable value. They claim that it is against "equity and good conscience to permit Aetna to retain the amount at issue" on the disputed claims (*i.e.*, billed charges minus the allowed amount) and that "[j]ustice and equity require Aetna to reimburse" Plaintiffs "in full" – Plaintiffs' billed charge. Indeed, what costs are incurred in providing care for the disputed claims and the profit margin on those services relative to billed charges are relevant to the reasonable value inquiry. If Plaintiffs claim that their

---

[9] These cases are not limited to construction claims. No such limitation appears in either court's opinion. *J-Way* involved dredging services. *Taylor* involved the value of legal services.

14003857.1

billed charges are the reasonable value of the disputed claims and billed charges nets a 600% profit over costs, a trier of fact may reject the unjust enrichment and quantum meruit claims.

Exhibit 1 identifies the cost information requested by Aetna and those requests are proportional to the needs of this case and the issues at stake on the $41 million claims. The cost information is readily maintained and tracked by TeamHealth in the ordinary course of business. TeamHealth tracks numerous data points on the costs and profitability of Plaintiffs' staffing companies and the ER doctors performing the services on the Disputed Claims. As demonstrated by TeamHealth's CEO Leif Murphy's letter to Congress, he reported that TeamHealth's average cost to provide an ER room visit was $150 per encounter. (Ex. 14.) Aetna seeks the similar data during the relevant time period for Ohio and the data backing up that claim. There is no undue burden in producing those documents. The same is true with respect to the other discovery Aetna requests. Plaintiffs should thus be ordered to produce the discovery requested in Exhibit 1.

### ii. Discovery Regarding Plaintiffs' and TeamHealth's Organizational Structure is Relevant and Proportional.

Plaintiffs' and TeamHealth's organizational structure is relevant to the claims and defenses in this lawsuit for the following reasons:

- Plaintiffs define themselves in the Complaint as "Physicians" who actually provided the ER services at issue. Discovery is necessary to rebut that allegation and show the contractual agreements amongst and between each Plaintiff and TeamHealth entities. Those contracts are accessible and there is no undue burden of production.[10]

- Plaintiffs cannot claim they are practicing ER doctors and stand to benefit from a judgment – which they will undoubtedly attempt to tell the jury – but thwart Aetna's discovery into that claim. Aetna has a right to test this uncorroborated statement by reviewing actual documents and not be limited to self-serving TeamHealth executive testimony.

- Aetna has asserted its counterclaim and is entitled to discover the agreements and relationship related to billing and coding of claims. Billing and coding is performed by other TeamHealth entities. Aetna is entitled to discover how that structure operates.

---

[10] Aetna is producing its health plans and administrative service agreements on the 912 sampled claims.

- The premise of Plaintiffs' claims for an implied in fact contract is the course of dealing between the parties, but given that Plaintiffs admit TeamHealth conducts the business operations, Aetna is entitled to discovery showing no interaction with these Plaintiffs.[11]

- Each "Plaintiff" corporate representative is employed by TeamHealth. (ECF # 27; *see also* Ex. 15.)Aetna needs to know the corporate relationship to test the witness's credibility and ability to speak on behalf of the Plaintiff corporations.

- Aetna is entitled to determine whether Plaintiffs are just holding companies or have actual relationships with the ER doctors that allegedly contract with Plaintiffs. This is relevant to Plaintiffs' standing and privity to assert contract claims in this lawsuit. TeamHealth's 2016 10-K stated that TeamHealth had working relationships with approximately 8,700 physicians, of whom approximately 3,900 were independently contracted. (Ex. 16.)

- The "form" contracts produced show that the ER doctors contract with TeamHealth, not Plaintiffs. And that is the contract that Plaintiffs claim assigns the right to collect the professional ER fees to Plaintiffs.

- Aetna is also entitled to discover who owns Plaintiffs. Plaintiffs' counsel has represented that these are physician owned companies (ECF # 71, 30:25-31:4.) and have repeated those claims on discovery calls. That claim that will be repeated to the jury and must be tested with document discovery.[12]

- Plaintiffs concede that the organizational structure is relevant. In their requests for production to Aetna, they defined "Plaintiffs" to include TeamHealth and made requests for documents/interactions between Aetna and TeamHealth as a result. (First RFP Nos. 2-8, First ROG Nos. 3-4.) In their August 12, 2022 Clarifications, they continue to pursue such documents: "to the extent Aetna does not specifically refer to Plaintiffs but refers to TeamHealth [or] its affiliates … Aetna should produce such documents." Plaintiffs cannot claim that Aetna's interactions with TeamHealth are relevant, but hide behind corporate formalities to thwart discovery into the corporate structure.

The corporate relationship and agreements between Plaintiffs and TeamHealth entities are thus relevant to the claims and defenses in this lawsuit. This information is also obtainable without undue burden on Plaintiffs and important to the issues in this case. As such, Plaintiffs should be ordered to produce organizational structure and relationship documents listed in Exhibit 2.

---

[11] Many of the documents identified in response to Interrogatory No. 5 (Ex. 25) come from a central TeamHealth entity that is not Plaintiffs. Alleged communications Plaintiffs cite in their discovery responses about "objections" come from TeamHealth executives/staff – not Plaintiffs.

[12] In fact, Plaintiffs' public filings required under R.C. 1785.06 show they are not physician owned – but rather owned by a TeamHealth entity or TeamHealth executive. (Ex. 17.)

9

### iii.    Contracts with and Compensation from the 52 Hospitals Are Discoverable.

Exhibit 3 describes the specific documents sought by these discovery requests and break

into three main categories: (1) hospital contracts, (2) compensation from the hospitals, and (3) the

termination of Plaintiff EPS's relationship with CCF:

- *With respect to the hospital contracts*, the burden of producing them is low – only 52 hospital facilities are involved. These contracts are relevant. Plaintiffs pled they are required by their "*contractual arrangements with the hospitals*" to provide professional ER services to Aetna's members. (ECF # 1, ¶ 47, PageID #10.) This is the basis for their implied contract claims. As such, the contracts with hospitals are relevant to the specific allegations in the Complaint. These contracts also are relevant to show who is receiving the benefit of Plaintiffs' ER services – Aetna or the hospitals?[13] Finally, Plaintiffs' experts will claim that there is a distinct ONET market to set reasonable value for ER services because ONET providers do not receive the benefits of being an in-network ("INNET") provider. But TeamHealth's 10-Ks show they obtain exclusive agreements to staff the ERs. Those hospital facilities are all INNET. Thus, discovery of these contracts will rebut the claims as to the ONET market because, in essence, if TeamHealth is the exclusive staffing company for ER at an INNET hospital, it gets all the benefits of being INNET.

- *With respect to the hospital payments/compensation*, TeamHealth's 10-K and publicly filed hospital Form 990s indicate that Plaintiffs and/or TeamHealth receive compensation from the hospitals for providing the services to cover their costs – a fact relevant Plaintiffs' equitable claim that they are unfairly undercompensated for providing services and do not receive full reimbursement of the costs incurred in rendering services. (Ex. 16; Ex. 18.) These reimbursements are relevant to show the subsidized costs of providing ER services, the question of reasonable value, and questions of whether Aetna is being unjustly enriched by paying less than Plaintiffs' billed charges. This discovery is proportional as it informs key elements of Plaintiffs' claims, readily available and there is no undue burden in producing Plaintiffs' revenue from the hospitals.

- *With respect to the CCF contract termination,* an element of the reasonable value calculation under Ohio law requires examining what providers of like skill and quality receive in reimbursements in the same geographic area.[14] Plaintiffs have pled that reasonable value is measured by "the community where the services were performed and by the person who provided them." (ECF # 1, ¶ 6, PageID #3.) Plaintiff EPS staffed CCF's ERs in 2015-2016 and its staffed physicians were providing services to Aetna members at a reimbursement rate far higher than CCF agreed to in 2017 after it termed EPS. Aetna is

---

[13] Aetna believes these contracts contain provisions on balance billing, disclosures to patients regarding surprise billing, and relationships with payers. They may specify the qualifications necessary for ER physicians/nurses, a fact relevant to reasonable value.

[14] *E.g., Chiropractic Clinic of Miami Valley Hosp. v. Middleton*, 2d Dist. Montgomery No. 24240, 2011-Ohio-5069, ¶¶ 20-21; *Neurological Assoc., Inc. v. Borowsky*, 8th Dist. Cuyahoga No. 41197, 1980 WL 354911, *2-6 (Sept. 18, 1980) (quoting 42 O. Jur. 2d, Physicians and Surgeons, Sec. 174, Page 695).

entitled to discover the circumstances of CCF's termination of EPS and show that the CCF emergency room physicians employed by CCF after the EPS termination were of like skill and quality. In fact, Aetna believes some of the same doctors were retained by CCF and providing the same ER services in 2017 at far lower reimbursement rates than EPS billed Aetna in 2015-2016. Documents relating to direct comparators of physicians are highly relevant here, particularly when Plaintiffs have denied CCF is a comparator. The amount that the same ER doctors were being paid by EPS and CCF and reimbursed by Aetna for the same services is highly relevant to the reasonable value of the services. Thus, discovery into the facts surrounding that CCF termination is relevant to reasonable value calculation, important to the issues in this case, and not unduly burdensome as it is narrowly tailored to a limited time-frame of documents from 2016 and 2017 and limited issue of the termination of the CCF contract.

For these reasons, Plaintiffs should be ordered to produce the discovery listed in Exhibit 3.

### iv. Contracts and Compensation of the 306 ER Doctors Performing the Samples Claim Services Are Discoverable.

Plaintiffs claim that the money "at issue" that Aetna has retained belong to the "Physicians" in justice and in equity. (ECF # 1, ¶ 96, PageID #17.) They claim the "Physicians" own Plaintiffs and represent themselves as the "front-line heroes" providing life-saving treatment. (ECF # 71, 30:25-31:4; ECF # 1, ¶ 1, PageID #1; ¶ 10, PageID #3; ¶¶ 53-60, PageID #11-12; ¶ 78, PageID #14; ¶ 97, PageID #17.) These are claims Plaintiffs intend to attempt to present to the jury. The relationship Plaintiffs have with their ER doctors, the hourly rate of pay, and whether they have been paid in full are all relevant to those claims.[15] In fact, Aetna's independent research shows that Plaintiffs are not owned by doctors (Ex. 17.)

The foregoing documents, along with the annual hourly and other compensation paid to the ER doctors are relevant to the reasonable value calculation:

- Plaintiffs pay the ER doctors an hourly rate in exchange for the provision of ER services. Thus, the hourly rate paid by Plaintiffs to the doctors divided by the number of encounters per hour would show the reasonable value Plaintiffs and the doctors place on the services.

- This information also would be relevant to the average cost per encounter – which as demonstrated herein is relevant to reasonable value.

---

[15] Aetna limited its request to the 306 professionals performing services on the sampled Medical Claims. This discovery is additionally relevant and proportional as "costs" discovery.

14003857.1

- Plaintiffs denied that the compensation the physicians were paid from 2013 to 2021 *did not vary* based on what Aetna allowed on the claims. (*See* RFA 40.) Yet, Plaintiffs will attempt to argue at trial that the ER doctors rate of compensation is affected by Aetna's rate of pay, and Aetna has a right to rebut that claim.

Exhibit 4 describes the contract and compensation documents sought. This discovery is proportional as it is retained by Plaintiffs in the ordinary course and important to the questions of equity and reasonable value in this $41 million suit. Plaintiffs agreed to search the files of the 306 ER physicians for CVs. While doing so, they can also retrieve any contracts, compensation, and encounter data. Thus, Plaintiffs should produce the documents described in Exhibit 4.

### v.   Discovery Regarding Market Analysis of Professional ER Reimbursement Rates is Relevant and Proportional.

Plaintiffs seek reimbursement of an amount they contend equals reasonable value. One measure in an unjust enrichment claim is fair market value, *i.e.*, the amount a willing buyer pays and willing seller receives. *Masheter v. Brewer*, 40 Ohio St. 2d 31, 33 (1974); *Hamilton v. Hamilton*, 2002-Ohio-2417, ¶ 47 (12th Dist.) Plaintiffs admit that if an implied contract exists, the reasonable value will be determined by a fact-finder based on market rates. There is no dispute that the Ohio market analysis discovery, as described in Exhibit 5, is relevant and important to this $41 million case claiming Aetna reimbursed at less than market rates.[16] For these reasons, the Court should order production of the documents and data described in Exhibit 5.

### vi.   Policies on Challenging Claims Payment Are Relevant and Proportional.

Plaintiffs claim they produced documents. They have not. Plaintiffs should either identify the responsive documents by Bates number or state there are none. FRCP 34(b)(2)(E)(i).

### vii.   Discovery Regarding Plaintiffs' Analysis of Medicare Rates in Comparison with Costs, Which Is Relevant to Plaintiffs' Claims Regarding Its Costs.

Plaintiffs placed their costs at issue and admitted costs are relevant. Ohio law states that

---

[16] In Plaintiffs' August 12, 2022 discovery request clarifications, they requested that Aetna produce market analyses. Plaintiffs cannot foreclose Aetna from seeking similar discovery.

12

costs and profits are relevant to the reasonable value inquiry. Here, the narrow discovery sought is described in Exhibit 7. This is data readily available to Plaintiffs as TeamHealth made representations to Congress about Medicare and its costs, its website makes these claims, and its counsel made these claims at Science Day. (Ex. 14; Ex. 19; ECF # 71, 15:5-25; Ex. 20.) Thus, the discovery described in Exhibit 7 is relevant, proportional, and discoverable.

### viii. Discovery regarding Plaintiffs' Contract Negotiations, Terminations, and Disputes with Ohio MCO Payers Is Relevant to the Reasonable Value Claim.

*With respect to Plaintiffs' disputes with MCO payers*, Aetna seeks the documents described in Exhibit 8. Again, reasonable value equals what a willing seller and a willing buyer will accept in voluntary, arm's length transactions. *Masheter*, 40 Ohio St. 2d at 33; *Hamilton*, 2002-Ohio-2417, ¶ 47. Plaintiffs claim they have in-network contracts with four MCOs. (Ex. 21.) It is undeniable that Plaintiffs use litigation threats as a means to obtain above market INNET rates. (Ex. 22; *see also* Ex. 23[17].) Such rates are *not* arms-length. Thus, the circumstances surrounding how Plaintiffs obtained their INNET rates is relevant to determine whether a rate is reflects the market or coercion. Aetna's economic experts can opine on that subject, and whether such information is admissible at trial is irrelevant here. *Lewis*, 135 F.3d at 402; FRCP 26(b)(1). Aetna narrowly limited discovery to the other five major MCO payers in Ohio and to negotiations and/or terminations of their respective contracts since 2013 to present and specific settlement agreements, if any, with those MCOs that required entering a provider reimbursement agreement.

*With respect to the UHC arbitration*, 

. (Ex. 24.)

----

[17] In a 11/21/2019 letter from TeamHealth CEO Leif Murphy, he states that TeamHealth would begin suing insurers for alleged underpayments as a matter of corporate practice. (Ex. 23.)



. If UHC is right and a binding arbitration decision is rendered, that would mean Plaintiffs' market data for out of network claims is inflated by millions of dollars, is inaccurate and unreliable and needs redone.

(Ex. 24.) This information is relevant to Plaintiffs' claims and is narrowly tailored to the needs of this case as Plaintiffs' damages model must rely on accurate market data and Aetna is entitled to challenge the model through discovery.

There is no undue burden in producing the foregoing documents described in Exhibit 8. Accordingly, the Court should order their production.

### ix. Documents on Alleged Industry Practices on Assignments of Benefits.

Plaintiffs claim they produced documents. They have not. Plaintiffs should either identify the responsive documents by Bates number or state there are none. FRCP 34(b)(2)(E)(i).

### x. Fulsome Discovery on Alleged Evidence of Implied Contracts Is Proper.

Aetna understands that Plaintiffs are relying on the documents identified in response to Second Interrogatory No. 5. (Ex. 25.) Aetna seeks the following:

- An order under Rule 34(b)(2)(E)(i) that Plaintiffs identify by Bates number the documents they contend are responsive as not all documents were identified by Bates Number.

- Plaintiffs identified "CMS 1500 forms submitted by ER Providers to Defendants in accordance with Defendants' procedures" as responsive. The alleged "procedures" relied on by Defendants have not been produced.

- Plaintiffs identified "Plaintiffs_54314-315" as a responsive document. Aetna seeks that Plaintiffs provide the native original copy retrieved by Plaintiffs and identify the date on

14

which Plaintiffs first downloaded the document.

**IV.    The Discovery Sought by Plaintiffs from Aetna Is Not Relevant or Proportional to the Needs of the Case.**

Plaintiffs' First RFP No. 11 requests that Aetna produce documents on assignment of benefits, including prohibitions and limitations on assignments and the impact an assignment may have on payment. This request seeks information not relevant to the parties' claims or defenses and is not proportional to the needs of this case. Aetna is not claiming that anti-assignment clauses prohibit Plaintiffs' assignments here. It is a non-issue and not relevant. Further, Aetna has already produced or is producing (i) copies of all Plan documents and EOBs for the 912 sampled claims and (ii) any of its reimbursement policies. Those documents address whether the health plans have provisions with any prohibitions on the assignment of benefits. Any further discovery is not relevant or proportional. And to the extent Plaintiffs seek communications between Aetna and plan sponsors on asserting anti-assignment clauses as a defense in this lawsuit, there are no responsive documents. Thus, any additional discovery beyond that identified herein should be denied.

Plaintiffs have also requested that Aetna produce a copy of its facility contract with the Cleveland Clinic Foundation ("CCF") in response to First RFP No. 20. Aetna has produced the CCF contract for the reimbursement of professional services. The CCF facility contract bears no relevance to reimbursement of professional ER services, the elements of Plaintiffs' implied contract claims or the reasonable value calculation.

## CONCLUSION

As set forth herein, Plaintiffs should be ordered to produce the discovery described in Exhibits 1 to 10, and Aetna's objections to Plaintiffs' discovery should be sustained.

Respectfully submitted,

*/s/ Robert J. Fogarty*
Robert J. Fogarty (0006818)
rjfogarty@hahnlaw.com
Casey J. McElfresh (0088083)
cmcelfresh@hahnlaw.com
HAHN L OESER & PARKS LLP
200 Public Square, Suite 2800
Cleveland, OH 44114
Phone: (216) 621-0150
Fax: (216) 241-2824

Marc J. Kessler (0059236)
mkessler@hahnlaw.com
HAHN LOESER & PARKS LLP
65 E. State St., Ste. 1400
Columbus, Ohio 43215
Phone: (614) 233-5168
Fax: (614) 233-5185

*Counsel for Defendants*

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on September 2nd, 2022, the foregoing was served on the following

parties of record via e-mail:

Donald S. Scherzer
dscherzer@ralaw.com
Rachael L. Russo
rrusso@ralaw.com
ROETZEL & ANDRESS, LPA
1375 East Ninth Street
One Cleveland Center, 10th Floor
Cleveland, OH 44114

Alan D. Lash
alash@lashgoldberg.com
Justin C. Fineberg
jfineberg@lashgoldberg.com
Michael Lee Ehren
mehren@lashgoldberg.com
LASH & GOLDBERG LLP
Miami Tower
100 S.E. 2nd Street, Suite 1200
Miami, FL 33131

John Zavitsanos
jzavitsanos@azalaw.com
Joseph Y. Ahmad
joe.ahmad@azalaw.com
P. Kevin Leyendecker
kleyendecker@azalaw.com
Sammy Ford
sford@azalaw.com
Cameron A. Byrd
cbyrd@azalaw.com
Michael A. Killingsworth
mkillingsworth@azalaw.com
AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney, Suite 2500
Houston, Texas 77010

*Counsel for Plaintiffs*

*/s/ Robert J. Fogarty*
*One of the Attorneys for Defendants*

17

## Category I - Discovery sought regarding the costs
## Plaintiffs incurred in providing the ER services at issue

**ORIGINAL REQUEST(S)**

**1ˢᵗ NO. 68:** Produce all Documents relating to the cost of care with respect to the Medical Claims, including but not limited to any Documents analyzing, studying, or reporting regarding the costs of care by CPT code or otherwise.

**Amended/Refined Request**: Please produce the following:

- All internal or external Communications and/or Documents referencing the full costs incurred for providing the Medical Services for the Medical Claims as alleged in paragraph 49 of the Complaint.

