UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITEDHEALTHCARE SERVICES, INC., UNITED HEALTHCARE INSURANCE CO., and UMR, INC., <br><br> Plaintiffs, <br><br> v. <br><br> TEAM HEALTH HOLDINGS, INC., AMERITEAM SERVICES, LLC, and HCFS HEALTH CARE FINANCIAL SERVICES, INC., <br><br> Defendants. | No. 3:21-CV-364-DCLC-DCP |

## MEMORANDUM AND ORDER

This case is before the Court pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court is Defendants' Second Motion to Compel Discovery [Doc. 196]. Plaintiffs responded in opposition to the motion [Doc. 208], and Defendants filed a reply [Doc. 210]. The motion is ripe for adjudication. *See* E.D. Tenn. L.R. 7.1(a). For the reasons set forth below, the Court **DENIES** the motion [**Doc. 196**].

**I.      BACKGROUND**

On October 21, 2021, Plaintiffs filed the Complaint [Doc. 1]. "[Plaintiffs] provide health insurance or claim administration services under a variety of plans and policies [*Id*. ¶ 25]. They explain that this case involves "payments made from . . . Plaintiffs' fully insured and self-funded plans" [*Id*.]. "Plaintiffs both fund and administer their fully insured plans[,]" and "pay claims submitted to these plans out of their own assets" [*Id*. ¶ 26]. With respect to "Plaintiffs' self-funded plans, or Administrative Services Only ('ASO') plans[,]" these "are funded by contributions from

their respective sponsor employers and member employees" [*Id*. ¶ 27]. Plaintiffs state that they "provide claim administration services for such plans pursuant to Administrative Services Agreements ('ASAs'), which identify the rights and obligations of . . . [Plaintiffs] and the plan sponsors" [*Id*.]. "[T]he ASAs give . . . Plaintiffs the exclusive discretion and authority to monitor and pursue overpayments of plans funds" [*Id*. ¶ 29].

According to the Complaint, "Plaintiffs process (or 'adjudicate') and pay approximately one million claims every day" [*Id*. ¶ 32]. Given that volume, Plaintiffs submit that their employees cannot review every claim they receive and that providers and billing companies generally do not submit medical records with insurance claims to Plaintiffs [*Id*. ¶¶ 32–33]. Plaintiffs' adjudication process is automated, meaning that they "rely on providers to supply truthful and accurate information with insurance claims, and require providers to attest to the accuracy of the claims they submit" [*Id*. ¶ 34].

Plaintiffs claim that Defendants "operate[] one of the largest emergency room staffing and billing companies in the United States" and that they "affiliate[] with or acquire[] medical groups across the country" [*Id*. ¶¶ 2–3]. Plaintiffs state that "[t]hese medical groups have contracts with hospitals or hospital systems under which the medical groups staff hospital emergency departments" [*Id*. ¶ 3]. Plaintiffs claim, however, that "[Defendants] handle everything related to coding and billing of claims from [their] centralized billing centers" [*Id*.]. Plaintiffs contend that "[Defendants] submit[] claims using the standard CM-1500 claim form or its electronic equivalent" [*Id*. ¶ 36]. With respect to the claim forms, Plaintiffs state there are "[c]ertain fields . . . that are particularity important to the amount . . . Plaintiffs pay on claims" [*Id*. ¶ 37]. Plaintiffs submit that "CPT codes are among the most important information included in a claim[,]" explaining that they "are standardized codes that denote the type and degree of care rendered to a

2

patient" [*Id*. ¶ 38]. Plaintiffs further allege that these codes "are the principal way in which providers convey to insurers and claims administrators the services for which they seek payment" [*Id*.]. Also, Plaintiffs state, "The type and degree of care indicated by the CPT code(s) included in a claim is a primary determinate of what the . . . Plaintiffs will pay on the claim" [*Id*. ¶ 39].

According to Plaintiffs, "[Defendants] block[] attempts by insurers and claims administrators to contract directly with [their] affiliated medical-groups, and demand[] independence from hospitals within which [they] operate[] in [their] dealings with insurers and claims administrators" [*Id*. ¶ 48]. They state that recently, "[Defendants have] gained notoriety . . . for [their] aggressive pursuit of profit at the expense of patient and insurers alike" and that "[p]rivate equity firms generally, and Blackstone specifically, apply significant pressure to the companies they acquire (such as [Defendants]) to maximize near-term profits" [*Id*. ¶¶ 50–51]. Plaintiffs allege that "[Defendants'] own compensation structure amplifies this incentive" [*Id*. ¶ 52].