- Any internal or external Communications and/or Documents related to TeamHealth's CEO's letter to Congress [March 13, 2019 Leif Murphy Ltr., Exhibit 4 to RFAs ("RFA Ex. 4")] supporting or referencing his statement that the average cost per encounter is $150.

- All Documents that Identify the cost of care per emergency room encounter in Ohio for each Plaintiff for each year from 2013-2021.

- The contracts, hourly rate, and compensation for each of the 306 ER physicians/nurses who performed the emergency services on the sampled Medical Claims.

- Documents that Identify the average number of encounters per hour in Ohio for Plaintiffs employed or independently contracted physicians./nurses for each year from 2013-2021.

# Exhibit 1

**Category II - Discovery regarding Plaintiffs' and TeamHealth's organizational structure and the contractual relationships between and amongst them, including operating agreements, management agreements, financial statements and the analysis and studies of Plaintiffs and the Ohio ER market before acquisition**

**ORIGINAL REQUEST(S)**

**1st RFP NO. 78:** Produce all Documents relating to your corporate organizational structure.

**1st RFP NO. 79:** Produce all Documents relating to your parent company's, subsidiaries', and affiliate companies' organizational structure.

**1st RFP NO. 80:** Produce all Documents relating to your officers, board of directors, and/or shareholders.

**1st RFP NO. 81:** Produce all Documents relating to your financial statements, quarterly income reports, annual income reports, investors reports, and/or tax returns from January 1, 2012 to the present.

**1st RFP NO. 83:** Produce all Documents relating to the contractual relationship between you and Team Health, including but not limited to, all contracts and agreements between you and Team Health, and/or all amendments, schedules, addenda, and attachments to the contract or agreement.

**1st RFP NO. 84:** Produce all Documents relating to internal communications concerning the relationship between you and Team Health.

**1st RFP NO. 85:** Produce all Documents received by you from Team Health, Tennessee Parent, Tennessee Merger, and/or Blackstone concerning Team Health's acquisition of you, including but not limited to, all documents, marketing materials, and proposals describing the benefits (financial and otherwise), costs, and requirements for your affiliation with Team Health.

**1st RFP NO. 86:** Produce all Documents relating to your communications with Team Health, Tennessee Parent, Tennessee Merger, and/or Blackstone concerning Team Health's acquisition of and/or affiliation with you.

**Amended/Refined Request**: Please produce the following:

- Documents that Identify each Plaintiffs' organizational structure, shareholders, officers, and management team.

- Documents that Identify TeamHealth's organizational structure, shareholders, officers, and management team.

- Documents that Identify the relationship between each named Plaintiff and TeamHealth.

# Exhibit 2

- Agreements or contracts between each of the Plaintiffs and TeamHealth, including any regarding the payment of costs and/or regarding any services provided by Plaintiffs to TeamHealth or by TeamHealth to any Plaintiffs.

- Any agreements between each Plaintiff.

- Annual and quarterly financial statements from January 1, 2013 to the present for each named Plaintiff.

# Exhibit 2

**Category III - Discovery sought regarding Plaintiffs' contractual relationship with the 52 hospitals where Plaintiffs staff the ER including copies of contracts and compensation received from the hospitals**

17.  **HOSPITAL CONTRACTS AND EMTALA.**

**ORIGINAL REQUEST(S)**

**1st RFP NO. 76:** Produce all Documents concerning the contractual relationship between you and any hospital or medical facility where Medical Services were provided by you to any patient whose Medical Claims are at issue in the Lawsuit, including but not limited to all contracts, agreements and/or memoranda of understanding between you and those hospitals or medical facilities, and all amendments, schedules, addenda, and attachments thereto.

**1st RFP NO. 77:** Produce all Documents concerning the contractual relationship between Team Health and any hospital or medical facility where Medical Services were provided by you to any patient whose Medical Claims are at issue in the Lawsuit, including but not limited to all contracts, agreements and/or memoranda of understanding between Team Health and those hospitals or medical facilities, and all amendments, schedules, addenda, and attachments thereto.

**2nd RFP NO. 6:** All Documents Related to the contractual relationship between each Plaintiff and any hospital or medical facility where Medical Services were provided by that Plaintiff to any patient whose Medical Claims are at issue in the Lawsuit, including but not limited to all contracts, agreements and/or memoranda of understanding between each Plaintiff and those hospitals or medical facilities, and all amendments, schedules, addenda, and attachments thereto.

**2nd RFP NO. 7:** All Documents Related to the contractual relationship between TeamHealth and any hospital or medical facility where Medical Services were provided by Plaintiffs to any patient whose Medical Claims are at issue in the Lawsuit, including but not limited to all contracts, agreements and/or memoranda of understanding between TeamHealth and those hospitals or medical facilities, and all amendments, schedules, addenda, and attachments thereto.

**Amended/Refined Request**: Please produce the following:

- Copies of all contracts and agreements with the Ohio hospital facilities where Plaintiffs staff emergency rooms.

- All Documents relating to Your contractual obligations with each hospital as alleged in paragraph 47 of the Complaint.

- All Documents and Communications referring to payments, compensation, and /or subsidies You have received and/or are owed from any hospital facility in Ohio.

- Plaintiff Emergency Physician Services' contract with CCF and any internal or external Communications and/or Documents relating to termination of that contract.

# Exhibit 3

4

**Category IV - Discovery sought regarding the contracts and compensation paid to the ER physicians independently contracted or employed by Plaintiffs**

16. **CONTRACTS BETWEEN PLAINTIFFS AND TEAMHEALTH; PLAINTIFFS' AND TEAMHEALTH'S CONTRACTS WITH THE ER DOCTORS; THE ER DOCTORS RELATIONSHIP TO PLAINTIFFS.**

### ORIGINAL REQUEST(S)

**1st RFP NO. 73:** Produce all Documents relating to the contractual relationship between you, your individual physicians and/or providers and Team Health, including but not limited to all

contracts, agreements and/or memoranda of understanding between you, your individual physicians and/or providers and Team Health, and all amendments, schedules, addenda, and attachments thereto.

**1st RFP NO. 74:** Produce all Documents relating to your compensation of emergency room physicians from January 1, 2012 to the present.

**2nd RFP NO. 5:** All Documents Related to the contractual relationship between each Plaintiff, its individual physicians and/or providers and TeamHealth, including but not limited to all contracts, agreements and/or memoranda of understanding between each Plaintiff, its individual physicians and/or providers and TeamHealth, and all amendments, schedules, addenda, and attachments thereto.

**3rd RFP NO. 1:** All Documents Related to or that Describe the average hourly rates and compensation paid to the physicians and/or medical personnel who performed the Medical Claims from January 1, 2012 through the present.

**Amended/Refined Request**: Please produce the following:

- Copies of any agreements and/or contracts between each Plaintiff and TeamHealth relating to the services that TeamHealth provides to Plaintiffs. This would include operating agreements, employment agreements, services agreements, management agreements, and/or shareholder agreements.

- For each year from 2013 through 2021, the contracts, hourly rate and compensation for each of the 306 ER physicians/nurses who performed the emergency services on the sampled Medical Claims.

- Documents which Identify whether each physician/nurse who performed the Medical Service for the Medical Claims has been paid in full per the terms of Your contract with them.

# Exhibit 4

- All Documents that Identify the average number of encounters per hour in Ohio for Plaintiffs employed or independently contracted physicians./nurses from 2013 through 2022.

- Documents that Identify the relationship between the physicians/nurses who performed the Medical Services and the Plaintiffs and/or TeamHealth.

- Any internal or external Communications or Documents relating to policies, procedures, and/or practices regarding the distribution of any proceeds, reimbursements, and/or payments in Ohio as part of the settlement of disputes with any payors.

- Any internal or external Communications or Documents showing the distribution of any proceeds, reimbursements, and/or payments in Ohio as the result of any settlement of dispute with any payors.

- Any and all Documents which show that the hourly rate or compensation You paid Your emergency room physicians for providing emergency medical services in Ohio from May 4, 2013 to June 21, 2021 varied based on reimbursement allowed by Aetna to You.

## Exhibit 4

## Category V - Discovery regarding Plaintiffs' and/or TeamHealth's
## market analyses or studies on reimbursements in the Ohio ER professional market

**15.    MARKET ANALYSES/STUDIES OF OHIO ER RATES.**

**ORIGINAL REQUEST(S)**

**1st RFP NO. 70:** Produce all Documents relating to any policies, procedures and/or internal communications concerning Team Health's plan, strategy or policy for affiliating with physician groups in Ohio, including but not limited to, Documents and communications concerning the types of groups subject to affiliation, the requirements for affiliation, any post-affiliation plans concerning the affiliated group's pre-affiliation payor contracts, and any criteria for termination of any group's affiliation with Team Health.

**1st RFP NO. 87:** Produce all Documents relating to your analysis and consideration of whether to affiliate with Team Health, including but not limited to your consideration of financial benefits for you and/or the physicians associated with you, as well as any non-financial benefits resulting from the affiliation.

**1st RFP NO. 88:** Produce all Documents relating to Team Health's analysis and consideration of whether to affiliate with any other Plaintiffs in the Lawsuit, including but not limited to any analysis of rates and/or any impact of any anticipated increase in any of your or the other Plaintiffs' rates that might result from the affiliation.

**1st RFP NO. 89:** Produce all Documents reflecting any criteria or requirements that you had to satisfy to be affiliated with Team Health, including but not limited to, communications concerning any financial performance, staffing arrangements with market hospitals, exclusivity arrangements, network status with commercial payers, contract rates with commercial payers, and any quality-of-care criteria.

**Amended/Refined Request:** Please produce the following:

- Any internal or external Communications and/or Documents referring to any analyses, reports, or studies of Ohio billed charges, market rates and/or reimbursements for professional emergency services from 2013 through 2021.

- Any internal or external Communications and/or Documents analyzing Ohio billed charges, market rates and/or reimbursements for professional emergency services created or reviewed during the acquisition of any of the Plaintiffs.

# Exhibit 5

**Category VI - Discovery regarding policies on challenging claims payments**

21. **POLICIES, PRACTICES, AND PROCEDURES FOR PROCESSING, ACCEPTING, CHALLENGING, AND/OR DISPUTING DECISIONS BY PAYERS.**

**ORIGINAL REQUEST(S)**

**2nd RFP NO. 20:** All Documents Related to each Plaintiffs' and/or TeamHealth's policies, procedures, practices, and instructions Related to processing, accepting, challenging, and/or disputing any (1) explanation of benefit received from any payor, (2) remittance advice received from any payor, and/or (3) payments received from any payor for medical claims.

**2nd RFP NO. 21:** All Documents, including internal or external Communications, Related to each Plaintiffs' and/or TeamHealth's policies, procedures, practices, and instructions with

respect to processing, accepting, challenging, and/or disputing any (1) explanation of benefit received from any payor, (2) remittance advice received from any payor, and/or (3) payments received from any payor for medical claims.

**Amended/Refined Request**: Plaintiffs agreed to search and produce responsive documents.

Notwithstanding, please produce the following:

- Copies of any policies, procedures, practices, and instructions related to processing, accepting, challenging, and/or disputing any claims decision and/or payment by a payor applicable to the Ohio market.

- Copies of any policies, procedures, practices, and instructions related to processing, accepting, challenging, and/or disputing any claims decision and/or payment by Aetna on the Medical Claims.

- All internal or external Communications and/or Documents relating to the foregoing.

# Exhibit 6

**Category VII - Discovery regarding Plaintiffs'
analysis of Medicare rates in comparison with costs**

**ORIGINAL REQUEST(S)**

**3rd RFP NO. 15:** All Documents Related to Your analysis of Medicare rates in comparison with Your cost of providing emergency room services.

**Amended/Refined Request**: Plaintiffs agreed to search for and state whether any such Documents exist. This Request includes all internal or external Communications and/or Documents supporting Your claims that Medicare rate increases have not kept up with Your costs of providing emergency services in Ohio. Plaintiffs have requested to brief whether such Documents should be produced if they do exist.

# Exhibit 7

9

**Category VIII - Discovery regarding Plaintiffs' disputes with other MCO payers in Ohio**

**ORIGINAL REQUEST(S)**

**1st RFP NO. 49:** Produce all Documents relating to all contracts, agreements, and/or memoranda of understanding (including exhibits, schedules, attachments, addenda, and amendments) between you and any other commercial Payor in effect from January 1, 2012 to the present.

**1st RFP NO. 60:** Produce all Documents relating to contracts with commercial Payors from whom you have received in-network reimbursements for Medical Services provided in the State of Ohio from January 1, 2012 to the present.

**3rd RFP NO. 17:** All Documents Related to your arbitration with UnitedHealthcare Insurance Company and/or any of its subsidiaries Related to Your billing for emergency services in Ohio and/or Ohio market rates for emergency services.

**Amended/Refined Request**: Please produce the following:

- All Documents referring to the negotiations and/or termination of the in-network ("INN" or "INNET") contracts with United Healthcare Insurance Company ("UHC"), Cigna, Anthem, Humana, and/or Medical Mutual of Ohio ("MMO") from May 29, 2013 to June 21, 2021.

- All settlement agreements with UHC, Cigna, Anthem, Humana, and/or MMO for any claims or disputes which refer to or include a provision for entering into a participating provider agreement and/or out-of-network reimbursement agreement for Ohio emergency services.

- All Documents regarding Plaintiffs' dispute with UHC for the reimbursement of emergency professional services in Ohio as referenced in the July 9, 2019 letter produced as Bates Number Plaintiffs 52206-52207.

- A copy of any decision and/or award when issued in Your arbitration with UHC and/or any of its subsidiaries Related to Your billing for emergency professional services in Ohio.

- A copy of the UHC provider leasing agreement that Plaintiffs' counsel claimed gave all Plaintiffs the right to bill through Plaintiff CES's TIN and contract.

# Exhibit 8

**<u>Category IX - Discovery regarding alleged industry practices on assignments of benefits</u>**

**<u>ORIGINAL REQUEST(S)</u>**

**2nd RFP NO. 23:** All Documents, including internal or external Communications, Related to any industry wide practices that You contend exist with respect to directing payors to remit payments directly to providers.

**2nd RFP NO. 25:** All Documents, including internal or external Communications, Related to any industry wide practices that You contend exist with respect to the completion of Box 27 of the CMS 1500 claim form.

**<u>Amended/Refined Request</u>**: Plaintiffs have stated that they have no responsive Documents.

Please confirm in writing that Plaintiffs have no responsive Documents.

# Exhibit 9

**Category X - Discovery regarding evidence of implied contracts**

**ORIGINAL REQUEST(S)**

**2ⁿᵈ RFP NO. 28:** All Documents, including internal or external Communications, that You contend formed the implied contract between Plaintiffs and Aetna that Plaintiffs allege in the Complaint that they have with Aetna.

**Amended/Refined Request**: Plaintiffs have stated they are relying on the list of documents identified in response to Interrogatory No. 5.

Aetna requests Plaintiffs confirm in writing that they do not know of any other responsive Documents.

**ORIGINAL REQUEST(S)**

**2ⁿᵈ RFP NO. 29:** All Documents, including internal or external Communications, that You contend provide the terms the implied contract between Plaintiffs and Aetna that Plaintiffs allege in the Complaint that they have with Aetna.

**Amended/Refined Request**: Plaintiffs have stated they are relying on the list of documents identified in response to Interrogatory No. 5.

Aetna requests that Plaintiffs confirm in writing that they do not know of any other responsive Documents.

**2ⁿᵈ RFP NO. 30:** All Documents that You contend evidence Aetna's agreement to pay Plaintiffs the reasonable value of services and/or whatever amounts You contend that Aetna agreed to pay.

**Amended/Refined Request**: Plaintiffs have stated they have no other Documents to provide. Please confirm that Plaintiffs are not aware of any other responsive Documents.

# Exhibit 10

**Relevant Discovery Rulings in**
*__ACS Primary Care Physicians Southwest, PA (TeamHealth), et. al. v. Molina Healthcare, Inc.__*, Case No. 2017-77084
**District Court of Harris County, Texas**

| Order Compelling Response | Molina Request | Comparable Aetna Request Categories |
|---|---|---|
| 12/14/2018 Order on Defendant's First Motion to Compel<br><br>[*see* Ex. 11-A.] | **1st RFP 18[1]** – All documents reflecting, relating to and/or evidencing the percentage that Emergency Services actually recovers for any emergency medicine services of the kind provided to Molina Members | **Category I -** Discovery sought regarding the costs Plaintiffs incurred in providing the ER services at issue [Ex. 1.]<br><br>**Category III -** Discovery sought regarding Plaintiffs' contractual relationship with the 52 hospitals where Plaintiffs staff the ER including copies of contracts and compensation received from the hospitals [Ex. 3.]<br><br>**Category IV -** Discovery sought regarding the contracts and compensation paid to the ER physicians independently contracted or employed by Plaintiffs [Ex. 4.] |

---

[1]  Copies of the relevant First Set of RFPs to TeamHealth in *Molina* are attached as Exhibit 11-E.

# Exhibit 11

1

| Order Compelling Response | Molina Request | Comparable Aetna Request Categories |
|---|---|---|
| *Id.* | **1st RFP 19** – All documents reflecting, relating to, and/or evidencing the comparative amounts charged by Emergency Services for emergency medicine services of the kind provided to Molina Members as it relates to: (i) uninsured patients; (ii) Medicaid patients; (iii) patients using other government supported programs; (iv) Molina Members; (v) private pay patients pursuant to a participating provider agreement; and (vi) private pay patients not pursuant to a participating provider agreement, other than Molina Members. | **Category VII** - Discovery regarding Plaintiffs' analysis of Medicare rates in comparison with costs [Ex. 7.] |
| *Id.* | **1st RFP 20** – All documents reflecting, relating to, and/or evidencing the comparative amounts collected by Emergency Services for emergency medicine services of the kind provided to Molina Members as it relates to: (i) uninsured patients; (ii) Medicaid patients; (iii) patients using other government supported programs; (iv) Molina Members; (v) private pay patients pursuant to a participating provider agreement; and (vi) private pay patients not pursuant to a participating provider agreement, other than Molina Members. | **Category I** - Discovery sought regarding the costs Plaintiffs incurred in providing the ER services at issue [Ex. 1.]<br><br>**Category VII** - Discovery regarding Plaintiffs' analysis of Medicare rates in comparison with costs [Ex. 7.] |

2

| Order Compelling Response | Molina Request | Comparable Aetna Request Categories |
|---|---|---|
| 07/24/2020 Order Granting Defendants' Fifth Motion for Reconsideration of Prior Discovery Orders<br><br>[Ex. 11-D.] | **1st RFP 17 -** All documents reflecting, relating to, and/or evidencing the profit margin that Emergency Services recovers for any emergency medicine services of the kind provided to Molina Members. | **Category I -** Discovery regarding Plaintiffs' analysis of Medicare rates in comparison with costs [Ex. 1.]<br><br>**Category VII -** Discovery regarding Plaintiffs' analysis of Medicare rates in comparison with costs [Ex. 7.] |
| 06/20/2019 Order Granting Defendant's Second Motion to Compel<br><br>[Ex. 11-B.] | **2nd RFP 10[2] -** Documents sufficient to evidence the ownership of Plaintiffs during the Relevant Period. | **Category II -** Discovery regarding Plaintiffs' and TeamHealth's organizational structure and the contractual relationships between and amongst them, including operating agreements, management agreements, financial statements and the analysis and studies of Plaintiffs and the Ohio ER market before acquisition [Ex. 2.] |
| *Id.* | **2nd RFP 14 -** All contracts or agreements between TeamHealth and Plaintiffs that were in effect at any point during the Relevant Period, including, but not limited to, any management agreements, severance agreements, succession agreements, banking agreements or account sweep agreements, independent contractor agreements, medical director agreements, performance or bonus plan agreements, and stock management or right of first refusal agreements. | **Category II -** Discovery regarding Plaintiffs' and TeamHealth's organizational structure and the contractual relationships between and amongst them, including operating agreements, management agreements, financial statements and the analysis and studies of Plaintiffs and the Ohio ER market before acquisition [Ex. 2.] |

---

[2]  Copies of the relevant Second Set of RFPs to TeamHealth in *Molina* are attached as Exhibit 11-F.