Plaintiffs state that "[t]his lawsuit principally concerns a form of insurance fraud called 'upcoding'" [*Id*. ¶ 55]. They allege that "[u]pcoding occurs when a provider submits a claim to an insurer or claims administrator utilizing an inaccurate billing code in order to obtain higher payment" and that "[t]he provider uses the billing code to deceive the insurer or claims administrator into overpaying by misrepresenting the type or degree of services rendered" [*Id*. ¶ 56]. Plaintiffs contend that "[Defendants] have systematically upcoded claims for emergency room services" [*Id*. ¶ 58]. Plaintiffs state that "providers generally bill emergency room services to insurers using consecutively numbered CPT codes from 99281 to 99285" and that "[h]igher numbers indicate more extensive and complex treatment billed at higher rates" [*Id*. ¶ 59]. "CPT codes 99285 and 99284 denote treatment of especially serious issues, typically requiring the

3

physician's immediate, sustained, and undivided attention" [*Id.* ¶ 61]. The higher "CPT code 99285 is reserved for relatively rare cases in which the patient is at imminent risk of death or loss of physiological function[,]" and "CPT Code 99284 denotes emergency care for particularly severe and complex but non-life threatening medical issues" [*Id.* ¶¶ 62, 64].

Plaintiffs allege that they began reviewing Defendants' conduct in light of "allegations that [Defendants] engaged in abusive billing practices" [*Id.* ¶ 67]. Plaintiffs focused their review on claims utilizing CPT Codes 99284–99285 [*Id.*]. After finding that Defendants were using CPT Code 99285 at a rate far higher than other providers, Plaintiffs requested and received medical records, which Plaintiffs allege did not support the CPT Code 99285 [*Id.* ¶¶ 68–69].[1]

Plaintiffs claim that "[Defendants] deliberately upcoded claims utilizing CPT codes 99285 and 99284 . . . in order to deceive . . . Plaintiffs into overpaying for emergency room services and to reap windfall profits at the . . . Plaintiffs' and their customers' and members' expense" [*Id.* ¶ 88]. Plaintiffs state that they were damaged by Defendants' upcoding, explaining that it "is a particularly insidious form of fraud that is difficult to uncover and resource-intensive to investigate" and that here, "the number of affiliates through which [Defendants have] carried out [their] scheme, as well as [their] failure to disclose the identities of all of [their] affiliates, further obscured [their] systematic upcoding" [*Id.* ¶ 104].

In addition, Plaintiffs assert that they have been damaged by Defendants "extravagantly high bill[ing] charges" [*Id.* ¶ 111]. They state that Defendants also file litigation against patients "[w]hen insurers have declined to pay" and that they conceal charity care from patients, which "'is a form of financial assistance for low-income patients'" [*Id.* ¶¶ 117–18 (citation omitted)].

---

[1] Plaintiffs cite examples of Defendants' alleged upcoding in paragraphs 73–86 [Doc. 1 ¶¶ 73–86].

Furthermore, Plaintiffs accuse Defendants of billing for services performed by non-physicians as if the service was performed by physicians [*Id.* ¶ 123]. And finally, Plaintiffs state that Defendants also engage in "a practice called pass-through billing in order to maximize payments from insurers" [*Id.* ¶ 131]. Plaintiffs assert:

> Pass-through billing occurs when one provider bills for medical services that were in reality rendered by another provider. Typically, the billing provider has a contract with an insurer while the rendering provider does not. Pass-through billing deceives the insurer into paying for services performed by the non-contracted provider at rates it has negotiated with the contracted provider when it might otherwise pay less or not at all.

[*Id.* ¶ 132].

Based on the above, Plaintiffs allege fraud, negligent misrepresentation, violations of Tenn. Code Ann. §§ 56-53-102, 103, and 107, violations of the Tennessee Consumer Protection Act and other state consumer protection statutes, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), and conspiracy to violate civil RICO, 18 U.S.C. § 1962(d) [*Id.* ¶¶ 137–201, 211–36]. They seek declaratory relief, injunctive relief, unjust enrichment, and other damages [*Id.* ¶¶ 202–10, 237–40; *see also* at 54].