3

| Order Compelling Response | Molina Request | Comparable Aetna Request Categories |
|---|---|---|
| *Id.* | **2nd RFP 22** - All contracts or agreements where Plaintiffs are parties and for which TeamHealth is a third-party beneficiary. | **Category III** - Discovery sought regarding Plaintiffs' contractual relationship with the 52 hospitals where Plaintiffs staff the ER including copies of contracts and compensation received from the hospitals [Ex. 3.] <br><br> **Category IV** - Discovery sought regarding the contracts and compensation paid to the ER physicians independently contracted or employed by Plaintiffs [Ex. 4.] |
| *Id.* | **2nd RFP 23** - All documents referring or relating to the amounts paid by Plaintiffs to TeamHealth during the Relevant Period, including, but not limited to, amounts paid in the aggregate and as a percentage of gross and net income. | **Category II** - Discovery regarding Plaintiffs' and TeamHealth's organizational structure and the contractual relationships between and amongst them, including operating agreements, management agreements, financial statements and the analysis and studies of Plaintiffs and the Ohio ER market before acquisition [Ex. 2.] |
| *Id.* | **2nd RFP 45** - Documents sufficient to evidence each licensed physician that Plaintiffs contracted with during the Relevant Period, including licensed physicians who may have been contracted with prior to the Relevant Period but who remain under contract during the Relevant Period, whether through an employment agreement or an independent contractor agreement. | **Category IV** - Discovery sought regarding the contracts and compensation paid to the ER physicians independently contracted or employed by Plaintiffs [Ex. 4.] |

4

| Order Compelling Response | Molina Request | Comparable Aetna Request Categories |
|---|---|---|
| *Id.* | **2nd RFP 48** – All communications between Plaintiffs and TeamHealth regarding the Lawsuit. | **Category II -** Discovery regarding Plaintiffs' and TeamHealth's organizational structure and the contractual relationships between and amongst them, including operating agreements, management agreements, financial statements and the analysis and studies of Plaintiffs and the Ohio ER market before acquisition [Ex. 2.] |
| *Id.* | **2nd RFP 49** – All communications between Plaintiffs and TeamHealth regarding Molina's reimbursement policies relating to emergency services in Texas | **Category II -** Discovery regarding Plaintiffs' and TeamHealth's organizational structure and the contractual relationships between and amongst them, including operating agreements, management agreements, financial statements and the analysis and studies of Plaintiffs and the Ohio ER market before acquisition [Ex. 2.] |
| *Id.* | **2nd RFP 70** - Any organizational charts for Plaintiffs. | **Category II -** Discovery regarding Plaintiffs' and TeamHealth's organizational structure and the contractual relationships between and amongst them, including operating agreements, management agreements, financial statements and the analysis and studies of Plaintiffs and the Ohio ER market before acquisition [Ex. 2.] |

5

| Order Compelling Response | Molina Request | Comparable Aetna Request Categories |
|---|---|---|
| *Id.* | **2nd ROG 3**[3] – Identify all persons within Plaintiffs' organizations with the responsibility for determining their chargemasters or determining the usual and customary rate for reimbursement of emergency services claims similar to the Claims. | **Category II -** Discovery regarding Plaintiffs' and TeamHealth's organizational structure and the contractual relationships between and amongst them, including operating agreements, management agreements, financial statements and the analysis and studies of Plaintiffs and the Ohio ER market before acquisition [Ex. 2.] |

---

[3] Copies of the relevant Second Set of ROGs to TeamHealth in *Molina* are attached as Exhibit 11-G.

6

| Order Compelling Response | Molina Request | Comparable Aetna Request Categories |
|---|---|---|
| 06/17/2019 Order Granting in Part and Denying in Part Defendants' Third Motion to Compel<br><br>[Ex. 11-C.] | **3rd RFP 6** – In connection with any litigation brought by Plaintiffs against a payor other than Molina that is based, in whole or in part, on that payor's purported failure to pay the "usual and customary rate" under Texas Insurance Code Section 1271.155, please produce: (i) Plaintiffs' verified interrogatory responses regarding or relating to the manner and methodology of calculating the usual and customary rate; (ii) transcripts of any witnesses associated with Plaintiffs, including expert witnesses, discussing, referring, or relating to the manner and methodology of calculating the usual and customary rate; and (iii) the expert disclosures and reports, if any, of any expert witness opining, referring, or relating to the manner and methodology of calculating the usual and customary rate, including any expert reports. This request specifically includes, but is not limited to, the litigation entitled *Emergency Services of Texas, P.A., et al. v. Humana Insurance Company, et al.* which was filed in the Western District of Texas on February 14, 2019. | **Category VI** - Discovery regarding policies on challenging claims payments [Ex. 6.] |
| *Id.* | **3rd RFP 8[4]** – Any policy and procedure used by Plaintiffs that governs the charging or calculation of charges for healthcare services to patients on an unbundled or bundled basis. | **Category I -** Discovery sought regarding the costs Plaintiffs incurred in providing the ER services at issue [Ex. 1.] |

---

[4]  Copies of the relevant Third Set of RFPs to TeamHealth in *Molina* are attached as Exhibit 11-H.

7

| Order Compelling Response | Molina Request | Comparable Aetna Request Categories |
|---|---|---|
| *Id.* | **3rd RFP 10** – Plaintiffs' policy and procedure defining their efforts to collect deductibles, co-payments, and other co-insurance obligations from patients. | **Category I -** Discovery sought regarding the costs Plaintiffs incurred in providing the ER services at issue [Ex. 1.] |
| *Id.* | **3rd RFP 11** – Documents sufficient to evidence Plaintiffs' collection practices of copays and/or deductibles from Molina Enrollees. | **Category I -** Discovery sought regarding the costs Plaintiffs incurred in providing the ER services at issue [Ex. 1.] |
| *Id.* | **3rd RFP 21** – The annual revenue and expense detail for all patients during the Relevant Period at each Hospital | **Category I -** Discovery sought regarding the costs Plaintiffs incurred in providing the ER services at issue [Ex. 1.]<br><br>**Category III -** Discovery sought regarding Plaintiffs' contractual relationship with the 52 hospitals where Plaintiffs staff the ER including copies of contracts and compensation received from the hospitals [Ex. 3.]<br><br>**Category IV -** Discovery sought regarding the contracts and compensation paid to the ER physicians independently contracted or employed by Plaintiffs [Ex. 4.] |

8

| Order Compelling Response | Molina Request | Comparable Aetna Request Categories |
|---|---|---|
| *Id.* | **3rd RFP 24** - Documents and communications sufficient to evidence the average actual expense incurred by Plaintiffs per patient visit for all patients at the Hospital, before corporate allocations, during the Relevant Period. | **Category I -** Discovery sought regarding the costs Plaintiffs incurred in providing the ER services at issue [Ex. 1.]<br><br>**Category III -** Discovery sought regarding Plaintiffs' contractual relationship with the 52 hospitals where Plaintiffs staff the ER including copies of contracts and compensation received from the hospitals [Ex. 3.]<br><br>**Category IV -** Discovery sought regarding the contracts and compensation paid to the ER physicians independently contracted or employed by Plaintiffs [Ex. 4.] |
| *Id.* | **3rd RFP 25** - Documents and/or reports sufficient to evidence the annual work relative value units ("RVU") production at the Hospital. | **Category I -** Discovery sought regarding the costs Plaintiffs incurred in providing the ER services at issue [Ex. 1.] |

9

| Order Compelling Response | Molina Request | Comparable Aetna Request Categories |
|---|---|---|
| 07/24/2020 Order Granting Defendants' Fifth Motion for Reconsideration of Prior Discovery Orders<br><br>[Ex. 11-D.] | **3rd RFP 23 -** Documents and communications sufficient to evidence the average gross and net revenues that Plaintiffs received per patient visit for all patients at the Hospital during the Relevant Period. | **Category I -** Discovery sought regarding the costs Plaintiffs incurred in providing the ER services at issue [Ex. 1.]<br><br>**Category III -** Discovery sought regarding Plaintiffs' contractual relationship with the 52 hospitals where Plaintiffs staff the ER including copies of contracts and compensation received from the hospitals [Ex. 3.]<br><br>**Category IV -** Discovery sought regarding the contracts and compensation paid to the ER physicians independently contracted or employed by Plaintiffs [Ex. 4.] |

10

| Order Compelling Response | Molina Request | Comparable Aetna Request Categories |
|---|---|---|
| *Id.* | **3rd RFP 26 -** For the years starting from 2015 to present, documents sufficient to evidence the gross revenue, net revenue, contractual write offs, and bad debt at the Hospital, including but not limited to the gross and net revenues, contractual write offs, and bad debt attributable to (i) Medicare patients, (ii) Medicaid patients, (iii) commercially insured patients, (iv) uninsured patients, and (v) all other patients that do not fall into any of the previously named categories. For this request, "Medicare patients" includes patients under a "Medicare Managed Care" plan and "Medicaid patients" includes patients under a "Medicaid Managed Care" plan. | **Category I -** Discovery sought regarding the costs Plaintiffs incurred in providing the ER services at issue [Ex. 1.]<br><br>**Category III -** Discovery sought regarding Plaintiffs' contractual relationship with the 52 hospitals where Plaintiffs staff the ER including copies of contracts and compensation received from the hospitals [Ex. 3.]<br><br>**Category IV -** Discovery sought regarding the contracts and compensation paid to the ER physicians independently contracted or employed by Plaintiffs [Ex. 4.]<br><br>**Category VII -** Discovery regarding Plaintiffs' analysis of Medicare rates in comparison with costs. [Ex. 7.] |

11

Filed 18 December 18 A8:55
Chris Daniel - District Clerk
Harris County

CAUSE NO.  2017-77084

Pgs-1

OBJDZ
CPROX

| | | |
|---|---|---|
| ACS PRIMARY CARE PHYSICIANS SOUTHWEST P A, | § § | IN THE DISTRICT COURT OF |
| *Plaintiff(s),* | § | |
| vs. | § | HARRIS COUNTY, TEXAS |
| | § | |
| MOLINA HEALTHCARE INC, | § | |
| *Defendant(s).* | § | 113th JUDICIAL DISTRICT |

## ORDER ON DEFENDANT'S FIRST MOTION TO COMPEL

On December 14, 2018, a hearing was held to consider *Defendant's First Motion to Compel*, filed November 6, 2018.  Counsel for all parties appeared. The Court considered the pleadings and documents filed, the Court's record, the argument of counsel, and relevant authority.  It is

Ordered that the Plaintiffs' objection to Request for Production № 17 is sustained.  It is further

Ordered that the Plaintiffs' objections to Requests for Production №18, № 19 and №20 are overruled.  It is therefore,

Ordered that Plaintiff ACS Primary Care Physicians Southwest, PA shall produce documents responsive to Requests for Production №18, № 19 and № 20 on or before the close of business on January 11, 2019. It is further

Ordered that Plaintiff Emergency Services of Texas, PA shall produce documents responsive to Requests for Production №18, № 19 and № 20 on or before the close of business on January 11, 2019.

Signed December 14, 2018

Hon. MICHAEL LANDRUM
Judge, 113th District Court

4/29/2019 2:12 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 33144101
By: Devanshi Patel
Filed: 4/29/2019 2:12 PM
Pgs-2

CPROZ

## CAUSE NO. 2017-77084

| | | |
|---|---|---|
| ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA, and EMERGENCY SERVICES OF TEXAS, PA, | § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| v. | § § | HARRIS COUNTY, TEXAS |
| MOLINA HEALTHCARE, INC. and MOLINA HEALTHCARE OF TEXAS, INC., | § § § § | |
| Defendants. | § | 113th JUDICIAL DISTRICT |

## ORDER GRANTING DEFENDANTS' SECOND MOTION TO COMPEL

After considering Defendants Molina Healthcare, Inc. and Molina Healthcare of Texas, Inc.'s (collectively, "Molina" or "Defendants") Second Motion to Compel (the "Motion"), Plaintiffs ACS Primary Care Physicians Southwest, PA and Emergency Services of Texas, PA's (collectively, "Plaintiffs") Response to the Motion, Molina's Reply in Support of the Motion, the pleadings on file, and the authorities, the Court finds that the Motion is well founded and should be, and is, **GRANTED**, in part.

IT IS ORDERED, ADJUDGED, AND DECREED that any objections Plaintiffs asserted in response to Requests for Production 10, 14, 22, 23, 24, 34, 37-39, 45, 46, 48, 49, 51-54, and 70 ~~8-54 and 61-71 and Interrogatories 1-3 were obscured by~~ and Interrogatory 3 are overruled. ~~Plaintiffs' numerous unfounded objections and are therefore waived~~.

~~IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiffs' objections to Requests for Production 8-54 and 61-71 and Interrogatories 1-3 are overruled.~~

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiffs shall amend and supplement their Objections and Responses to Defendants' Second Requests for Production

**ORDER GRANTING DEFENDANTS' SECOND MOTION TO COMPEL** – Page 1
*ACTIVE 43096051v1*

and Defendants' Second Set of Interrogatories to respond fully and in good faith, and in accordance with the terms of this Order, to each Request and Interrogatory (collectively, the "Amended Responses"). In making the Amended Responses, Plaintiffs shall not assert any additional or supplemental objections. Plaintiffs shall serve their Amended Responses by no later than 5:00 p.m., Central Standard Time, on the 14th day after the execution of this Order.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiffs shall produce all documents responsive to Requests for Production 10, 14, 22, 23, 24, 34, 37-39, 45, 46, 48, 49, 51-54, and 70 8-54 and 61-71, by no later than 5:00 p.m., Central Standard Time, on the 14th day after the execution of this Order. Such documents shall be delivered on a CD, DVD, or hard drive or via File Transfer Protocol, and all electronic or magnetic data shall be produced in the form specified in Defendants' Second Requests for Production.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiffs shall pay Molina's reasonable and necessary attorneys' fees incurred in the making of this Motion in the total amount of $_____.

So ordered.

SIGNED and ENTERED this ____ day of _____, 2019.

Signed:
6/20/2019

_____
JUDGE PRESIDING

**ORDER GRANTING DEFENDANTS' SECOND MOTION TO COMPEL – Page 2**
*ACTIVE 43096051v1*

6/13/2019 1:12 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 34352114
By: Devanshi Patel
Filed: 6/13/2019 1:12 PM

CAUSE NO. 2017-77084

| | | |
|---|---|---|
| ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA, and EMERGENCY SERVICES OF TEXAS, PA, | § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § | |
| v. | § § | HARRIS COUNTY, TEXAS |
| MOLINA HEALTHCARE, INC. and MOLINA HEALTHCARE OF TEXAS, INC., | § § § § | |
| Defendants. | § | 113th JUDICIAL DISTRICT |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' THIRD MOTION TO COMPEL

After considering Defendants Molina Healthcare, Inc. and Molina Healthcare of Texas, Inc.'s (collectively, "Molina" or "Defendants") Third Motion to Compel (the "Motion"), Plaintiffs ACS Primary Care Physicians Southwest, PA and Emergency Services of Texas, PA's (collectively, "Plaintiffs") Response to the Motion, the pleadings on file, and the authorities, the Court finds that the Motion is well founded and should be, and is, **GRANTED IN PART AND DENIED IN PART.**

IT IS ORDERED that Plaintiffs' objections to Requests for Production 23 and 26 are sustained and that Plaintiffs' objections to Requests for Production 21, 24, and 25 are overruled;

IT IS FURTHER ORDERED that Plaintiffs shall produce all documents responsive to Requests for Production 21, 24, and 25 by no later than 5:00 p.m., Central Standard Time, on the 28th day after the execution of this Order. Such documents shall be delivered on a CD, DVD, or

ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANTS' THIRD MOTION TO COMPEL – Page 1
*ACTIVE 43894891v1*

hard drive or via File Transfer Protocol, and all electronic or magnetic data shall be produced in the form specified in Defendants' Third Requests for Production.

 IT IS FURTHER ORDERED that Defendants' Motion regarding Requests for Production 6–8 and 10–11 is deemed moot at this time based on Plaintiffs' representation that responsive documents either do not exist or that it will produce responsive documents. Defendant may re-urge its Motion as to these Requests at a later date. This order does not impact Plaintiffs' duty to supplement, as required by the Texas Rules of Civil Procedure, should responsive documents come into existence.

 SIGNED and ENTERED this ____ day of _____, 2019.


       Signed:
       6/17/2019 _____
       HON. JUDGE RABEEA COLLIER
       Judge 113th Judicial District Court



AGREED AS TO FORM:


/s/ Larry Childs _____
Counsel for Plaintiffs


/s/ Christopher M. LaVigne _____
Counsel for Defendants



**ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANTS' THIRD MOTION TO COMPEL** – Page 2
*ACTIVE 43894891v1*

7/17/2020 3:47 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 44627714
By: SASHA PRINCE
Filed: 7/17/2020 3:47 PM

## CAUSE NO. 2017-77084

| | | |
|---|---|---|
| ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA, and EMERGENCY SERVICES OF TEXAS, PA, | § § § § | IN THE DISTRICT COURT OF |
| **Plaintiffs,** | § § | |
| v. | § § | HARRIS COUNTY, TEXAS |
| MOLINA HEALTHCARE, INC. and MOLINA HEALTHCARE OF TEXAS, INC., | § § § § | |
| **Defendants.** | § | 113th JUDICIAL DISTRICT |

---

## ORDER GRANTING DEFENDANTS' MOTION FOR RECONSIDERATION OF PRIOR DISCOVERY ORDERS AND FIFTH MOTION TO COMPEL

---

After considering Defendants Molina Healthcare, Inc. and Molina Healthcare of Texas, Inc.'s (collectively, "Molina" or "Defendants") Motion for Reconsideration of Prior Discovery Orders and Fifth Motion to Compel (the "Motion"), Response to the Motion, the pleadings on file, and the authorities, the Court finds that the Motion is well founded and should be, and is, **GRANTED**.

IT IS ORDERED, ADJUDGED, AND DECREED that the Court has reconsidered its Order on Defendants' First Motion to Compel (signed 12/14/2018), Order Granting Defendants' Second Motion to Compel (signed 6/20/2019), and Order Granting in Part and Denying in Part Defendants' Third Motion to Compel (signed 6/17/2019) sustaining Plaintiffs ACS Primary Care Physicians Southwest, PA's and Emergency Services of Texas, PA's (collectively, "Plaintiffs") objections to the following requests:

- Request 17, contained within Plaintiffs' Combined Responses to Defendant's First Requests for Production;

- Request 26, contained within Plaintiffs' Objections and Responses to Defendants' Second Requests for Production; and

- Requests ~~6,~~ 23 and 26, contained within Plaintiffs' Objections and Responses to Defendants' Third Requests for Production.

Plaintiffs objections to the above requests are overruled and Plaintiffs shall produce all documents responsive to these requests, as they are written in Defendants' First, Second, and Third Requests for Production, respectively, by no later than 5:00 p.m., Central Standard Time, on the 14th day after the execution of this Order. Such documents shall be delivered on a CD, DVD, or hard drive or via File Transfer Protocol, and all electronic or magnetic data shall be produced in the form specified in Exhibit A of Defendants' First Requests for Production.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that ~~Plaintiffs objections to~~ **in connection with Request 10,** **Plaintiff shall produce responsive documents that it intends to introduce at trial no later than 30 days prior to trial.** ~~Request 10 contained within Plaintiffs' Combined Responses to Defendants' First Requests for Production are overruled. Plaintiffs shall supplement their existing productions with all documents responsive to Request 10, as it is written in Defendants' First Requests for Production, by no later than 5:00 p.m., Central Standard Time, on the 14th day after the execution of this Orde~~r. Such documents shall be delivered on a CD, DVD, or hard drive or via File Transfer Protocol, and all electronic or magnetic data shall be produced in the form specified in Exhibit A of Defendants' First Requests for Production.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiffs shall supplement their existing productions with all documents responsive to Requests 18, 19, and 20 contained within Defendants' First Requests for Production, as they are written in Defendants'

**ORDER GRANTING DEFENDANTS' MOTION FOR RECONSIDERATION OF PRIOR DISCOVERY ORDERS AND FIFTH MOTION TO COMPEL** – Page 2
*ACTIVE 51506089v1*

Case 3:21-cv-00364-DCLC-DCP     Document 94-6     Filed 02/07/25     Page 50 of 140
PageID #: 770

First Requests for Production, by no later than 5:00 p.m., Central Standard Time, on the 14th day

after the execution of this Order.  Such documents shall be delivered on a CD, DVD, or hard drive

or via File Transfer Protocol, and all electronic or magnetic data shall be produced in the form

specified in Exhibit A of Defendants' First Requests for Production.


So ordered.

SIGNED and ENTERED this _____ day of _____, 2020.