In May 2025, Defendants served Request for Production ("RFP") No. 64 on Plaintiffs [Doc. 208 p. 2]. RFP No. 64 states, and Plaintiffs responded, as follows:

> **RFP No. 64**. Produce all Documents describing or constituting the policies, procedures, guides, grids, worksheets, software, or tools used by any emergency medicine practice affiliated with Optum, United, or any related entity, including, without limitation, Sound Physicians, to code professional emergency medicine claims.
>
> **Response.** United incorporates by reference its General Objections. United further objects to this Request as it seeks information not relevant to any claim or defense in this case. Claims billed by emergency medicine practices affiliated with United have nothing to do with this case. United further objects to this Request as vague and ambiguous, and overly broad, unduly burdensome, and

> disproportionate to the needs of the case. TeamHealth previously
> moved to compel documents related to Sound physicians and other
> Optum and United affiliated medical groups and the Court refused
> to compel United to produce such documents.

[Doc. 197-1 p. 7].

On September 8, 2025, the parties appeared before the Court via telephone for an informal discovery dispute conference [Doc. 188]. The Court found that it did not have sufficient information to adjudicate the issues about RFP No. 64 and granted Defendants leave to file a motion [Doc. 189 p. 2].

Defendants move the Court for an order compelling Plaintiffs to respond to RFP No. 64 [Doc. 196]. For grounds, Defendants argue that it seeks relevant information [Doc. 197 pp. 4–6] that is proportional to the needs of the case [*Id*. at 6–8]. In addition, Defendants claim that Plaintiffs have waived any objection to RFP No. 64 based on their purported lack of possession, custody, or control over the information sought [*Id*. at 8–10].

Plaintiffs respond that RFP No. 64 seeks irrelevant information and that the Court has already determined so [Doc. 208 pp. 5–7]. They deny that the documents RFP No. 64 seeks are within their possession, custody, or control, and they claim that they have not waived that objection [*Id*. at 7–11]. In support of their position, they rely on the Declaration of Ryan Wong, Plaintiffs' Senior Associate Litigation Counsel [Doc. 209].

Defendants filed a reply, maintaining that the information is relevant to the issues in the case [Doc. 210 pp. 2–6]. They contend that Plaintiffs do have custody or control of the information sought [*Id*. at 6–10].

II. ANALYSIS

The Court will consider Plaintiffs' objection that they do not have possession, custody, or control of the documents responsive to RFP No. 64. The Court further finds Defendants have not

6

Case 3:21-cv-00364-DCLC-DCP   Document 247   Filed 12/19/25   Page 6 of 14
PageID #: 4189

shown that Plaintiffs possess such documents. Given that finding, the Court need not address whether RFP No. 64 seeks relevant information that is proportional to the needs of the case.

Defendants claim that "Plaintiffs argued for the first time on September 8, 2025, 'that they are not in possession, custody, or control of the documents' sought in RFP [No.] 64" [Doc. 197 p. 8 (citation omitted)]. They contend, therefore, that Plaintiffs waived that objection [*Id*. at 8–9].

Plaintiffs respond that "[Defendants'] motion should . . . be denied because [they] lack[] possession, custody, or control over responsive documents" [Doc. 208 p. 7]. They claim that they did not waive any objection because they "included a general objection to the Requests objecting 'to the extent that they seek to impose obligations inconsistent with, or beyond those required by, the Federal Rules of Civil Procedure'" [*Id*. at 10 (citation omitted)]. Further, Plaintiffs state that "the issue of waiver is inapposite because a court cannot compel a party to produce documents that it does not have and cannot obtain" [*Id*. at 11].

Defendants reply that "to the extent a subpoena is ultimately necessary, [Plaintiffs'] failure to adequately raise an objection to control upon receipt of RFP [No.] 64 should estop [Plaintiffs] from objecting to such subpoena" [Doc. 210 p. 10].

Rule 34 requires, "For each item or category, the response must . . . state with specificity the grounds for objecting to the request, including the reasons." Fed. R. Civ. P. 34(b)(2)(B). Generally, "a party's failure to timely raise an objection to a discovery request is a waiver of that objection." *Caltrider v. TEVA Sales and Marketing, Inc.*, No. 1:23-CV-536, 2025 WL 3478225, at *5 (W.D. Mich. Oct. 24, 2025) (quoting *Vanguard Soap, LLC v. Certain Underwriters At Lloyd's, London*, No. 221CV02172, 2022 WL 20613114, at *6 (W.D. Tenn. Nov. 1, 2022) (collecting cases)). "This rule applies with equal force to all objections . . ." *Id*. (quoting *Carfagno*

*v. Jackson Nat'l Life Ins. Co.*, No. 5:99CV118, 2001 WL 34059032, at *2 (W.D. Mich. Feb. 13, 2001) (collecting cases)).