Signed: _Rebecca Sutton-Collier_____
7/24/2020
JUDGE PRESIDING


**ORDER GRANTING DEFENDANTS' MOTION FOR RECONSIDERATION**
**OF PRIOR DISCOVERY ORDERS AND FIFTH MOTION TO COMPEL** – Page 3
*ACTIVE 51506089v1*

**Request For Production No. 17:**   All documents reflecting, relating to, and/or evidencing the profit margin that ACS recovers for any emergency medicine services of the kind provided to Molina Members.

**Request For Production No. 18:** All documents reflecting, relating to, and/or evidencing the percentage that ACS actually recovers for any emergency medicine services of the kind provided to Molina Members as compared to ACS' standard charges for any emergency medicine services of the kind provided to Molina Members.

**Request For Production No. 19:**     All documents reflecting, relating to, and/or evidencing the comparative amounts charged by ACS for emergency medicine services of the kind provided to Molina Members as it relates to: (i) uninsured patients; (ii) Medicaid patients; (iii) patients using other government supported programs; (iv) Molina Members; (v) private pay patients pursuant to a participating provider agreement; and (vi) private pay patients not pursuant to a participating provider agreement, other than Molina Members.

**DEFENDANTS' FIRST REQUEST FOR PRODUCTION TO PLAINTIFF**
**ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA – Page 13**

**Request For Production No. 20:**     All documents reflecting, relating to, and/or evidencing the

---

**DEFENDANTS' FIRST REQUEST FOR PRODUCTION TO PLAINTIFF**
**ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA – Page 13**

comparative amounts collected by ACS for emergency medicine services of the kind provided to Molina Members as it relates to: (i) uninsured patients; (ii) Medicaid patients; (iii) patients using other government supported programs; (iv) Molina Members; (v) private pay patients pursuant to a participating provider agreement; and (vi) private pay patients not pursuant to a participating provider agreement, other than Molina Members.

**DEFENDANTS' FIRST REQUEST FOR PRODUCTION TO PLAINTIFF**
**ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA – Page 14**

**Request For Production No. 10:** Documents sufficient to evidence the ownership of Plaintiffs during the Relevant Period.

**DEFENDANTS' SECOND REQUEST FOR PRODUCTION TO
PLAINTIFF ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA – Page 9**
*NJ 231009010v1*

Case 3:21-cv-00364-DCLC-DCP      Document 94-6      Filed 02/07/25      Page 57 of 140
PageID #: 777

**Request For Production No. 14:** All contracts or agreements between TeamHealth and Plaintiffs that were in effect at any point during the Relevant Period, including, but not limited to, any management agreements, severance agreements, succession agreements, banking agreements or account sweep agreements, independent contractor agreements, medical director agreements, performance or bonus plan agreements, and stock management or right of first refusal agreements.

**DEFENDANTS' SECOND REQUEST FOR PRODUCTION TO
PLAINTIFF ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA – Page 10**
*NJ 231009010v1*

Case 3:21-cv-00364-DCLC-DCP     Document 94-6     Filed 02/07/25     Page 58 of 140
PageID #: 778

**Request For Production No. 22:**     All contracts or agreements where Plaintiffs are parties and

for which TeamHealth is a third-party beneficiary.

**DEFENDANTS' SECOND REQUEST FOR PRODUCTION TO**
**PLAINTIFF ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA – Page 11**
*NJ 231009010v1*

Case 3:21-cv-00364-DCLC-DCP      Document 94-6      Filed 02/07/25      Page 59 of 140
PageID #: 779

**Request For Production No. 23:**     All documents referring or relating to the amounts paid by Plaintiffs to TeamHealth during the Relevant Period, including, but not limited to, amounts paid in the aggregate and as a percentage of gross and net income.

**DEFENDANTS' SECOND REQUEST FOR PRODUCTION TO**
**PLAINTIFF ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA – Page 11**
*NJ 231009010v1*

Case 3:21-cv-00364-DCLC-DCP       Document 94-6       Filed 02/07/25       Page 60 of 140
PageID #: 780

**Request For Production No. 45:**     Documents sufficient to evidence each licensed physician that Plaintiffs contracted with during the Relevant Period, including licensed physicians who may have been contracted with prior to the Relevant Period but who remain under contract during the Relevant Period, whether through an employment agreement or an independent contractor agreement.

**DEFENDANTS' SECOND REQUEST FOR PRODUCTION TO**
**PLAINTIFF ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA – Page 14**
*NJ 231009010v1*

Case 3:21-cv-00364-DCLC-DCP     Document 94-6     Filed 02/07/25     Page 61 of 140
PageID #: 781

**Request For Production No. 48:**    All communications between Plaintiffs and TeamHealth regarding the Lawsuit.

**Request For Production No. 49:**     All communications between Plaintiffs and TeamHealth regarding Molina's reimbursement policies relating to emergency services in Texas.

DEFENDANTS' SECOND REQUEST FOR PRODUCTION TO
PLAINTIFF ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA – **Page 15**
NJ 231009010v1

Case 3:21-cv-00364-DCLC-DCP      Document 94-6     Filed 02/07/25     Page 63 of 140
PageID #: 783

**Request For Production No. 70:**     Any organizational charts for Plaintiffs.

**DEFENDANTS' SECOND REQUEST FOR PRODUCTION TO**
**PLAINTIFF ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA – Page 17**
*NJ 231009010v1*

Case 3:21-cv-00364-DCLC-DCP      Document 94-6      Filed 02/07/25      Page 64 of 140
PageID #: 784

**Interrogatory No. 3:**

Identify all persons within Plaintiffs' organizations with the responsibility for determining their chargemaster or determining the usual and customary rate for reimbursement of emergency services claims similar to the Claims.

**ANSWER:**

DEFENDANT MOLINA HEALTHCARE OF TEXAS, INC.'S SECOND SET OF
INTERROGATORIES TO PLAINTIFF ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA **– Page 7**
*NJ 230935870v1*

Case 3:21-cv-00364-DCLC-DCP      Document 94-6      Filed 02/07/25      Page 65 of 140
PageID #: 785

**Request For Production No. 6:**     In connection with any litigation brought by Plaintiffs against a payor other than Molina that is based, in whole or in part, on that payor's purported failure to pay the "usual and customary rate" under Texas Insurance Code Section 1271.155, please produce: (i) Plaintiffs' verified interrogatory responses regarding or relating to the manner and methodology of calculating the usual and customary rate; (ii) transcripts of any witnesses associated with Plaintiffs, including expert witnesses, discussing, referring, or relating to the manner and methodology of calculating the usual and customary rate; and (iii) the expert disclosures and reports, if any, of any expert witness opining, referring, or relating to the manner and methodology of calculating the usual and customary rate, including any expert reports. This request specifically includes, but is not limited to, the litigation entitled *Emergency Services of Texas, P.A., et al. v. Humana Insurance Company, et al.* which was filed in the Western District of Texas on February 14, 2019.

**DEFENDANTS' THIRD REQUEST FOR PRODUCTION TO PLAINTIFF**
**ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA – Page 9**
*ACTIVE 41609375v1*

**Request For Production No. 8:**     Any policy and procedure used by Plaintiffs that governs the charging or calculation of charges for healthcare services to patients on an unbundled or bundled basis.

**DEFENDANTS' THIRD REQUEST FOR PRODUCTION TO PLAINTIFF**
**ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA – Page 10**
*ACTIVE 41609375v1*

Case 3:21-cv-00364-DCLC-DCP       Document 94-6       Filed 02/07/25       Page 67 of 140
PageID #: 787

**Request For Production No. 10:**    Plaintiffs' policy and procedure defining their efforts to

collect deductibles, co-payments, and other co-insurance obligations from patients.

<u>**DEFENDANTS' THIRD REQUEST FOR PRODUCTION TO PLAINTIFF**</u>
<u>**ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA** – **Page 10**</u>
*ACTIVE 41609375v1*

**Request For Production No. 11:** Documents sufficient to evidence Plaintiffs' collection practices of copays and/or deductibles from Molina Enrollees.

DEFENDANTS' THIRD REQUEST FOR PRODUCTION TO PLAINTIFF
ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA – Page 10
ACTIVE 41609375v1

Case 3:21-cv-00364-DCLC-DCP     Document 94-6     Filed 02/07/25     Page 69 of 140
PageID #: 789

**Request For Production No. 21:**   The annual revenue and expense detail for all patients during the Relevant Period at each Hospital.

**DEFENDANTS' THIRD REQUEST FOR PRODUCTION TO PLAINTIFF**
**ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA – Page 12**
*ACTIVE 41609375v1*

Case 3:21-cv-00364-DCLC-DCP      Document 94-6      Filed 02/07/25      Page 70 of 140
PageID #: 790

**Request For Production No. 23:**     Documents and communications sufficient to evidence the average gross and net revenues that Plaintiffs received per patient visit for all patients at the Hospital during the Relevant Period.

**DEFENDANTS' THIRD REQUEST FOR PRODUCTION TO PLAINTIFF
ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA – Page 12**
*ACTIVE 41609375v1*

Case 3:21-cv-00364-DCLC-DCP     Document 94-6     Filed 02/07/25     Page 71 of 140
PageID #: 791

**Request For Production No. 24:**     Documents and communications sufficient to evidence the average actual expense incurred by Plaintiffs per patient visit for all patients at the Hospital, before corporate allocations, during the Relevant Period.

**DEFENDANTS' THIRD REQUEST FOR PRODUCTION TO PLAINTIFF
ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA – Page 12**
*ACTIVE 41609375v1*

Case 3:21-cv-00364-DCLC-DCP       Document 94-6      Filed 02/07/25      Page 72 of 140
PageID #: 792

**Request For Production No. 25:**    Documents and/or reports sufficient to evidence the annual

work relative value units ("RVU") production at the Hospital.

__DEFENDANTS' THIRD REQUEST FOR PRODUCTION TO PLAINTIFF__
__ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA__ **– Page 12**
*ACTIVE 41609375v1*

Case 3:21-cv-00364-DCLC-DCP      Document 94-6      Filed 02/07/25      Page 73 of 140
PageID #: 793

**Request For Production No. 26:**    For the years starting from 2015 to present, documents sufficient to evidence the gross revenue, net revenue, contractual write offs, and bad debt at the Hospital, including but not limited to the gross and net revenues, contractual write offs, and bad debt attributable to (i) Medicare patients, (ii) Medicaid patients, (iii) commercially insured patients, (iv) uninsured patients, and (v) all other patients that do not fall into any of the previously named categories.  For this request, "Medicare patients" includes patients under a "Medicare Managed Care" plan and "Medicaid patients" includes patients under a "Medicaid Managed Care" plan.

**DEFENDANTS' THIRD REQUEST FOR PRODUCTION TO PLAINTIFF**
**ACS PRIMARY CARE PHYSICIANS SOUTHWEST, PA – Page 12**
*ACTIVE 41609375v1*

**Chart of Plaintiffs' Inapposite Authority**

**Synopsis:** The cases Plaintiffs circulated are unpersuasive and inapposite here. First, the cases identified by Plaintiffs also either (i) involve issues not presented here – such as statutory criteria defining reimbursements rates or whether Medicare/Medicaid payment data should be produced, (ii) did not present the same facts as here– *e.g.*, Plaintiffs' Complaint allegations regarding costs, hospital contracts, and claims to be the physicians providing the services, and (iii) did not include the same law—*e.g.*, a quantum meruit damage calculation that is reasonable costs + reasonable profit. Third, Plaintiffs selective cases are not binding on this Court. Finally, only one of the cases (Oklahoma) involved Aetna—the rest involved United Healthcare ("UHC").

| <u>Case</u> | <u>Reasons Rulings Are Not Persuasive</u> |
|---|---|
| ***Aetna Oklahoma Order*** | This case did not contain any allegation that (1) TeamHealth and Plaintiffs were not being paid their full costs, (2) TeamHealth or Plaintiffs owed EMTALA duties due to Plaintiffs' hospital contracts or, (3) that TeamHealth or Plaintiffs were the "Physicians" performing the services. Additionally, Plaintiffs sought payment of "prevailing charges" under an Oklahoma HMO statute not the law in Ohio. |
| ***UHC New York Order*** | In New York, a state statute set the criteria for a reasonable fee at the 80th percentile for ***all*** charges for the particular health services performed by a provider in the same specialty … in the geographic area. It was on that basis that the court denied cost discovery. Here, Ohio law does not use charge data as a criteria and Plaintiffs have specifically placed costs at issue. In addition, discovery on Plaintiffs' corporate structure, contracts with and compensation paid to its ER doctors, and contracts with and compensation received from its hospitals are relevant and proportional for reasons beyond questions of damages calculations. |
| ***UHC Florida (State) Court Orders*** | The first "order" made no determinations as to the discoverability of costs. The sole issue decided was whether discovery should include payment data for Medicare and Medicaid—an issue not present here. In a later decision, the court denied "costs" discovery for reasons inapplicable here. First, the claim was statutory and the Florida statute required reimbursement of usual and customary charges in the community. Because the statute's focus was charges in the community, then costs were not relevant. Second, the defendants asserted no defense of "unreasonable pricing." In contrast, Aetna has defenses that Plaintiffs' billed charges are unreasonable and Ohio law limits quantum meruit damages to reasonable costs + reasonable profits. |

# Exhibit 12

| Case | Reasons Rulings Are Not Persuasive |
|---|---|
| **UHC Nevada (State) Court Orders** | This state court judgment  is on appeal and was a case where the TeamHealth plaintiffs sought tort damages and claimed  a rate of payment equaled Fair Health 80th percentile – as opposed to their billed charge as claimed here. Plaintiffs sought over $10 million dollars on their implied contract claim and the jury awarded only $2.65 million dollars. The remaining damages were punitive damages. Further, the orders offer no analysis as to why the discovery sought  was denied other than the reasoning it was  a rate of payment and not right of payment case. That is not  the case  here as Plaintiffs have yet to  establish an implied contract existed to pay billed charges. In addition, one of Aetna's defenses here  is that Aetna would never agree to an implied contract to pay Plaintiffs' billed charges which are likely 700% over their full costs in providing the services.  So, at the discovery stage, the costs information is relevant and proportional for the reasons set forth in the brief. |

**Exhibit 12**

**Chart of Other Reported TeamHealth Cases**

| Case | Relevant Rulings |
|---|---|
| *ACS Primary Care Physicians Sw., P.A. v. UnitedHealthcare Ins. Co.*, 514 F. Supp. 3d 927, 934-35 (S.D. Tex. 2021) *supplemented*, No. 4:20-CV-01282, 2021 WL 6617719 (S.D. Tex. Feb. 10, 2021) | Dismissing quantum meruit claim because (i) the TeamHealth plaintiffs' provision of services to an insurance company's member does not confer a benefit on the insurance company; rather, the insurer's "duty is to *reimburse* members", (ii) the health plan document is an express contract that bears directly on the quantum meruit claim that bars finding an implied in law contract, (iii) "[t]he plans' terms define the method of reimbursement that Defendants agreed to provide to its members (or their physicians) upon obtaining out-of-network services." <br><br> Also, dismissing implied in fact contract claim because TeamHealth plaintiffs failed to plausibly show meeting of minds to contract or allege "any facts to show that either the 'circumstances' or the 'conduct' of the parties implies an inference of mutual assent to contract." <br><br> Same counsel as here for TeamHealth. |
| *Emergency Dep't Physicians P.C. v. United Healthcare, Inc.*, 507 F. Supp. 3d 814, 829 (E.D. Mich. 2020) | Dismissing implied in fact contract claim because the plaintiffs failed to plausibly plead the insurer agreed to pay "reasonable rates" where the complaint alleged the parties did not agree on a mutually agreeable rate of payment for the TeamHealth plaintiffs' services. <br><br> Dismissing unjust enrichment claim because Plaintiffs fail to allege inequity as they could bill the defendants' insureds and had a right to pursue a third party. |
| *Buffalo Emergency Assocs., LLP v. Aetna Health, Inc.*, 167 A.D.3d 461, 462, 87 N.Y.S.3d 877 (2018) | Dismissing unjust enrichment claim because complaint did not allege equitable obligation running from Aetna to TeamHealth plaintiffs. |

**Exhibit 13**

March 13, 2019

Honorable Bill Cassidy, M.D.                    The Honorable Tom Carper
United States Senator                           United States Senator
520 Hart Senate Office Building                 513 Hart Senate Office Building
Washington, DC 20510                            Washington, DC 25010

Honorable Todd Young                            Honorable Lisa Murkowski
United States Senator                           United States Senator
400 Russell Senate Office Building              522 Hart Senate Office Building
Washington, DC 20510                            Washington, DC 20510

Honorable Michael F. Bennet                     Honorable Margaret Wood Hassan
United States Senator                           United States Senator
261 Russell Senate Office Building              330 Hart Senate Office Building
Washington, DC 20510                            Washington, DC 20510

**Re: Bi-Partisan Workgroup's Request for Data and Information on Surprise Medical Billing**

Dear Senators Cassidy, Bennet, Carper, Young, Murkowski and Hassan:

On behalf of TeamHealth and nearly 6,000 affiliated practicing physicians providing emergency department medical services to over 16 million patients per year in 39 states across the country, representing approximately 12% of the total US emergency department visits, I'd like to take this opportunity to thank you for your workgroup's efforts in developing a comprehensive legislative solution to protect patients from surprise medical billing.

As part of your workgroup's recent request to stakeholders seeking data and information to assist you in your efforts to pass meaningful surprise billing legislation, please accept this letter to supplement the narrative which the American College of Emergency Physicians (ACEP) submitted to your office on February 22, 2019. We submit this letter to you to document several important factors that contribute to out-of-network balance and surprise billing in the emergency department.

**Balance Billing for TeamHealth is a Contract Leveraging Tool and Not a Source of Revenue**
Balance billing yields immaterial revenue for TeamHealth and is not performed with the objective of enhancing revenue. Rather, for TeamHealth and for emergency medicine providers as a whole, balance billing is our only available source of contract negotiating leverage. In 2017, TeamHealth balance billed 0.16% (16 BPS) of the patients who presented in our emergency departments. See the table below for 2017 frequency.

| Payer Type | Balance Billing Frequency |
|---|---|
| All Payers | 0.16% |
| All Commercial | 0.71% |
| Out-of-Network Commercial | 3.57% |

**Exhibit 44**

The average balance billed amount is $529, which excludes patient cost sharing amounts (e.g., co-payments, co-insurance and deductibles). However, only 30% of the patients we balance billed actually remitted a full or partial payment for such amount. In aggregate, TeamHealth receives just 0.08% (8 BPS) of our commercial fee-for-service collections from balance billed amounts.

Much of the public narrative and patient dissatisfaction results from a misunderstanding of health plan benefit design. The problem of surprise billing is often an issue of surprise lack of coverage. Our data indicates commercial patients are 9 times more likely to receive a bill greater than $750 that is the result of their copayment, co-insurance or deductible cost-sharing obligation as opposed to their receipt of an actual out-of-network balance bill.

### Escalating Bad Debt

For 2016, TeamHealth billed commercially insured patients for co-payments, co-insurance and deductible balances under their plan benefits in the total amount of $237 million and successfully collected $98 million, for a yield of 41%. The balance of $139 million represented bad debt for these patients and equated to a 10.7% shortfall in our overall commercial fee-for-service collections.  This uncollectible amount reflected in the commercially insured population is rising each year and represents a direct cost shift from insurers and employers to providers.  Therefore, we ask you to require insurers to fulfill their true role as the financial intermediary and insurer of health care services and remit in full their negotiated balances.  Deferring patient collections to clinicians ultimately positions TeamHealth as the debt collector while ultimately interfering in the trusted relationship between patients and providers.

Separately, uninsured patients account for 16% of our volume and that percentage has been steadily rising during recent years.[1]  For 2016, we treated 2.5 million uninsured patients and collected $85 million, for a collection rate of 3.7%, representing an average yield of $34 per patient.  Even at Medicare rates, our uninsured bad debt represents an annual loss of revenue of $279 million.

### Economics of Emergency Medicine and Reliance on Commercial Insurance

To fully understand the economic model associated with the delivery of emergency care, it is important to recognize that nearly 3 in 4 patients who visit an emergency department are either uninsured or carry fixed-rate government sponsored insurance that has not appropriately kept up with inflation or other factors that support the cost for delivering care.