Plaintiffs objected to Defendants' Fourth Set of Requests for Production with general objections, including "[Plaintiffs] object[] to the Requests to the extent that they seek to impose obligations inconsistent with, or beyond those required by, the Federal Rules of Civil Procedure, the Court's Local Rules, or any Order of this Court" [Doc. 209-2 p. 3]. Other courts have called this objection "improper and essentially useless." *In re Meggitt*, No. 17-30029, 2018 WL 1121585, at *4 (Bankr. N.D. Ohio Feb. 27, 2018) (collecting cases and analyzing this objection as to request for admissions); *see also Heller v. City of Dallas*, 303 F.R.D. 466, 482–83 (N.D. Tex. 2014) (stating that defendant's general objection to the requests for production "to the extent they exceed and/or conflict with the nature and scope of discovery permitted under the Federal Rules of Civil Procedure and any other federal law . . . violate[d] the Federal Rules and [was] invalid").

But still, Rule 34 provides that parties may request documents from other parties that are "in the responding party's possession, custody, or control[.]" Fed. R. Civ. P. 34(a)(1)(A); *see also In re Porsche Cars N. Am., Inc.*, No. 2:11-MD-2233, 2012 WL 4361430, at *4 (S.D. Ohio Sept. 25, 2012) (citation omitted) ("A party responding to a request for production under Rule 34 need only provide documents that are in its possession, custody, or control."). Possession, custody, or control are "essential requirements under Rule 34[.]" *Gluc v. Prudential Life Ins. Co. of Am.*, 309 F.R.D. 406, 416 (W.D. Ky. 2015) (quoting *United Mercantile Agencies v. Silver Fleet Motor Express,* 1 F.R.D. 709, 712 (W.D. Ky. 1941)). Defendants have not provided the Court with any authority that it may compel documents that the opposing party does not have control, custody, or possess, and therefore, the Court will consider the merits of this issue. *See Henderson v. Zurn Indus., Inc.*, 131 F.R.D. 560, 564 (S.D. Ind. 1990) (stating that it was necessary for the court to

8

determine whether the requested discovery was in the possession, custody, or control of the party, even when the objection was not raised because "it is still necessary to ensure that the requested discovery is allowable under the Federal Rules" as courts "cannot enter an order that is contrary to law by virtue of a party's purported waiver").

Defendants state that the objection to possession, custody or[,] control is inconsistent with the position [Plaintiffs have] taken throughout this litigation" [Doc. 197 p. 9]. According to Defendants, "Throughout this litigation, [Plaintiffs have] demonstrated that information in Optum's custody is readily available to [Plaintiffs] on demand. In fact, during discovery, [Defendants'] counsel asked [Plaintiffs'] counsel whether [Defendants] had to issue subpoenas to Optum for information, and counsel for [Plaintiffs] said no—[Plaintiffs] could produce Optum-related information" [*Id*.]. They state that "[c]onsistent with that representation, [Plaintiffs have] relied heavily on a substantial volume of material obtained from Optum, including production of electronically-stored information from employees that work for Optum and have optum.com email addresses (including for [Plaintiffs'] agreed custodian Jackie Miller, an employee of Optum)" [*Id*. (footnote omitted)]. It further contends:

> [Plaintiffs have] produced records reflecting Optum's communications with [Defendants'] affiliates; records of Optum's analysis of emergency medicine claims submitted by [Defendants'] affiliates; job descriptions for Optum employees; and data collected and analyzed by Optum employees. More recently, [Plaintiffs] obtained and produced billions of lines of data obtained from Optum, which it described as "a United affiliate." [Plaintiffs have] also explained that Optum has maintained an ownership interest in Sound Physicians since 2018.

[*Id*. (internal citations omitted)]. They therefore claim that Plaintiffs should produce the documents [*Id*. at 9–10].