As referenced in the chart below, 74% of TeamHealth's emergency department patient encounters are reimbursed below our average cost of $150 per encounter, leaving the remaining commercial population (26%) with the responsibility of cross-subsidizing government sponsored reimbursement and uninsured patient populations. Rural and indigent markets with proportionately lower commercial coverage are by definition unsustainable without some form of subsidy payment from the hospital.

| Payer | Percentage of Overall Volume | Avg. Collection Amount  (Per Patient Visit) |
|---|---|---|
| Medicare | 25% | $145 |
| Medicaid | 33% | $75 |
| Uninsured | 16% | $34 |
| Commercial | 26% | $350 |

Unlike primary care and specialty providers who deliver elective and/or scheduled care, and even urgent care centers, emergency departments cannot choose their patients, and must staff their facilities with qualified medical professionals, 24 hours a day, 7 days a week.

**Out-of-Network Reimbursement is Declining**
Insurers are unilaterally reducing out-of-network reimbursement. This payer behavior increases the potential for increased balance billing frequency and for a higher patient balance billed amount. Prohibiting balance billing will only embolden insurers unless there are sufficient provider protections in place, such as a defined out-of-network payment standard. The table below shows a multi-year trend of allowables. It also illustrates that out-of-network reimbursement is now lower than in-network reimbursement, which provides an incentive for payers to terminate contracts and/or refuse to negotiate in good faith for in-network contracts.

Multi-Year Trend of Allowables

|  | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| In Network Commercial (non-BCBS) | $492 | $513 | $575 | $587 |
| % Medicare | 365% | 378% | 420% | 425% |
| Out-of-Network Commercial (non-BCBS) | $578 | $528 | $482 | $429 |
| % Medicare | 441% | 389% | 349% | 306% |
| All BCBS Claims | $232 | $235 | $254 | $262 |
| % Medicare | 175% | 176% | 187% | 192% |

**All Private Insurers Must Be Part of the Solution**
The table above also illustrates that any solution to balance billing must be applied to all categories of payers. Absent this, exempted insurers would have unequal standing in the market. Any legislation must cover the entire private insurance market.

Additionally, we find that market-driven contract rates are further inhibited when there is no meaningful state regulation in effect that mandates honoring of a patient's Assignment of Benefits.[2] In these situations, an insurer can process the claim and remit the amounts to the patient instead of the provider, forcing the provider to collect the remitted payment from the patient in addition to any patient cost sharing amounts. A comprehensive solution to protecting patients from large bills and removing them from the provider/insurer transaction would require insurers to honor the patient's assignment of benefits which must also be applied in the states and federally for all out-of-network situations.

**Out of Network Reimbursement is Often Arbitrary**
Insurer adjudication of claims is unpredictable and varies widely, due to benefit plan design and changing payer behavior. The table below illustrates that payers adjudicate certain claims at or near Medicare rates and other claims at a high percentage of charges. However, aggressive payer behavior is shifting the distribution of claim adjudication in their favor. A defined payment standard is necessary to protect providers from unilateral insurer changes in reimbursement.

| Distribution of Allowable - All OON | | | | |
|---|---|---|---|---|
| % of Medicare | 2015 | 2016 | 2017 | 2018 |
| 100% - 199% | 23% | 26% | 31% | 45% |
| 200% - 299% | 25% | 24% | 20% | 11% |
| 300% - 399% | 8% | 8% | 6% | 6% |
| 400% - 499% | 11% | 9% | 8% | 7% |
| 500% + | 32% | 33% | 35% | 31% |

**TeamHealth Supports the Cassidy Plan**
TeamHealth endorses a meaningful, comprehensive national solution. We follow your lead and support your working draft legislation, "Protecting Patients from Surprise Medical Bills Act" (aka the 'Cassidy Plan') which calls for a defined usual, customary and reasonable (UCR) out-of-network payment amount. We support your working draft's proposal to adopt 125% of the median allowed amount as determined by a

[2] https://www.americanbar.org/groups/health_law/publications/aba_health_esource/2015-2016/july/undersign/

nationally recognized independent benchmarking database (e.g., FairHealth Allowed Benchmarking Database Tool) as the basis for defining UCR. We recognize that this will result in short-term disruption to TeamHealth, but we believe the patient benefits outweigh the provider and insurer disadvantages.

To effectuate a viable national solution, TeamHealth also recommends the implementation of a: (i) ceiling on patient out-of-pocket cost-sharing for emergency care; (ii) a nationally imposed assignment of benefits provision; and (iii) stipulation requiring insurers and payers to collect patient out-of-pocket cost-sharing amounts from their insureds, which mitigates provider bad debt losses.

In closing, we propose for your consideration an enhanced Cassidy Plan which creates:

1. **Interim Direct Reimbursement (IDR)** - requiring health plans to remit an Interim Direct Reimbursement (IDR) payment to the out-of-network provider at not less than 125% of the average allowed amount in accordance with the FairHealth Benchmarking Database for Allowed Amounts,[3] based on a base year of 2017, which shall then be adjusted annually for CPI inflationary factors, including geography and specialty;

2. **Insurer Reimbursement that Includes the Patient Cost Sharing Amount** - the IDR payment remitted directly to the provider must also include the patient cost-sharing obligation, including deductibles and co-insurance, which the health plan would then collect from the patient or employer. This removes the provider from the role of patient debt collector and protects the provider from the increasing cost shift;

3. **Cap on Patient Cost-Sharing for Emergency Care at $1,000** – a per incident patient cost-sharing cap of $1,000, specific to and exclusively limited to all emergency care, for both professional and facility care rendered during the emergency incident (as defined by EMTALA)[4] which shall be paired with a honoring of the patient's assignment of benefits, irrespective of in or out-of-network status.; and

4. **Baseball Style Alternative Dispute Resolution (ADR)** – available to both payers and providers to provide either with a cost-effective mechanism to challenge the reasonableness of the Interim Direct Payment. It shall apply to enrollees in self-funded plans (ERISA) as well as state regulated fully-insured plans, if such state has not implemented an alternative dispute resolution program with a defined out-of-network payment standard.

I believe your work is of utmost importance and must achieve a comprehensive solution that simultaneously protects patients and preserves the financial health and sustainability of the emergency medical delivery system. Your draft legislation acknowledges the negative and harmful implications that would occur by de-coupling commercial insurance's cross-subsidization of emergency care from any balance billing solution while failing to address underfunded government sources of reimbursement, bad debt and the uninsured. Please do not hesitate to reach out to me at any time. I can be reached at (865) 293-5300 and I would be happy to travel to your office in Washington, DC to meet in person.

Very truly yours,

Leif Murphy
President & Chief Executive Officer

---

[3] https://www.fairhealth.org/benchmark-data-products/benchmark-modules
[4] https://www.law.cornell.edu/uscode/text/42/1395dd

**List of Corporate Representatives Appearing for Plaintiffs**

| Name | Position/Employer | Bio Link |
|------|-------------------|----------|
| Kent Bristow | Senior Vice President, Revenue Management, TeamHealth | https://www.teamhealth.com/leadership/kent-bristow/?r=1 |
| Carol Owen | Chief Counsel, Commercial Litigation, TeamHealth | https://www.linkedin.com/in/carol-owen-0325aa6/ |
| Paul Bevilacqua | Vice President of Managed Care, TeamHealth | https://www.linkedin.com/in/paul-bevilacqua-9969766/ |
| James Rybak, MD | Executive Vice President, TeamHealth | https://www.linkedin.com/in/james-rybak-a79596ba/ |
| | | |

**Exhibit 15**

10-K 1 tmh-201510k.htm 10-K

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

For the fiscal year ended December 31, 2015

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

For the transition period from                to                .

Commission File Number 001-34583

# Team Health Holdings, Inc.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **36-4276525** |
| (State or other jurisdiction of incorporation) | (I.R.S. Employer Identification No.) |

**265 Brookview Centre Way**
**Suite 400**
**Knoxville, Tennessee 37919**
**(865) 693-1000**
**(Address, zip code, and telephone number, including area code, of registrant's principal executive office.)**

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Name of each exchange where registered** |
|---|---|
| common stock, par value $0.01 per share | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 and 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter periods that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   ☑ Yes   ☐ No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☐

Indicate by check mark whether the registrant is a large accelerated filers, accelerated filer, a non-accelerated filer or smaller reporting company. See definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑      Accelerated filer ☐      Non-accelerated filer ☐      Smaller reporting company ☐

(do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act)   Yes ☐   No ☑

As of June 30, 2015 (the last business day of the registrant's most recently completed second fiscal quarter), the aggregate market value of the voting and non-voting common equity held by non-affiliates (for this purpose, all outstanding and issued common stock minus stock held by the officers, directors and known holders of 10% or more of the registrant's common stock) was $4.7 billion, based on the closing price of the registrant's common stock reported on the New York Stock Exchange on such date of $65.33 per share.

As of February 18, 2016, there were outstanding 73,537,940 shares of common stock of Team Health Holdings, Inc, with a par value of $.01.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's Proxy Statement to be filed with the Securities and Exchange Commission relating to the 2016 Annual Meeting of Shareholders, which statement will be filed pursuant to Regulation 14A not later than 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K, are incorporated by reference into Part III of this report.

Table of Contents

- ED advice calls;
- physician referral;
- class scheduling;
- appointment scheduling; and
- web response.

In addition, we can provide our ED clients with outbound follow-up calls to patients who have been discharged from an ED. We believe this service results in increased patient satisfaction and decreased liability for the hospital.

Our medical call center is one of the few call centers nationwide that is accredited by the Utilization Review Accreditation Committee, an independent nonprofit organization that provides accreditation and certification programs for call centers.

**Contractual Arrangements**

We earn revenues from both fee for service arrangements and from flat-rate or hourly contracts. Neither form of contract requires any significant financial outlay, investment obligation or equipment purchase by us other than the professional expenses and administrative support costs associated with obtaining and staffing the contracts and the associated cost of working capital for such investments.

Our contracts with hospitals generally have terms of three years. Our present contracts with military treatment and government facilities are generally for one year. Both types of contracts often include automatic renewal options under similar terms and conditions unless either party gives notice to the other of an intent not to renew. Despite the fact that most contracts are terminable by either party upon notice of as little as 90 days, the average tenure of our existing ED contracts is approximately eleven years. The termination of a contract is usually due to either an award of the contract to another staffing provider as a result of a competitive bidding process or the termination of the contract by us due to a lack of an acceptable profit margin on fee for service patient volumes coupled with inadequate contract subsidies. Contracts may also be terminated as a result of a hospital facility closing due to facility mergers or a hospital attempting to insource the services being provided by us.

*Hospitals.* We provide outsourced physician staffing and administrative services to hospitals under fee for service contracts, flat-rate contracts and cost-plus contracts. Hospitals entering into fee for service contracts agree, in exchange for granting exclusivity to us for such services, to authorize us to bill and collect the professional component of the charges for such professional services. Under the fee for service arrangements, we bill patients and third-party payors for services rendered. Depending on the underlying economics of the services provided to the hospital, including its payor mix, we may also receive supplemental revenue from the hospital. In a fee for service arrangement, we accept responsibility for billing and collections.

Under flat-rate contracts, the hospital usually performs the billing and collection services of the professional component and assumes the risk of collectability. In return for providing the physician staffing and administrative services, the hospital pays us a contractually negotiated fee, often on an hourly basis. Under cost-plus contracts, the hospital typically reimburses us the amount of our total costs incurred in providing physicians and mid-level practitioners to perform the professional services, plus an agreed upon administrative management fee, less our billings and collections of the professional component of the charges for such professional services.

IPC's affiliated clinicians are credentialed and maintain privileges at the hospitals they serve. Patients are referred to our affiliated clinicians through their community medical providers, emergency departments, payors and hospitals, in the same manner as many other medical professionals receive referrals. Third party payors and patients pay for our services in the same manner as they would pay the primary care physicians and other medical professionals who otherwise would be furnishing this direct patient care. Patient encounters are obtained through a network of more than 48,000 referring physicians and 3,500 health plans. Our hospitalist programs are structured to provide acute care hospitals with a consistent on-site physician presence that typically results in fewer admitting physicians overseeing patients in the hospital, thereby reducing process variability and enhancing the ability to implement standardized practices. We believe our affiliated clinicians' consistent presence in the facilities leads to more efficient processes within the acute care hospitals, which can improve clinical outcomes, decrease average length of inpatient stay and lower costs per day. By concentrating the care of more patients with relatively fewer physicians, hospitals can more easily implement new initiatives and enhance compliance with protocols.

***Alternative Sites of Inpatient and Post-Acute Care Facilities.*** Alternative sites of inpatient and post-acute care facilities such as long-term acute care facilities, specialty hospitals, psychiatric facilities, rehabilitation hospitals and skilled nursing facilities face many of the same challenges as acute care hospitals. There is increasing demand for facility-based care in the post-acute setting, and these facilities face challenges related to the narrow breadth of physician coverage that is typically

6

Table of Contents

available at such sites. Our affiliated clinicians provide alternative sites of inpatient care in the post-acute setting with consistent on-site physician availability and experience. We believe this benefits inpatient care in post-acute care facilities by providing a single point of contact and regular communication with other healthcare constituents outside the site of care. Our clinicians in both post-acute and acute care facilities may coordinate patient care with each other, thereby providing a continuum of care which improves quality of care while enhancing the patient experience. By coordinating inpatient care at such facilities, we believe our affiliated clinicians manage the appropriate utilization of patient care to the benefit of both the patients and the facility.

*Military Treatment and Government Facilities.* Our present contracts to provide staffing for military treatment and government facilities generally provide such staffing on an hourly or contracted fee basis.

*Physicians.* We contract with physicians as independent contractors or employees to provide the professional services necessary to fulfill our contractual obligations to our hospital clients. We typically pay physicians: (1) a base rate (generally for emergency physicians an hourly rate for each hour of coverage and a base salary for other physician specialties) provided at rates comparable to the market in which they work; (2) a productivity-based payment such as a relative value unit (RVU) based payment or (3) a combination of both a fixed rate and a productivity-based payment. The hourly rate varies depending on whether the physician is independently contracted or an employee. Independently contracted physicians are required to pay self-employment tax, social security, and workers' compensation insurance premiums. By contrast, we pay these taxes and expenses for employed physicians. See "Risk Factors—Risks Related to Our Business—A reclassification of our independent contractor physicians by tax authorities could require us to pay retroactive taxes and penalties which could have a material adverse effect on us."

Our contracts with physicians generally have automatic renewal provisions and can be terminated at any time under certain circumstances by either party without cause, typically upon 90 to 180 days notice. Our physician contracts may also be terminated immediately for cause by us under certain circumstances. In addition, we have generally required physicians to sign non-competition and non-solicitation agreements. Although the terms of our non-competition and non-solicitation agreements vary from physician to physician, they generally restrict the physician for two years after termination from divulging confidential information, soliciting or hiring our employees and physicians, inducing termination of our agreements, competing for and/or soliciting our clients and, in limited cases, providing services in a particular geographic region. As of December 31, 2015, we had working relationships with approximately 8,700 physicians, of which approximately 3,900 were independently contracted. See "Risk Factors—Risks Related to Our Business—If we are not able to successfully recruit and retain qualified physicians and nurses to serve as our independent contractors or employees, our net revenues could be adversely affected."

*Other Healthcare Professionals.* We utilize other advanced practice clinicians, such as physician assistants, nurse practitioners, certified registered nurse anesthetists, anesthesiologist assistants and administrative support staff to assist physicians when staffing our hospital-based facilities. We also provide other healthcare professionals such as nurses, specialty technicians and administrative support staff on a contractual basis to military treatment and government facilities. As of December 31, 2015, we employed or contracted with approximately 9,300 other healthcare professionals.

## Services

We provide a full range of outsourced physician and non-physician healthcare professional staffing and administrative services, including the following:

*Contract Management.* Our delivery of services for a clinical area of a healthcare facility is led by an experienced contract management team of clinical and other healthcare professionals. The team usually includes a regional medical director, an on-site medical director and a client services manager. The on-site medical director is a physician with the primary responsibility of coordinating the physician component of a clinical area of the facility. The medical director works with the team, in conjunction with the nursing staff and private medical staff, to improve clinical quality and operational effectiveness. Additionally, the medical director works closely with the regional operating unit's operations staff to meet the client's ongoing recruiting and staffing needs.

*Operational Consulting.* We assist our clients in achieving or exceeding their clinical, operational and financial goals through operational consulting. Our focus is on improving patient satisfaction, reducing patient throughput times, managing resource utilization, promoting integration among multiple service lines, improving clinical outcomes, and overall enhancing efficiency and quality of patient care. We utilize physician and nurse coaches in providing this consulting service.

*Staffing.* We provide a full range of staffing services to meet the unique needs of each healthcare facility. Our dedicated clinical teams include qualified, career-oriented physicians and other healthcare professionals responsible for the delivery of high quality, cost-effective care. These teams also rely on managerial personnel, many of whom have clinical experience, who oversee the administration and operations of the clinical area. As a result of our staffing services, healthcare facilities can focus

JC ID ----> 201428100316



| DATE | DOCUMENT ID | DESCRIPTION | FILING | EXPED | PENALTY | CERT | COPY |
|------|-------------|-------------|--------|-------|---------|------|------|
| 10/08/2014 | 201428100316 | DOMESTIC ARTICLES/PROFESSIONAL (ARP) | 125.00 | 100.00 | 0.00 | 0.00 | 0.00 |

### Receipt

This is not a bill. Please do not remit payment.

NSI
145 BAKER ST.
ATTN: MARINA M. REEL
MARION, OH 43302

# STATE OF OHIO
## CERTIFICATE

### Ohio Secretary of State, Jon Husted
#### 2333383

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**MERCY EMERGENCY CARE SERVICES, INC.**

and, that said business records show the filing and recording of:

Document(s)                                         Document No(s):

**DOMESTIC ARTICLES/PROFESSIONAL**                  **201428100316**

Effective Date:  10/07/2014



United States of America
State of Ohio
Office of the Secretary of State

Witness my hand and the seal of the Secretary of State at Columbus, Ohio this 8th day of October, A.D. 2014.

*Jon Husted*

Ohio Secretary of State

**Exhibit 17**

JC ID ----> 201428100316



Form 532C Prescribed by:

# JON HUSTED
### Ohio Secretary of State

Central Ohio: (614) 466-3910
Toll Free: (877) SOS-FILE (767-3453)
www.OhioSecretaryofState.gov
Busserv@OhioSecretaryofState.gov

Mail this form to one of the following:

Regular Filing (non expedite)
P.O. Box 670
Columbus, OH 43216

Expedite Filing (Two-business day processing
time requires an additional $100.00).
P.O. Box 1390
Columbus, OH 43216

# Initial Articles of Incorporation
## (Professional Association, Domestic Corporation)
### Filing Fee: $125
#### (170 - ARP)

**First:**    Name of Corporation    Mercy Emergency Care Services, Inc.

(Name must include the following word or abbreviation: company, co.,
corporation, corp., incorporated, or inc.)

Corporation's Profession    Medicine

**Second:**    Location of Principal
office in Ohio

Columbus         Ohio
City                State

Franklin
County

Effective Date
(Optional)        mm/dd/yyyy

(The legal existence of the corporation begins upon
the filing of the articles or on a later date specified
that is not more than ninety days after filing)

CLIENT SERVICE CENTER    2014 OCT -7 AM 10: 42    RECEIVED SECRETARY OF STATE

**Third:**    The number of shares which the corporation is authorized to have outstanding.
(Please state if shares are common or preferred and their par value, if any.)

1,000         Common         None
Number of Shares     Type            Par Value

**Fourth:**    If the corporation is to have an initial stated capital, please state the amount of that stated capital

Amount

**Note:** ORC Chapter 1701 and Chapter 1785 allow for additional provisions to be included in the Articles of
Incorporation. If including any of these additional provisions, please do so by including
them in an attachment to this form.**

## ORIGINAL APPOINTMENT OF STATUTORY AGENT

The undersigned, being at least a majority of the incorporators of | Mercy Emergency Care Services, Inc.
hereby appoint the following to be statutory agent upon whom any process, notice or demand required or permitted by statute to be served upon the corporation may be served. The complete address of the agent is

| CSC - Lawyers Incorporating Service (Corporation Service Company) |
Name

| 50 West Broad Street, Suite 1800 |
Mailing Address

| Columbus | | Ohio | 43215 |
City | | State | Zip Code

Must be signed by the
Incorporators or a
majority of the
incorporators

Signature

Signature

Signature

## ACCEPTANCE OF APPOINTMENT

The Undersigned, | CSC-Lawyers Incorporating Service (Corporation Service Company), named herein as the
Statutory Agent Name

Statutory agent for | Mercy Emergency Care Services, Inc.
Corporation Name

hereby acknowledges and accepts the appointment of statutory agent for said corporation.