9

Plaintiffs acknowledge that they have "produced certain data and documents from Optum in this litigation," but they state that "those documents were in [Plaintiffs'] actual possession because [Plaintiffs] contracted with Optum as a vendor to conduct the prepayment review and to help develop [Plaintiffs'] E/M coding policy (which has been produced) that is at issue in this case" [Doc. 208 p. 8 (emphasis omitted)]. "[T]he production of such documents[,]" Plaintiffs argue, "says nothing about [their] legal right to demand documents from Optum that relate to Optum's provider business[,] which is entirely separate from [Plaintiffs] and provides no support for [Defendants'] speculation that [Plaintiffs have] an unqualified right to do so" [*Id.* (emphasis omitted)]. Plaintiffs further claim that "[Defendants'] theory of control is also misguided because it ignores that there is no direct chain of ownership between [Plaintiffs] and Optum affiliated entities" [*Id.*]. Plaintiffs state that Optum is their sister company that "holds a minority, non-controlling interest in Sound Physicians" [*Id.* at 9 (citation omitted)]. But even if Defendants had provided support that Plaintiffs have possession of Optum documents, Plaintiffs contend that they "provide[] no support for [their] speculation that Optum has actual possession or the legal right to demand those documents from Sound Physicians (or any other provider group)" [*Id.*].

Defendants reply that "[Plaintiffs'] position is inconsistent with [their] conduct in this litigation and with applicable law" [Doc. 210 p. 6]. According to Defendants, "[Plaintiffs have] previously told [Defendants] that [they] need not subpoena information from Optum because [Plaintiffs are] able to produce Optum-related information" [*Id.* (citation omitted)]. They state that "[Plaintiffs] have also obtained and produced extensive material from Optum" [*id.* (citation omitted)] and that "[they] previously filed a declaration in which [they] detailed the process through which it was able to request and obtain billions of lines of data 'maintained' by Optum" [*id.* at 6–7 (citation omitted)]. Defendants argue that Plaintiffs requested other information from

10

Optum and that in a prior hearing when Defendants sought Sound Physicians' information, Plaintiffs only objected based on relevance [*Id*. at 7]. They state that "[Plaintiffs'] version of the applicable legal standard is likewise unavailing[,]" explaining that the "standard is necessarily case-specific" and not a "rigid adherence to corporate separateness or other legal rules that may or may not create true impediments to production" [*Id*. (citation omitted)]. "Should the Court decline to order production of the requested materials in light of [Plaintiffs'] challenge to Rule 34 control," Defendants submit, "[Plaintiffs] should be ordered to, at the very least, request the documents sought in RFP [No.] 64 from Sound Physicians" [*Id*. at 10].

The Sixth Circuit has noted that "documents are deemed to be within the 'possession, custody or control' for purposes of Rule 34 if the party has actual possession, custody or control, or has the legal right to obtain the documents on demand." *In re Bankers Tr. Co.*, 61 F.3d 465, 469 (6th Cir. 1995) (emphasis omitted) (quoting *Resolution Trust Corp. v. Deloitte & Touche,* 145 F.R.D. 108, 110 (D. Colo. 1992)). In other words, "legal ownership of the document is not determinative." *Id* (citations omitted). "Rule 34 is sufficiently flexible to be adapted to the exigencies of particular litigation." *Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 206 (1958). "The party seeking documents bears the burden of establishing control." *In re Porsche Cars N. Am., Inc.*, No. 2:11-MD-2233, 2012 WL 4361430, at *4 (S.D. Ohio Sept. 25, 2012) (citation omitted); *McGraw-Hill Glob. Educ., LLC v. Jones*, No. 5:14-CV-42, 2015 WL 5074487, at *2 (W.D. Ky. Aug. 8, 2015) ("Plaintiffs bear the burden of establishing the relationship between Defendant and any of these entities that establishes possession, custody, or control; speculation does not suffice." (citation omitted)).

As an initial matter, the Court notes that there is no information confirming that Defendants have possession, custody, or control over Sound Physicians' documents. Indeed, the only

11

Case 3:21-cv-00364-DCLC-DCP   Document 247   Filed 12/19/25   Page 11 of 14
PageID #: 4194

information the Court has about Sound Physicians is that Optum "has a minority and non-controlling ownership interest in a Sound Physicians['] holding company" [Doc. 209 ¶ 4]. The Court therefore finds that Defendants have not shown that Plaintiffs have possession, custody, or custody over Sound Physicians' documents.