Statutory Agent Signature | By: _Stephanie Thilmeo Asst. V.P._
Individual Agent's Signature / Signature on behalf of Corporate Agent

☐ If the agent is an individual and using a P.O. Box, check this box to confirm the agent is an Ohio resident.

By signing and submitting this form to the Ohio Secretary of State, the undersigned hereby certifies that he or she has the requisite authority to execute this document.

**Required**
Articles and original appointment of agent must be signed by the incorporator(s).

If the incorporator is an individual, then they must sign in the "signature" box and print his/her name in the "Print Name" box.

If the incorporator is a business entity, not an individual, then please print the entity name in the "signature" box, an authorized representative of the entity must sign in the "By" box and print his/her name in the "Print Name" box.

Signature

By

John R. Stair

Print Name

Signature

By

Print Name

Signature

By

Print Name



| DATE | DOCUMENT ID | DESCRIPTION | FILING | EXPED | PENALTY | CERT | COPY |
|------|-------------|-------------|--------|-------|---------|------|------|
| 07/14/2020 | 202019602912 | BIENNIAL REPORT OF PROFESSIONAL ASSOCIATION (20A) | 25.00 | | | | 0 |

## Receipt

This is not a bill. Please do not remit payment.

**KELLY GREANEY**

**265 BROOKVIEW CENTRE WAY, SUITE 400**

**KNOXVILLE, TN, 37919**

# STATE OF OHIO
## CERTIFICATE

### Ohio Secretary of State, Frank LaRose

#### 2333381

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**PREMIER EMERGENCY CARE SERVICES, INC.**

and, that said business records show the filing and recording of:

Document(s)                                                    Document No(s):

**BIENNIAL REPORT OF PROFESSIONAL ASSOCIATION**                **202019602912**

Effective Date: 07/14/2020



Witness my hand and the seal of the
Secretary of State at Columbus, Ohio
this 14th day of July, A.D. 2020.

*Frank LaRose*

United States of America
State of Ohio
Office of the Secretary of State

**Ohio Secretary of State**

Form 520 Prescribed by:



**Frank LaRose**
*Ohio Secretary of State*

Date Electronically Filed: 7/14/2020

Toll Free: 877.767.3453 | Central Ohio: 614.466.3910

OhioSoS.gov | business@OhioSoS.gov

File online or for more information: OhioBusinessCentral.gov

# Biennial Report
## (Domestic, Professional Association, Domestic or Foreign LLP)
### Filing Fee: $25
### Form Must Be Typed

**CHECK ONLY ONE (1) Box**

(1) ☉ `2020`
Indicate Year

Biennial Report
of Professional
Association (102-YRA)
(even-numbered years)

List Profession `MEDICAL`

(2) ☐
Indicate Year

Biennial Report
of Limited Liability
Partnership (103-YRL)
(odd-numbered years)

If foreign limited liability
partnership, provide
jurisdiction of formation

Name of Entity `PREMIER EMERGENCY CARE SERVICES, INC.`

Charter or Registration Number `2333381`

---

**Complete the information in this section if box (1) is checked**

**Shareholders of Professional Association**
Authenticating this form constitutes a certification that all the below listed shareholders are duly licensed or otherwise legally authorized to render the professional services in this state in the profession that is listed above.

| Name | Address |
|------|---------|
| WILLIAM A. COLE MD | 332 CONGRESS PARK DRIVE, SUITE 450 DAYTON OHIO |
| | |
| | |
| | |
| | |
| | |

**Complete the applicable information in this section if box (2) is checked**

Address of the partnership's chief executive office:

Mailing Address

| | | |
|---|---|---|
| City | State | Zip Code |

If the chief executive office is not in Ohio, the address of any office of the partnership in Ohio:

Mailing Address

| | | |
|---|---|---|
| City | State | Zip Code |

If the partnership does not have an office in Ohio, the name and address of the partnership's current agent for service of process:

Name of Agent

Mailing Address

| | | |
|---|---|---|
| City | State | Zip Code |

By signing and submitting this form to the Ohio Secretary of State, the undersigned hereby certifies that he or she has the requisite authority to execute this document.

**Required**
Report must be signed by an officer of the professional association or partner or authorized representative of the partnership.

WILLIAM A COLE MD

Signature

By (if applicable)

If authorized representative is an individual, then they must sign in the "signature" box and print their name in the "Print Name" box.

Print Name

If authorized representative is a business entity, not an individual, then please print the business name in the "signature" box, an authorized representative of the business entity must sign in the "By" box and print their name in the "Print Name" box.

JC ID --> 202023402544



| DATE | DOCUMENT ID | DESCRIPTION | FILING | EXPED | PENALTY | CERT | COPY |
|------|-------------|-------------|--------|-------|---------|------|------|
| 08/21/2020 | 202023402544 | BIENNIAL REPORT OF PROFESSIONAL ASSOCIATION (20A) | 25.00 | | | | 0 |

### Receipt

This is not a bill. Please do not remit payment.

**KELLY  GREANEY**

**265 BROOKVIEW CENTRE WAY, SUITE 400**

**KNOXVILLE, TN, 37919**

# STATE OF OHIO
## CERTIFICATE

### Ohio Secretary of State, Frank LaRose

#### 2039164

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**OHIO EMERGENCY PROFESSIONALS, INC.**

and, that said business records show the filing and recording of:

Document(s)                                                    Document No(s):

**BIENNIAL REPORT OF PROFESSIONAL ASSOCIATION**      **202023402544**

        **Effective Date:   08/21/2020**



Witness my hand and the seal of the
Secretary of State at Columbus, Ohio
this 21st day of August, A.D. 2020.

United States of America
State of Ohio
Office of the Secretary of State

**Ohio Secretary of State**

Form 520 Prescribed by:



Date Electronically Filed: 8/21/2020

Toll Free: 877.767.3453 | Central Ohio: 614.466.3910

OhioSoS.gov | business@OhioSoS.gov

File online or for more information: OhioBusinessCentral.gov

# Biennial Report
## (Domestic, Professional Association, Domestic or Foreign LLP)
### Filing Fee: $25
### Form Must Be Typed

**CHECK ONLY ONE (1) Box**

| (1) ⦿ | 2020 | Biennial Report of Professional Association (102-YRA) (even-numbered years) |
|---|---|---|
| | Indicate Year | |

| (2) ☐ | | Biennial Report of Limited Liability Partnership (103-YRL) (odd-numbered years) |
|---|---|---|
| | Indicate Year | |

If foreign limited liability partnership, provide jurisdiction of formation

List Profession | MEDICAL

Name of Entity | OHIO EMERGENCY PROFESSIONALS, INC.

Charter or Registration Number | 2039164

**Complete the information in this section if box (1) is checked**

**Shareholders of Professional Association**

Authenticating this form constitutes a certification that all the below listed shareholders are duly licensed or otherwise legally authorized to render the professional services in this state in the profession that is listed above.

| Name | Address |
|---|---|
| LAURA DOLLISON, DO | 265 BROOKVIEW CENTRE WAY, SUITE 400 KNOXVILLE |
| | |
| | |
| | |
| | |
| | |

**Complete the applicable information in this section if box (2) is checked**

Address of the partnership's chief executive office:

Mailing Address

City                          State        Zip Code

If the chief executive office is not in Ohio, the address of any office of the partnership in Ohio:

Mailing Address

City                          State        Zip Code

If the partnership does not have an office in Ohio, the name and address of the partnership's current agent for service of process:

Name of Agent

Mailing Address

City                          State        Zip Code

By signing and submitting this form to the Ohio Secretary of State, the undersigned hereby certifies that he or she has the requisite authority to execute this document.

**Required**
Report must be signed by an officer of the professional association or partner or authorized representative of the partnership.

LAURA DOLLISON DO

Signature

By (if applicable)

If authorized representative is an individual, then they must sign in the "signature" box and print their name in the "Print Name" box.

Print Name

If authorized representative is a business entity, not an individual, then please print the business name in the "signature" box, an authorized representative of the business entity must sign in the "By" box and print their name in the "Print Name" box.



| DATE | DOCUMENT ID | DESCRIPTION | FILING | EXPED | PENALTY | CERT | COPY |
|------|-------------|-------------|--------|-------|---------|------|------|
| 07/17/2018 | 201819801038 | BIENNIAL REPORT OF PROFESSIONAL ASSOCIATION (18A) | 25.00 | | | | 0 |

**Receipt**

This is not a bill. Please do not remit payment.

**KELLY GREANEY**

**265 BROOKVIEW CENTRE WAY, SUITE 400**

**KNOXVILLE, TN, 37919**

# S T A T E   O F   O H I O

## C E R T I F I C A T E

### Ohio Secretary of State, Jon Husted

#### 525169

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**CHILDREN'S EMERGENCY SERVICES, INC.**

and, that said business records show the filing and recording of:

Document(s)                                                    Document No(s):

**BIENNIAL REPORT OF PROFESSIONAL ASSOCIATION**          **201819801038**

Effective Date:  07/17/2018



United States of America
State of Ohio
Office of the Secretary of State

Witness my hand and the seal of the
Secretary of State at Columbus, Ohio
this 17th day of July, A.D. 2018.

*Jon Husted*

**Ohio Secretary of State**

Form 520 Prescribed by:

Date Electronically Filed: 7/17/2018



# JON HUSTED
## Ohio Secretary of State

Toll Free: (877) SOS-FILE  (877-767-3453) | Central Ohio: (614) 466-3910
*www.OhioSecretaryofState.gov* | *busserv@OhioSecretaryofState.gov*
File online or for more information: *www.OHBusinessCentral.com*

For screen readers, follow instructions located at this path.

## Biennial Report

### (Domestic, Professional Association, Domestic or Foreign LLP)
### Filing Fee: $25
### Form Must Be Typed

**CHECK ONLY ONE (1) Box**

(1) ☉  `2018`   Biennial Report
        of Professional
   Indicate Year   Association (102-YRA)
        (even-numbered years)

List Profession  `MEDICAL`

(2) ☐  `_____`   Biennial Report
        of Limited Liability
   Indicate Year   Partnership (103-YRL)
        (odd-numbered years)

If foreign limited liability
partnership, provide
jurisdiction of formation  `_____`

---

Name of Entity  `CHILDREN'S EMERGENCY SERVICES, INC.`

Charter or Registration Number  `525169`

---

**Complete the information in this section if box (1) is checked**

**Shareholders of Professional Association**
Authenticating this form constitutes a certification that all the below listed shareholders are duly licensed or otherwise legally authorized to render the professional services in this state in the profession that is listed above.

| Name | Address |
|------|---------|
| TEAM FINANCE LLC | 265 BROOKVIEW CENTRE WAY, SUITE 400 KNOXVILLE |
| | |
| | |
| | |
| | |
| | |

**Complete the applicable information in this section if box (2) is checked**

Address of the partnership's chief executive office:

Mailing Address

| | | |
|---|---|---|
| City | State | Zip Code |

If the chief executive office is not in Ohio, the address of any office of the partnership in Ohio:

Mailing Address

| | | |
|---|---|---|
| City | State | Zip Code |

If the partnership does <u>not</u> have an office in Ohio, the name and address of the partnership's current agent for service of process:

Name of Agent

Mailing Address

| | | |
|---|---|---|
| City | State | Zip Code |

By signing and submitting this form to the Ohio Secretary of State, the undersigned hereby certifies that he or she has the requisite authority to execute this document.

**Required**
Report must be signed by an officer of the professional association or partner or authorized representative of the partnership.

JOHN R. STAIR

Signature

By (if applicable)

If authorized representative is an individual, then they must sign in the "signature" box and print their name in the "Print Name" box.

Print Name

If authorized representative is a business entity, not an individual, then please print the business name in the"signature" box, an authorized representative of the business entity must sign in the "By" box and print their name in the "Print Name" box.

Form 520                                                                                          Last Revised: 02/06/2012

| Form **990** | | **Return of Organization Exempt From Income Tax** | | OMB No 1545-0047 |
|---|---|---|---|---|
| | | Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations) | | **2018** |
| | | ▶ Do not enter social security numbers on this form as it may be made public | | **Open to Public Inspection** |
| Department of the Treasury Internal Revenue Service | | ▶ Go to _www.irs.gov/Form990_ for instructions and the latest information. | | |

**A** For the 2019 calendar year, or tax year beginning 01-01-2018 , and ending 12-31-2018

| **B** Check if applicable | **C** Name of organization GOOD SAMARITAN HOSPITAL | | **D** Employer identification number |
|---|---|---|---|
| ☐ Address change ☐ Name change ☐ Initial return ☐ Final return/terminated ☐ Amended return ☐ Application pending | % J MICHAEL SIMS | | 31-0536981 |
| | Doing business as | | |
| | Number and street (or P O box if mail is not delivered to street address) 110 N MAIN ST 500 | Room/suite | **E** Telephone number (937) 499-9942 |
| | City or town, state or province, country, and ZIP or foreign postal code DAYTON, OH 45402 | | **G** Gross receipts $ 289,015,353 |

| **F** Name and address of principal officer J MICHAEL SIMS 110 N MAIN ST 500 DAYTON, OH 45402 | **H(a)** Is this a group return for subordinates? ☐ Yes ☒ No |
|---|---|
| | **H(b)** Are all subordinates included? ☐ Yes ☐ No If "No," attach a list (see instructions) |
| **I** Tax-exempt status ☒ 501(c)(3) ☐ 501(c) ( ) ◀ (insert no ) ☐ 4947(a)(1) or ☐ 527 | |
| **J** Website: ▶ WWW PREMIERHEALTH COM | **H(c)** Group exemption number ▶ 0928 |
| **K** Form of organization ☒ Corporation ☐ Trust ☐ Association ☐ Other ▶ | **L** Year of formation 1932 **M** State of legal domicile OH |

## Part I Summary

| | | |
|---|---|---|
| **1** | Briefly describe the organization's mission or most significant activities WE WILL IMPROVE THE HEALTH OF THE COMMUNITIES WE SERVE WITH OTHERS WHO SHARE OUR COMMITMENT TO PROVIDE HIGH-QUALITY, COST-COMPETITIVE HEALTHCARE SERVICES | |

| | | | | |
|---|---|---|---|---|
| **2** | Check this box ▶ ☒ if the organization discontinued its operations or disposed of more than 25% of its net assets | | | |
| **3** | Number of voting members of the governing body (Part VI, line 1a) | **3** | 7 | |
| **4** | Number of independent voting members of the governing body (Part VI, line 1b) | **4** | 2 | |
| **5** | Total number of individuals employed in calendar year 2018 (Part V, line 2a) | **5** | 3,056 | |
| **6** | Total number of volunteers (estimate if necessary) | **6** | 118 | |
| **7a** | Total unrelated business revenue from Part VIII, column (C), line 12 | **7a** | 90,459 | |
| **b** | Net unrelated business taxable income from Form 990-T, line 34 | **7b** | -19,931 | |

| | | Prior Year | Current Year |
|---|---|---|---|
| **8** | Contributions and grants (Part VIII, line 1h) | 370,968 | 227,482 |
| **9** | Program service revenue (Part VIII, line 2g) | 382,542,402 | 154,114,624 |
| **10** | Investment income (Part VIII, column (A), lines 3, 4, and 7d ) | 7,043,536 | 4,586,933 |
| **11** | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 3,455,170 | 1,683,565 |
| **12** | Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 393,412,076 | 160,612,604 |
| **13** | Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) | 3,144,614 | 1,489,125 |
| **14** | Benefits paid to or for members (Part IX, column (A), line 4) | 0 | 0 |
| **15** | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 155,097,700 | 92,676,625 |
| **16a** | Professional fundraising fees (Part IX, column (A), line 11e) | 0 | 0 |
| **b** | Total fundraising expenses (Part IX, column (D), line 25) ▶0 | | |
| **17** | Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) | 250,320,350 | 119,555,613 |
| **18** | Total expenses Add lines 13–17 (must equal Part IX, column (A), line 25) | 408,562,664 | 213,721,363 |
| **19** | Revenue less expenses Subtract line 18 from line 12 | -15,150,588 | -53,108,759 |

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| **20** | Total assets (Part X, line 16) | 324,444,512 | 43,357,685 |
| **21** | Total liabilities (Part X, line 26) | 45,607,690 | 37,779,215 |
| **22** | Net assets or fund balances Subtract line 21 from line 20 | 278,836,822 | 5,578,470 |

## Part II Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

| **Sign Here** | Signature of officer | 2019-10-18 Date |
|---|---|---|
| | TIMOTHY D SNIDER TREASURER / CFO Type or print name and title | |

| **Paid Preparer Use Only** | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN P01268401 |
|---|---|---|---|---|---|
| | Firm's name ▶ ERNST & YOUNG US LLP | | | Firm's EIN ▶ | |
| | Firm's address ▶ 221 E 4TH STREET SUITE 2900 CINCINNATI, OH 452024216 | | | Phone no (513) 612-1400 | |

May the IRS discuss this return with the preparer shown above? (see instructions) ☒ Yes ☐ No

For Paperwork Reduction Act Notice, see the separate instructions. Cat No 11282Y Form **990** (2018)

**Part VII** Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees (continued)

| (A)<br>Name and Title | (B)<br>Average hours per week (list any hours for related organizations below dotted line) | (C)<br>Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D)<br>Reportable compensation from the organization (W-2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W-2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| See Additional Data Table | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **1b Sub-Total** . . . . . . . . . . ▶ | | | | | | | | | | |
| **c Total from continuation sheets to Part VII, Section A** . . . . ▶ | | | | | | | | | | |
| **d Total (add lines 1b and 1c)** . . . . . . ▶ | | | | | | | | 1,906,999 | 14,633,035 | 1,485,028 |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶ 11

| | | Yes | No |
|---|---|---|---|
| **3** | Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? If "Yes," complete Schedule J for such individual . . . . . . . . . . **3** | Yes | |
| **4** | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? If "Yes," complete Schedule J for such individual . . . . . . . . . . . . . . **4** | Yes | |
| **5** | Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? If "Yes," complete Schedule J for such person . . . . . . . . **5** | | No |

### Section B. Independent Contractors

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization Report compensation for the calendar year ending with or within the organization's tax year

| (A)<br>Name and business address | (B)<br>Description of services | (C)<br>Compensation |
|---|---|---|
| SHOOK CONSTRUCTION,<br>4977 NORTHCUTT PLACE<br>DAYTON, OH 45414 | CONSTRUCTION | 22,091,126 |
| DAWSON HEALTHCARE,<br>1114 DUBLIN RD<br>COLUMBUS, OH 43215 | AGENCY STAFF | 8,313,238 |
| EMERGENCY PROFESSIONAL SERVICES INC,<br>307 S EVERGREEN AVE<br>WOODBURY, NJ 08096 | MEDICAL SERVICES | 4,076,895 |
| CATHOLIC HEALTH INITIATIVES,<br>3900 OLYMPIC BLVD 400<br>ERLANGER, KY 41018 | CLINICAL ENGINEERING | 3,692,623 |
| ANESTHESIOLOGY SERVICES,<br>1 WYOMING ST 3SW TOWER<br>DAYTON, OH 45409 | MEDICAL SERVICES | 2,357,439 |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶ 49

Form **990** (2018)

# Clarifying the Debate

TeamHealth explores frequently asked questions about surprise medical billing and addresses the myths and facts about the debate.



**Exhibit 19**

https://www.teamhealthputspatientsfirst.com/clarifying-the-debate/

**+ FAQ: Why is TeamHealth actively involved in the surprise medical billing debate?**

**+ FAQ: What are the market motivations and implications involved with the surprise medical billing debate?**

**+ FAQ: Is the surprise medical billing debate being framed accurately?**

**+ FAQ: Are recently published academic studies on the topic reflective of current system care and market realities?**

**− FAQ: Is emergency care expensive?**

***Myth:*** Emergency care is often billed at excessive levels and/or are unsubstantiated.

***Fact:*** Despite the pressures and costs to provide emergency care, emergency medicine groups typically yield margins lower than 10%. Emergency care is complicated, unique and specialized, but despite its complexity, the cost for staffing emergency department provider care is remarkably low.



- While it is expensive to provide qualified and trained emergency medicine clinicians to all patients, regardless of a patient's ability to pay for that care, and to do so 24 hours a day/ 7 days per week, 365 days per year, the average cost to provide clinicians in an emergency department is **$150** per encounter.