Defendants claim that Plaintiffs have possession, custody, or control of the requested documents because Plaintiffs have "obtained and produced extensive material from Optum" [Doc. 210 p. 7], and they have previously represented that they could "'formally request[]' and obtain information in Optum's custody" without a subpoena [*id*. at 7 & 10]. "[If] one company has access to the documents of another in the regular course of business[,]" this "support[s] a finding of control." *In re Porsche Cars N. Am., Inc.*, 2012 WL 4361430, at *4. In support of their arguments, Defendants rely on the Declaration of Jamie R. Kurtz, Plaintiffs' counsel, which Plaintiffs submitted in support of their response in opposition to Defendants' motion to exclude the dNHI database [Doc. 172-1 ¶ 1]. She explains, "the dNHI database is a claims warehouse that includes hundreds of millions of commercial healthcare claims" [*Id*. ¶ 4]. "[It] is maintained by Optum, a [Plaintiff] affiliate, and is used primarily for academic research given the massive volume of de-identified claims data it houses" [*Id*. ¶ 5]. Plaintiffs later "formally requested [from Optum] the dNHI for use" [*Id*. ¶ 13].

While the Court has reviewed this declaration, the Court finds that Plaintiffs' ability to access the dNHI database, which is used primarily for academic research, is not dispositive of whether they also have possession, custody, or control over Optum's medical group documents. As Mr. Wong submits, "Optum is not operating as a vendor or delegee for [Plaintiffs]" [Doc. 209 ¶ 6]. In addition, he represents that "there is a firewall policy in place prohibiting [Plaintiffs']

employees from accessing documents containing competitively sensitive information from Optum's affiliated medical groups" [*Id.* ¶ 5].

Defendants assert that Plaintiffs have produced other information, including "Optum's communications with [Defendants'] affiliates; records of Optum's analysis of emergency medicine claims submitted by [Defendants'] affiliates; job descriptions for Optum employees; and data collected and analyzed by Optum employees" [Doc. 197 p. 9]. Indeed, a court may consider whether a party has been able to previously collect and produce documents from the non-party. *St. Clair Cnty. Employees' Ret. Sys. v. Acadia Healthcare Co., Inc.*, No. 3:18-CV-00988, 2023 WL 3659734, at *4 (M.D. Tenn. May 25, 2023) (finding that the defendant had control over documents held by a non-party, in part, because the defendant "had collected and produced email records of two Priory custodians"). Plaintiffs, however, acknowledge that they "have produced certain data and documents from Optum in this litigation[,]" but they claim that "those documents were in [Plaintiffs'] actual possession because [Plaintiffs] contracted with Optum as a vendor to conduct the prepayment review and to help develop [Plaintiffs'] E/M coding policy" [Doc. 209 p. 9]. Moreover, as Mr. Wong states, "[A]t times during litigation[, Plaintiffs] must subpoena Optum for records when the materials relate to Optum business that operate entirely independently from [Plaintiffs]" [Doc. 209 ¶ 6]. While Defendants claim that Plaintiffs have represented that they need not subpoena information from Optum, Defendants do not elaborate on these conversations or provide any context for them.[2]

---

[2] Defendants rely on *St. Clair Cnty. Employees' Ret. Sys.*, 2023 WL 3659734, at *4 to support their argument [Doc. 210 p. 8]. But in that case, the court found that the defendant had control over the non-party's documents because it previously produced the non-party's email records and it represented that "it was willing to discuss collection and production from additional custodian and non-custodial sources [of the non-party]." *St. Clair Cnty. Employees' Ret. Sys.*, 2023 WL 3659734, at *4. As noted above, however, Plaintiffs explain why they were able to produce

13

Case 3:21-cv-00364-DCLC-DCP   Document 247   Filed 12/19/25   Page 13 of 14
PageID #: 4196

The Court has also considered the relationship between Plaintiffs and Optum, which are sister companies [Doc. 208 p. 8]. But this relationship alone is not sufficiently. *In re Porsche Cars N. Am., Inc.*, 2012 WL 4361430, at *5 ("The Court cannot conclude at this time that Porsche AG has the legal right to demand documents from any of its corporate affiliates and/or parents.").

In summary, the Court finds that Defendants have not shown that Plaintiffs have possession, custody, or control over the requested documents pursuant to Rule 34.

III. CONCLUSION

For the reasons stated above, the Court **DENIES** Defendants' Second Motion to Compel Discovery [**Doc. 196**].

**IT IS SO ORDERED.**

ENTER:

*/s/ Debra C. Poplin*
Debra C. Poplin
United States Magistrate Judge

---

some documents, and Defendants do not provide any context for Plaintiffs' representation that they need not subpoena Optum documents.