**+ FAQ: What are the funding pressures associated with delivering emergency care?**

**+ FAQ: What is the impact of the uninsured using emergency care on the healthcare system?**

**+ FAQ: What are the market factors involved with the uninsured using emergency care?**

**+ FAQ: Why are emergency departments dependent on premium reimbursement from the commercial insurance industry?**

Home

Situational Analysis



5/10/2021

Clarifying the Debate

Correcting the Record

Contact

PRIVACY POLICY     TEAMHEALTH

Copyright © 2019 TeamHealth



# EXHIBIT 20
# PLACEHOLDER

# FILED UNDER SEAL
# (Attorneys' Eyes Only)

# EXHIBIT 21 PLACEHOLDER

# FILED UNDER SEAL (Attorneys' Eyes Only)

🔍 Start your search here

CONTACT US

ABOUT US        PEOPLE        PRACTICES        OFFICES
        DIVERSITY & INCLUSION        NEWS & INSIGHTS

# McDonald Carano Litigation Team Upends National Out-of-Network Healthcare Reimbursement

https://www.mcdonaldcarano.com/news/mcdonald-carano-litigation-team-upends-national-out-of-network-healthcare-reimbursement-system-with-62-65-million-jury-verdict/        **Exhibit 22**        1/10

# Reimbursement System with $62.65 Million Jury Verdict

« Back to Newsroom

**Pat Lundvall**

**Kristen T. Gallagher**

**Amanda M. Perach**

**Amanda C. Yen**

McDonald Carano congratulates **Pat Lundvall**, **Kristen Gallagher** and **Amanda Perach** on serving as lead Nevada trial counsel in an industry-changing jury verdict in Clark County District Court that awarded $60 million in punitive damages and $2.65 million in compensatory damages to the Nevada affiliates of Tennessee-based TeamHealth. Their local clients are three Nevada-based affiliated emergency room provider practice groups (Fremont Emergency Services Mandavia Ltd. serving the Las Vegas area, Team Physicians of Nevada-Mandavia PC serving Fallon, and the parent company of Ruby Crest Emergency Medicine serving Elko) who filed suit in 2019 against UnitedHealthcare for underpaying out-of-network emergency room healthcare providers. "Winning this trial was critical because it sets the stage for TeamHealth's successful litigation strategy across the country. TeamHealth needed a winning team of attorneys and we needed a litigation powerhouse firm that knows how to win in Nevada. This case is a bellwether and McDonald Carano was instrumental in our victory," said Carol Owen, Chief Counsel for Commercial Litigation and Revenue Payment Integrity at TeamHealth.

The case is *Fremont Emergency Services (Mandavia), et al. vs. UnitedHealth Group, Inc. et al.*, case number A-19-792978-B.

## National Impact

"As the largest healthcare insurer in the U.S. with over 70 million members and $257 billion in revenue, UnitedHealthcare's loss achieved a landmark victory for emergency

room healthcare providers subject to EMTALA, the federal act obligating these providers to perform stabilizing care regardless of ability to pay to every patient who presents with a health emergency. The trial success may begin to counter-balance the enormous power healthcare insurers, like United, have unscrupulously exercised against these critical first responders who perform an important public need. While these first responders are performing front line functions in communities across our nation certain insurers have lowballed reimbursement rates being paid to these emergency room healthcare providers knowing well the providers have no means to protect themselves against such predatory treatment other than the legal system. The impact of the jury's verdict should go far beyond the case itself; the jury sent a powerful message that it is time to correct an unconscionable humanitarian wrong and fix a gross business inequity," said Pat Lundvall, Chair of McDonald Carano's Commercial & Complex Litigation Practice.

## Opening Statement

After five days of jury selection, Pat Lundvall presented opening statement before Eighth District Court Judge Nancy Allf in Las Vegas in the closely watched trial that involved a highly anticipated view into UnitedHealthcare's reimbursement rate system. A TeamHealth **press release** explains that "The Nevada trial should be the most significant view behind the managed care curtain in recent history." Covering Pat's opening statement, *The Texas Lawbook* reported that "eyeballs across the country are on the trial" and "although the lawsuit at its core is about money, lawyers for

TeamHealth said during opening statements that the litigation could, on a broader level, impact the overall quality of emergency physician care." The article quoted Pat's opening statement that "In business cases, they're about passing money from one corporate pocketbook to another, but this case is about a little bit more; it's about the quality of healthcare in Nevada." Pat presented a slide to jurors showing UnitedHealthcare paid Nevada providers at the lowest rate in the Nation and then paid other Nevada emergency room providers an average of $528 per visit but paid TeamHealth doctors $247, cutting reimbursement to out-of-network providers by more than half from 2017 to 2020.

**Unanimous Verdict in Favor of TeamHealth**

After more than three weeks of testimony and two days of deliberation, the jury unanimously found UnitedHealthcare liable for breach of contract, unjust enrichment and two forms of unfair insurance practices and then awarded $60 million in punitive damages after awarding $2.65 million in compensatory damages. The jury found the evidence clear and convincing of UnitedHealthcare's guilt of oppression, fraud and malice. $20 million in punitive damages was awarded to each of the three emergency room provider groups that sued UnitedHealthcare and its affiliates. The jury's punitive damages award reflects the seriousness, severity and reprehensibility of UnitedHealthcare's underpayment of emergency room doctors as well as the jury's desire to deter similar conduct.

## A Bellwether Victory from Winning Trial Prep

For 2 ½ years, McDonald Carano worked diligently and tirelessly for TeamHealth in preparing the case for trial. Our litigators conceived and directed all discovery; drafted, argued and won all of their 55 substantive pretrial motions; successfully convinced the court to sanction UnitedHealthcare with an adverse inference in the form of a jury instruction that was critical in closing arguments; and, with valuable input from **Amanda Yen** of the Firm's Appellate Practice Group, drafted and successfully opposed UnitedHealthcare's two petitions for writ review and two motions to stay before the Nevada Supreme Court that UnitedHealthcare had attempted to use to prevent the case from being tried promptly. McDonald Carano also drafted the briefs and Pat argued a critical case before the Ninth Circuit Court of Appeals that established new precedent on ERISA preemption (Employee Retirement Income Security Act of 1974). Without a victory in that case, all cases across the nation brought by TeamHealth against UnitedHealthcare and other insurance carriers were at risk of being dismissed.

McDonald Carano also achieved the first production orders for crucial information which may be used in nine other similar cases TeamHealth has brought against UnitedHealthcare across the country. The ten lawsuits are only part of the 45 total lawsuits TeamHealth has filed against insurers across the U.S regarding emergency care physician billing rates. The Nevada case also is the first dispute to go to trial against a major insurer involving group healthcare plans that companies offer to

employees through commercial insurers. In addition to McDonald Carano as Nevada trial counsel, the TeamHealth litigation team included TeamHealth's Carol Owen, attorneys from Miami-based Lash & Goldberg and attorneys from Houston-based Ahmad Zavitsanos Anaipakos.

## Nationwide coverage of the trial includes:

"**As surprise billing ban nears, doctors and hospitals scramble to delay federal law**," USA Today, 12/11/2021

"**Nevada jury: Health insurers owe ER doctors $60M in damages**," Associated Press, 12/7/2021

"**TeamHealth wins $60 mln in underpayment suit against UnitedHealthcare**," Reuters, 12/8/2021

"**UnitedHealthcare Hit with $60M Punitive Verdict in Nevada Suit by ER doctors**," The Texas Lawbook, 12/7/2021

"**UnitedHealthcare must pay TeamHealth $62 million for shortchanging clinicians, jury says**," Modern Healthcare, 12/7/2021

"**United Healthcare owes $60M to ER doctors, jury rules**," Las Vegas Review Journal, 12/7/2021

"**Nevada jury says health insurer undercut ER reimbursements,**" Associated Press, 12/1/2021

"**TeamHealth Trial: A Threat, A Delay, A Juror Down** ," The Texas Lawbook, 11/9/2021

---

# About McDonald Carano

McDonald Carano has been shaping Nevada's legal, business, and policy landscape since our founding in 1949. With more than 60 lawyers and government affairs professionals working from offices in Las Vegas, Reno and Carson City, we are Nevada's law firm for business. Our local, national and global clients include Fortune 500 corporations, fast-growth and mid-market companies, entrepreneurs and startups, non-profit organizations, government entities, and high-net-worth individuals. Our attorneys deliver cross-discipline, one-stop, commercial law and government affairs counsel. Our dedication to clients, innovative thinking and practical solutions based in sound business and legal judgments are at the heart of our practice. For more information, please visit **mcdonaldcarano.com** or send an email to **info@mcdonaldcarano.com**.

**Media Contact**

Mark Buckovich

**mbuckovich@mcdonaldcarano.com**

702.257.4559

Pat Lundvall

Kristen T. Gallagher

Amanda M. Perach

Amanda C. Yen



MERITAS    STATE LAW RESOURCES    PAYMENTS    LINKEDIN

Website disclaimer: Information on this website is provided for informational purposes only and should not be construed as legal advice. The transmission and receipt of information on this website or communication with McDonald Carano via the Internet or email through this website does not constitute or create a lawyer-client relationship. Do not send us confidential information in response to this website. Such responses will not create a lawyer-client relationship, and whatever you disclose to us will not be privileged or confidential unless we have agreed to act as your legal counsel and you have executed a written engagement agreement with McDonald Carano. The information on this website may not reflect the most current legal developments and the contents and interpretation of the law addressed on this website is subject to revision. We disclaim all liability in respect to actions taken or not taken based on the contents of this website to the fullest extent permitted by law. Do not act or refrain from acting upon information on this website without seeking professional legal counsel. Map policy: The maps on our website are published on the web by Google and

sourced under an open license. The boundaries, names and designations on the maps do not imply the expression of any opinion on the part of McDonald Carano or its people in respect of the legal status of any country, territory, city or area, or the delimitation of any frontiers or boundaries.

© 2022 McDonald Carano LLP

p. 1

11/21/2019

Dear TeamHealth Colleagues:

TeamHealth is deeply proud that our physicians and advanced practice clinicians across the country provide lifesaving and high quality care to all patients regardless of their ability to pay. TeamHealth doctors and clinicians are on the front lines of patient care, fighting for patients to ensure that everyone who seeks our services is treated.

In the national debate over surprise medical billing, we have taken an industry leading position by committing to keep patients out of the middle of payment disputes with payors. When an insurer arbitrarily underpays our bill, as a matter of policy, we do not bill the patient. Instead, we pursue legal action against insurers to get them to uphold their financial commitments to their own customers. We will not take the fight to the patient.

"Surprise medical bills" happen when insurers underpay their obligations to physicians and ask us to pass the remainder of the bill to our patients, but they do not tell the full story of how insurers benefit from cost-shifting practices. Patients can also receive an unexpectedly large and burdensome bill due to unexpected copayments, high co-insurance, or ever-increasing deductibles. Current legislative proposals to address surprise medical bills still do not cap the significant financial burden that insurance companies can place on their members through cost shifting.

Over the last five years, the number of covered workers with deductibles of over $1,000 has grown by 51 percent and now exceeds half of all Americans with a commercial insurance plan. Over one-third of Americans have a deductible of over $2,000 - a challenging amount for the majority of U.S. households. Insurers have not hesitated to continuously increase the burden of medical debt on families and they have placed the responsibility for collection of that debt on physicians.

As insurance have increasingly refused to pay for the full cost of medical care and instead put that burden on patients through higher deductibles and co-pays, patients are essentially being asked to pay more for care before their insurance plan kicks in. As a result, more patients are unable to afford their medical bills.

With the number of these cases on the rise, TeamHealth understands the impact on our patients. While many doctors and hospitals have been forced to collect unpaid accounts as a standard practice, we have been undertaking a review of our third-party service provider's filing of lawsuits. We've determined to discontinue this practice immediately and will direct our third-party provider not to further pursue any pending cases. Effective December 1, 2019, we are implementing discount policies for our uninsured population to reduce the cost of care by as much 90 percent, and up to 100 when necessary. We will proactively include eligibility criteria in our invoices to help promote participation rather than force patients to seek assistance. TeamHealth will not take any patient to court for unpaid balances.

We are part of a broad coalition of physicians across the country that fully support banning surprise medical bills through federal legislation. From the beginning, TeamHealth, our leadership

**Exhibit 23**

Case: 1:19-cv-01224-JPC Doc #: 84-1 Filed: 01/17/23 17 of 129 - Page ID #: 1336

p. 2

team, and our shareholders have been actively working to reach a comprehensive legislative solution that does not shift further financial power to insurers at the expense of physicians and patients. Any bill must recognize the importance of protecting patients while preserving our fragile medical delivery system. Insurers cannot be the final voice in determining fair payment rates. We believe any legislation should also be expanded to cap or eliminate the vast majority of surprise bills – insurer-imposed copayments and deductibles.

Sincerely,

Leif Murphy
President & CEO
TeamHealth

# EXHIBIT 24
# PLACEHOLDER

# FILED UNDER SEAL
# (Attorneys' Eyes Only)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| EMERGENCY PROFESSIONAL SERVICES, INC., CHILDREN'S EMERGENCY SERVICES, INC., MERCY EMERGENCY CARE SERVICES, INC., OHIO EMERGENCY PROFESSIONALS, INC., and PREMIER EMERGENCY CARE SERVICES, INC., | |
| *Plaintiffs,* | Case No. 1:19-cv-1224 Hon. J. Philip Calabrese |
| *v.* | |
| AETNA HEALTH INC., AETNA HEALTH INSURANCE COMPANY, and AETNA LIFE INSURANCE COMPANY, | |
| *Defendants.* | |

**PLAINTIFFS' OMNIBUS RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES TO CHILDREN'S EMERGENCY SERVICES, INC., MERCY EMERGENCY CARE SERVICES, INC., OHIO EMERGENCY PROFESSIONALS, INC., AND PREMIER EMERGENCY CARE SERVICES, INC. AND SECOND SET OF INTERROGATORIES TO EMERGENCY PROFESSIONAL SERVICES, INC.**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiffs Ohio Emergency Professionals, Inc., Emergency Professional Services, Inc., Children's Emergency Services, Inc., Mercy Emergency Care Services, Inc., and Premier Emergency Care Services, Inc. ("Emergency Providers"), by and through undersigned counsel, hereby serve their Omnibus Responses and Objections to Defendants Aetna Health Inc., Aetna Health Insurance Company and Aetna Life Insurance Company's (collectively, "Aetna" or "Defendants") First Set of Interrogatories and Second Set of Interrogatories (each individual request an "Interrogatory" and collectively the "Interrogatories").

**Exhibit 25**

Case No. 1:19-cv-1224-JPC

**INTERROGATORY NO. 5:** Identify all Documents that You contend formed the implied-in-fact contract between Plaintiffs and Aetna that Plaintiffs allege in the Complaint they have with Aetna.

**RESPONSE:** Emergency Providers object to this Interrogatory to the extent it assumes

that an implied-in-fact contract needs to be in writing, which seeks a legal conclusion and is

inaccurate pursuant to Ohio law. The implied-in-fact contract is supported by more than just

documents, and is further supported by the parties' course of dealing.

5

Subject to and without waiver of the foregoing objections, Emergency Providers identify the following documents:

- Defendants' Rental/Wrap Claims payments (PLAINTIFFS_054285);

- Defendants' Allowed-In-Full Claims payments (PLAINTIFFS_054286);

- Defendants' policy for payment of out-of-network claims in which it delineates a hierarchy for how it pays claims and Defendants' obligation to hold members harmless from balance bills, which cannot be described further herein due to Defendants' designation of the document as Attorneys Eyes Only (AETNA_000564-601);

- Defendants' First Health Agreement;

- The CMS 1500 forms submitted by Emergency Providers to Defendants in accordance with Defendants' procedures;

- Electronic remittance advice received by Emergency Providers from Defendants in which Defendants pay the claim submitted by Emergency Providers and expressly state that Defendants' member should not be balance billed (e.g., PLAINTIFFS_046394);

- Defendants' explanation for how it determines reimbursement of out-of-network claims for emergency services (PLAINTIFFS_54314-315).

Discovery is ongoing, and Emergency Providers reserve the right to supplement this response.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |
|---|---|
| EMERGENCY PROFESSIONAL SERVICES, INC., CHILDREN'S EMERGENCY SERVICES, INC., MERCY EMERGENCY CARE SERVICES, INC., OHIO EMERGENCY PROFESSIONALS, INC., and PREMIER EMERGENCY CARE SERVICES, INC., | |
| *Plaintiffs,* | Case No. 1:19-cv-1224 |
| *v.* | **COMPLAINT** |
| AETNA HEALTH INC., AETNA HEALTH INSURANCE COMPANY, and AETNA LIFE INSURANCE COMPANY, | **JURY DEMAND ENDORSED HEREON** |
| *Defendants.* | |

Plaintiffs Emergency Professional Services, Inc.; Children's Emergency Services, Inc.; Mercy Emergency Care Services, Inc.; Ohio Emergency Professionals, Inc.; and Premier Emergency Care Services, Inc. (collectively, the "Physicians"), by and through counsel, for their complaint against defendants Aetna Health Inc., Aetna Health Insurance Company, and Aetna Life Insurance Company (collectively, "Aetna"), allege as follows:

### NATURE OF THE ACTION

1.     The Physicians bring this lawsuit to assert their common law rights to reasonable payments from Aetna in their business dealings.   For years, Aetna has failed to correctly pay the Physicians for certain medically necessary emergency health care services they provided in hospitals throughout Ohio.  Aetna refuses to pay for the reasonable value of the services rendered to these patients covered under health plans underwritten, operated, and/or administered by Aetna

112542\000001\4838-6004-1880

in hospital emergency rooms across this state where the Physicians' practice (health plan beneficiaries for whom the Physicians performed services without full reimbursement will be referred to as "Aetna's Members").

2.     For all of the claims at issue in this lawsuit, Physicians were non-participating providers, meaning they did not have an express contract with Aetna to accept discounted rates for their services, nor did they ever agree to be bound by Aetna's reimbursement policies or rate schedules. Specifically, the reimbursement claims within the scope of this action are only those non-participating commercial claims (including for patients covered by Affordable Care Act Exchange products) that were adjudicated as covered and allowed as payable by Aetna, on or after six years prior to the date of the filing of this action, at rates below the billed charges and the reasonable value of the services rendered, as measured by the community where they were performed and by the person who provided them. Such claims which are asserted in this action are collectively referred to as the "Non-Participating Claims".

3.     Emergency room doctors are obligated by applicable federal law to evaluate, examine, and treat all patients who come into an emergency room, regardless of the existence, or extent, of insurance coverage, and regardless of a patient's ability to pay for the care.

4.     Insurance companies like Aetna, which agree to provide coverage for emergency medical services, are contractually and legally responsible for ensuring that their members receive such services. Indeed, on information and belief, Aetna markets its insurance products as providing coverage for emergency care, 24 hours a day, 7 days a week, anywhere in the world, and without the need to obtain prior approval for the services.

5.     Emergency room doctors who provide emergency medical services to Aetna's Members therefore satisfy the insurers' obligations to provide for emergency medical services. In

2

## FACTUAL ALLEGATIONS

### *Aetna*

27.     Aetna is a national managed care organization that insures, operates and administers health plans in Ohio.

28.     In exchange for premiums and/or fees or other compensation, Aetna assumes responsibility for the payment of health care services, including emergency medical care, rendered to patients covered by its health plans.

29.     Aetna's responsibilities include providing coverage for emergency care, 24 hours a day, 7 days a week, anywhere in the world, without the need for Aetna's Members to obtain prior approval for the services, and without the need to obtain those services from participating providers.

30.     Aetna, in other words, bears responsibility for the payment of emergency medical care provided to Aetna's Members regardless of its contractual relationship with the doctor, *i.e.,* regardless of whether the treating physician is a participating provider or a non-participating provider. Aetna understands and expressly acknowledges that its members will seek emergency treatment from non-participating providers, and is obligated to pay for those services.  Aetna has acknowledged this obligation with respect to the Non-Participating Claims at issue in this litigation, as it processed and paid those claims, albeit at a rate lower than required by state law.

### *The Physicians*

31.     The Physicians are professional emergency medical group practices that staff emergency departments and treat emergency room patients at more than 30 Ohio hospitals.  They staff the facilities with doctors 24 hours a day, 7 days a week.   The emergency services at issue in this litigation that the Physicians provided to Aetna's members included treating conditions

ranging from cardiac arrest, to broken limbs, to burns, to diabetic ketoacidosis and shock, to gastric and/or obstetrical distress, among countless others. The value that the Physicians provide to their communities in resolving medical exigencies such as these is enormous.

32.     At all material times the Physicians have not been participating providers with Aetna.

33.     Each Non-Participating Claim is for reimbursement for services that the Physicians provided to Aetna's Members in good faith and at times when they were not participating providers with Aetna.

34.     At all material times the Physicians have not been a party to any express contract with Aetna that governs the reimbursement, or any other aspect, of the services provided to Aetna's Members. The Physicians therefore were "out-of-network" providers with Aetna when they rendered the services that underpin the Non-Participating Claims at issue in this lawsuit.

35.     Despite their out-of-network status, the Physicians provided emergency medical care to Aetna's Members in good faith.

36.     At all material times the Physicians timely and directly billed Aetna for the emergency medical care provided to Aetna's Members, with the reasonable expectation of being paid an appropriate amount for those services.

37.     At all material times Aetna satisfactorily determined that the Non-Participating Claims were covered and medically necessary under the respective health plans.

38.     At all material times the Physicians have not agreed to accept any form of discounted rate from Aetna or to be bound by Aetna's payment policies or rate schedules with respect to the Non-Participating Claims.

39.     Despite the absence of any such agreement, Aetna has unilaterally applied an improper discount to its payments to the Physicians for the Non-Participating Claims.

40.     Aetna's payment strategy for out-of-network providers is solely motivated by its desire to maximize profits.

41.     At all material times for the Non-Participating Claims at issue, Aetna has paid for the emergency medical care that the Physicians provided to Aetna's Members, but at rates less than the reasonable value of the services, as measured by the community where they were performed and by the person who provided them.

42.     Aetna's underpayments to the Physicians continue to accrue.

*Federal Law Mandates That The Physicians*
*Provide Emergency Medical Care to Aetna's Members*

43.     Federal law obligates emergency medical providers—like the Physicians—to provide stabilizing treatment to patients who present themselves at emergency departments.

44.     Under the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. §§ 1395dd(a)-(b), (d), (h), hospitals and the physicians who staff their emergency departments have a duty to "provide for an appropriate medical screening examination" when an individual comes to the emergency department and, if "the individual has an emergency medical condition," to "stabilize the medical condition" without inquiry into "the individual's method of payment or insurance status." 42 U.S.C. §§ 1395(a)-(b), (h).

45.     Hospitals are subject to civil liability for a violation of EMTALA's mandates. *See id.* § 1395dd(d)(2)(A). In addition, "any physician who is responsible for the examination, treatment, or transfer of an individual in a participating hospital" who negligently violates EMTALA is subject to civil monetary penalties of up to $50,000 per violation. *Id.* § 1395dd(d)(1)(B).

9

46. Thus, federal law requires that the Physicians provide stabilizing treatment to any individual—including Aetna's Members—who presents at an emergency department, regardless of the person's insurance coverage or ability to pay for the medical care.

47. Not only are emergency room doctors duty-bound to follow the foregoing federal requirements, but they often are obligated to provide emergency medical care under their contractual arrangements with the hospitals.[1]

### *The Law and Equity Must Intervene Here To Prevent An Injustice*

48. Under Ohio law, unjust enrichment occurs where a person has and retains money or benefits which in justice and equity belong to another.

49. Where an out-of-network health care provider is required by law to treat patients in an emergency room, an insurer is unjustly enriched if it fails to pay the out-of-network healthcare provider in full for the costs incurred in rendering the necessary treatment to the insurer's enrollees.

50. Here, to comply with their ethical and legal obligations under federal law, the Physicians provided, and continue to provide, medically necessary emergency medical care to Aetna's Members in good faith.

51. Aetna could not lawfully prevent its Members from seeking emergency medical care from the Physicians.

52. Aetna is required by Ohio law to provide coverage for emergency services to all Aetna Members. *See* Ohio Rev. Code §§ 3923.65(B), 1753.28(B). Aetna must provide such coverage irrespective of whether an emergency provider is a participating provider in Aetna's network. *See* 42 U.S.C. § 300gg-19a(b)(1).

---

[1] Hospitals subject to EMTALA are permitted to contract for emergency services, provided they comply with certain regulatory requirements. *See* 42 C.F.R. § 482.12.

53.     Thus, the Physicians were required by law to provide emergency care to Aetna's Members and Aetna was required by law to provide insurance coverage for such emergency services.  As such, the parties were, in effect, compelled to do business with each other.

54.     Aetna is obligated to reimburse the Physicians for the reasonable value of the services the Physicians provided, taking into account the Members' liability for such services.

55.     For all of the Non-Participating Claims, Aetna has failed to reimburse the Physicians for the reasonable value of the services, and Aetna therefore has been enriched by the amount of the difference between (i) the reasonable value of the Physicians' services and (ii) the amount allowed by Aetna (*i.e.*, the amount paid by Aetna plus the Members' liability).

56.     For all of the Non-Participating Claims, Aetna's failure to reimburse the Physicians the reasonable value of their services (and Aetna's concomitant enrichment thereby) comes at the Physicians' expense because the Physicians are entitled to reimbursement at the reasonable value of the services they have rendered to Aetna's Members.

57.     It would be against equity and good conscience to permit Aetna to retain the amount at issue on the Non-Participating Claims because the Physicians are entitled to such amounts at issue in the Non-Participating Claims, which represent the difference between the reasonable value of the services the Physicians have rendered and the amounts allowed by Aetna for such services. Justice and equity require that Aetna reimburse the Physicians in full for the emergency services they rendered to Aetna's Insureds, as reflected in the Non-Participating Claims.

58.     Furthermore, the emergency medical care provided by the Physicians to Aetna's Members materially benefits Aetna.  Without limitation, the Physicians' provision of emergency medical services to Aetna's Insureds benefited Aetna by discharging Aetna's contractual

obligations to Aetna's Insureds to ensure that such emergency services are provided to Aetna's Members.

59.      The benefit that Aetna receives from the Physicians' emergency medical care therefore is significant.  In exchange for premiums and other compensation, Aetna assumes a duty to provide coverage to its insureds for emergency medical care.  Satisfying this core obligation is a material benefit to Aetna.

60.      Thus, where providers (like Physicians) are required by law to treat patients in an emergency room, an insurance company (like Aetna) is unjustly enriched if it fails to reimburse the provider in full for rendering the necessary treatment to the insurer's members.

61.      At all material times the Physicians billed Aetna for their Non-Participating Claims arising from the treatment of Aetna's Members.  The Physicians did so based on this understanding and Aetna's implied agreement to reimburse them at the reasonable value for the emergency medical care rendered.

62.      Aetna knew that the Physicians expected payment for the emergency medical care they provided.  This is the reason Aetna consistently adjudicated the Non-Participating Claims as covered and medically necessary.   And this is why Aetna paid the Physicians for the Non-Participating Claims.  The payments made, however, were at all times below the reasonable value of the services rendered as measured by the community where they were performed and by the person who provided them.

63.      By assuming responsibility for paying for the emergency medical care provided to Aetna Members, justice requires Aetna to pay the reasonable value of those services.

12

64.     Aetna enjoyed, and accepted, the benefit of the Physicians' valuable services.  At all material times Aetna tendered payment to the Physicians—albeit at arbitrary, deficiently low rates—in response to the submission of the Non-Participating Claims that are subject of this action.

65.     Aetna has engaged in a scheme to unilaterally set its own artificially low reimbursement rates for emergency medical care provided to Aetna Members by non-participating providers, including the Physicians, for the Non-Participating Claims.

66.     The lower reimbursement rates paid by Aetna are neither reasonable nor sufficient to compensate the Physicians for the emergency medical care provided to Aetna's Members for the Non-Participating Claims.

67.     Aetna's refusal to pay the Physicians the reasonable value of the emergency medical care provided to Aetna's Members for the Non-Participating Claims has caused, and continues to cause, the Physicians to suffer damages in an amount equal to the difference between the amounts allowed and paid by Aetna and the reasonable value of the services the Physicians provide, plus the loss of use of that money.

68.     Aetna's underpayment of the Non-Participating Claims violates the duty it owes to the Physicians.

69.     The Physicians and Aetna do not voluntarily choose to transact with each other. Neither party has a choice in the matter.

70.     The Physicians and Aetna are compelled to operate together as a result of their concomitant legal duties, namely (1) a doctor's duty under federal law to treat emergency room patients regardless of their insurance coverage or ability to pay, and (2) the insurer's responsibility to pay for covered emergency medical care.

13

71.     An implied-in-law contract therefore must be imposed by law to prevent a grave injustice, specifically an enormous economic windfall in Aetna's favor.

72.     Ohio has long recognized and adhered to the common law doctrine of implied-in-law contracts to remedy situations like the one here presents.

73.     In sum, the Physicians' and Aetna's respective duties here to provide and pay for emergency medical care gives rise to an implied-in-law contract.  Allowing Aetna to benefit from the Physicians' provision of emergency medical care to Aetna's Members without paying reasonable compensation would be unjust, unconscionable and unfair given the circumstances.

74.     Aetna continues to underpay the Physicians for covered services rendered to Aetna's Members. The Physicians therefore seek a declaration establishing the appropriate reimbursement rates to be paid in order to avoid undergoing further harm.

75.     The Physicians specifically seek a determination that (1) Aetna has an obligation to reimburse the Physicians at rates equal to the reasonable value of the emergency medical care rendered, and (2) the rates Aetna has paid on the Non-Participating Claims are inadequate and violate its obligation to pay the Physicians the reasonable value of their services.

**FIRST CAUSE OF ACTION**
**Breach of Implied-in-Fact Contract**

76.     The Physicians re-allege and restate paragraphs 1 through 75 above as if they were fully set forth herein.

77.     At all material times, the Physicians were obligated under federal law to provide emergency medical care to all patients presenting at the emergency departments they staff, including Aetna's Members.

78.     At all material times, Aetna knew that the Physicians were non-participating providers that furnished emergency medical care to Aetna's Members.

14

79.     At all material times, Aetna knew that it was obligated by federal and Ohio law to provide coverage for emergency services to its Members rendered by an out-of-network healthcare provider and to therefore reimburse the Physicians the reasonable value of their services.

80.     At all material times, and continuing, the Physicians have undertaken to provide valuable emergency medical care to Aetna Members in good faith, and Aetna has undertaken to pay for such services provided to Aetna's Members.

81.     At all material times, Aetna was aware that the Physicians were entitled to and expected to be paid the reasonable value of their services.

82.     At all material times, the Physicians were not parties to any agreement with Aetna and did not agree to accept discounted rates from Aetna or to be bound by Aetna's reimbursement policies or rate schedules with respect to any of the Non-Participating Claims for emergency medical care rendered to Aetna's Members.

83.     Through the parties' conduct and respective undertaking of obligations concerning emergency medical services provided by the Physicians to Aetna's Members, the parties implicitly agreed, and the Physicians had a reasonable expectation and understanding, that Aetna would reimburse the Physicians for Non-Participating Claims at a rate reflecting the reasonable value of Plaintiffs' services.

84.     At all material times, the Physicians have directly billed Aetna for the Non-Participating Claims arising from the emergency medical care the Physicians rendered to Aetna's Members, based on Aetna's implied agreement to reimburse the Physicians for those services at rates equal to the reasonable value of the Physicians' services.

85.     For all Non-Participating Claims submitted to Aetna, the Physicians expected to be paid the reasonable value of the services rendered.

86. At all material times, Aetna has received and accepted the Physicians' bills for the emergency medicine care they provided and continue to provide to Aetna's Members, and Aetna has consistently adjudicated and paid, and continues to adjudicate and pay, the Physicians directly for the Non-Participating Claims, albeit at amounts less than the reasonable value of the services rendered.

87. In breach of its implied contract with the Physicians, Aetna has and continues to systemically adjudicate the Non-Participating Claims at rates substantially below the reasonable value of the professional emergency medical services provided to Aetna's Members by the Physicians.

88. The Physicians have performed all obligations under their implied contract with Aetna necessary for the Physicians to be reimbursed for the Non-Participating Claims at the reasonable value of the services rendered.

89. At all material times, all conditions precedent have occurred that were necessary for Aetna to perform its obligation to pay the Physicians on the Non-Participating Claims at the reasonable value of the Physicians' emergency medical care.

90. The Physicians did not agree that the lower reimbursement rates paid by Aetna were reasonable or sufficient to compensate the Physicians for the emergency medical services provided to Aetna's Members.

91. As a result of Aetna's breach of its implied contract to pay the Physicians for the Non-Participating Claims at the reasonable value of their services, the Physicians have suffered injury and are entitled to monetary damages from Aetna to compensate them for their injury.

92. The Physicians have suffered damages in an amount equal to (i) the difference between the amounts Aetna unilaterally allowed as payable for the Non-Participating Claims and

16

the lesser of the Physicians' charges and the reasonable value of their professional emergency medicine services, plus (ii) the Physicians' loss of use of that money.

## SECOND CAUSE OF ACTION
### Unjust Enrichment

93.     The Physicians re-allege and restate paragraphs 1 through 75 above as if they were fully set forth herein.

94.     For all of the Non-Participating Claims, Aetna has failed to reimburse the Physicians for the reasonable value of the services. Aetna therefore has been enriched by the amount of the difference between (i) the reasonable value of the Physicians' services and (ii) the amount allowed by Aetna (*i.e.,* the amount paid by Aetna plus the Members' liability).

95.     For all of the Non-Participating Claims, Aetna's failure to reimburse the Physicians the reasonable value of their services (and Aetna's concomitant enrichment thereby) comes at the Physicians' expense because the Physicians are entitled to reimbursement at the reasonable value of the services they have rendered to Aetna's Members.

96.     It would be against equity and good conscience to permit Aetna to retain the amount at issue on the Non-Participating Claims. The Physicians are entitled to such amounts at issue in the Non-Participating Claims, which represent the difference between the reasonable value of the services the Physicians have rendered and the amounts allowed by Aetna for such services. The monies at issue in the Non-Participating Claims that Aetna has retained in justice and in equity belong to the Physicians.

97.     Furthermore, the Physicians conferred a benefit on Aetna by providing valuable emergency medical care to Aetna's Members for which Aetna was responsible for payment.

98. In exchange for premiums and other forms of compensation, Aetna owes Aetna's Members an obligation to pay the Physicians for the covered medical services Aetna's Members receive from the Physicians, and to make sure they receive such services.

99. Aetna derives a material benefit from the Physicians' provision of emergency medical care to Aetna's Members, because it is through the Physicians' provision of those services that Aetna fulfills its core obligations to Aetna's Members to ensure that the Aetna's Members receive covered emergency services.

100. There is no dispute that the emergency medical care from which the Non-Participating Claims arise constituted covered services, because Aetna adjudicated the claims as payable, albeit at an amount less than the reasonable value of the services.

101. Aetna voluntarily accepted, retained and enjoyed, and continues to accept, retain and enjoy, the benefits conferred on it by the Physicians, knowing that the Physicians expected to be paid the reasonable value of their services.

102. Aetna has been unjustly enriched by its failure and refusal to pay the Physicians the reasonable value of the emergency medical care they provided to Aetna's Members, as reflected in the Non-Participating Claims at issue, and as measured by the community where they were rendered and by the person who rendered them.

103. Aetna has unjustly enriched itself by withholding from the Physicians monies it should have paid, namely the difference between the reasonable value of the emergency medical care rendered for the Non-Participating Claims and the amounts allowed as payable by Aetna, plus the Physicians' loss of use of that money.

104. Under these circumstances, it is unjust and inequitable for Aetna to retain the benefit they received without paying the value of that benefit; *i.e.*, by paying the Physicians

reasonable value of the emergency medical care the Physicians provided for the Non-Participating Claims.

105.     It would be against equity and good conscience to allow Aetna to reap a benefit by underpaying the Physicians for valuable emergency medical care provided to Aetna's Members, the they were compelled to render.

106.     Given these inequities, an equitable obligation arises and runs from Aetna to the Physicians.

107.     The Physicians seek compensatory damages, as permitted by applicable law, in an amount which will continue to accrue through the date of trial as a result of Aetna's continuing unjust enrichment, equal to (i) the difference between the amount Aetna adjudicated as payable for those services and the reasonable value of the Physicians emergency medicine care, plus (ii) the loss of use of that money.

### THIRD CAUSE OF ACTION
### Quantum Meruit

108.      The Physicians re-allege and restate paragraphs 1 through 75 above as if they were fully set forth herein.

109.     For all of the Non-Participating Claims, Aetna has failed to reimburse the Physicians at the full measure of the value of those services.

110.     For all of the Non-Participating Claims, Aetna's failure to reimburse the Physicians at the full measure of the value of their services (and Aetna's concomitant enrichment thereby) comes at the Physicians' expense because the Physicians are entitled to reimbursement at the full measure of the value of the services they have rendered to Aetna's Members.

111.     It would be against equity and good conscience to permit Aetna to retain the amount at issue on the Non-Participating Claims.  The Physicians are entitled to such amounts at issue in

the Non-Participating Claims, which represent the difference between the full measure of the value

of the services the Physicians have rendered and the amounts allowed by Aetna for such services.

The monies at issue in the Non-Participating Claims that Aetna has retained in justice and in equity

belong to the Physicians.

112. Furthermore, the Physicians conferred a benefit on Aetna by providing valuable

emergency medical care to Aetna's Members for which Aetna was responsible for payment.

113. In exchange for premiums and other forms of compensation, Aetna owes Aetna's

Members an obligation to pay the Physicians for the covered medical services Aetna's Members

receive from the Physicians, and to make sure they receive such services.

114. Aetna derives a material benefit from the Physicians' provision of emergency

medical care to Aetna's Members, because it is through the Physicians' provision of those services

that Aetna fulfills its core obligations to Aetna's Members to ensure that the Aetna's Members

receive covered emergency services.

115. There is no dispute that the emergency medical care from which the Non-

Participating Claims arise constituted covered services, because Aetna adjudicated the claims as

payable, albeit at an amount less than the full measure of the value of the services.

116. Aetna voluntarily accepted, retained and enjoyed, and continues to accept, retain

and enjoy, the benefits conferred on it by the Physicians, knowing that the Physicians expected to

be paid the full measure of the value of their services.

117. Aetna has been unjustly enriched by its failure and refusal to pay the Physicians the

full measure of the value of the emergency medical care they provided to Aetna's Members, as

reflected in the Non-Participating Claims at issue, and as measured by the community where they

were rendered and by the person who rendered them.

118.     Aetna has unjustly enriched itself by withholding from the Physicians monies it should have paid, namely the difference between the full measure of the value of the emergency medical care rendered for the Non-Participating Claims and the amounts allowed as payable by Aetna, plus the Physicians' loss of use of that money.

119.     Under these circumstances, it is unjust and inequitable for Aetna to retain the benefit they received without paying the full measure of the value of that benefit; *i.e.*, by paying the Physicians *quantum meruit*, or the full measure of the value of the emergency medical care the Physicians provided for the Non-Participating Claims.

120.     It would be against equity and good conscience to allow Aetna to reap a benefit by underpaying the Physicians for valuable emergency medical care provided to Aetna's Members, the they were compelled to render.

121.     Given these inequities, an equitable obligation arises and runs from Aetna to the Physicians.

122.     The Physicians seek compensatory damages, as permitted by applicable law, in an amount which will continue to accrue through the date of trial equal to (i) the difference between the amount Aetna adjudicated as payable for those services and the full measure of the value of the Physicians emergency medicine care, plus (ii) the loss of use of that money.

### FOURTH CAUSE OF ACTION
### Declaratory Relief

123.     Plaintiffs re-allege and restate paragraphs 1 through 75 above as if they were fully set forth herein.

124.     This is an action for declaratory and actual damages pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57.

125.   A bona fide and justiciable controversy exists that involves the Plaintiffs' substantial legal interests.

126.   All adverse parties are presently before the Court.

127.   A judicial declaration is necessary and appropriate to clarify the parties' respective rights and obligations concerning payment for the Physicians' services, and no adequate remedy at law is available.

128.   To prevent the need for successive, separate actions enforcing the Physicians' rights, the Physicians seek a declaration from this Court stating that Aetna must pay the Physicians prospectively for the Non-Participating Claims at the reasonable value of their services.

**WHEREFORE**, the Physicians pray that this Court:

(1) Enter judgments against Aetna and for each Physician pursuant to the First, Second and Third Causes of Action in an amount representing the difference between the amounts deemed payable by Aetna and the reasonable value of the Physicians' professional emergency medical care, as determined after trial, plus interest;

(2) Decree pursuant to the Fourth Cause of Action that Aetna must pay the Physicians prospectively for the emergency medicine care the Physicians render to Aetna Members in an amount that represents the reasonable value of the Physicians' emergency medical care, as determined after trial; and

(3) Award such further relief as this Court deems just and proper.