UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITEDHEALTHCARE SERVICES, INC., UNITED HEALTHCARE INSURANCE CO., and UMR, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:21-CV-364-DCLC-DCP |
| TEAM HEALTH HOLDINGS, INC., AMERITEAM SERVICES, LLC, and HCFS HEALTH CARE FINANCIAL SERVICES, INC., | ) ) ) ) ) | |
| Defendants. | ) | |

## **MEMORANDUM AND ORDER**

This case is before the Court pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

On January 22, 2026, the parties appeared before the Court to address the parties' discovery disputes pursuant to the discovery dispute procedure in the Scheduling Order [Doc. 89 p. 2]. Attorneys Munir Meghjee, Marcus Guith, and Kendell Vonckx appeared on behalf of Plaintiffs. Attorneys Gary Shockley and Robert Meyer appeared on behalf of Defendants. Specifically, the parties disputed Defendants' responses to Request for Production ("RFP") Nos. 91–93 and 96–98, and Plaintiffs' responses to RFP Nos. 9 and 10. In addition, Plaintiffs asked the Court to order Defendants to supplement their response to RFP No. 39, and they also claimed that Defendants had not produced certain documents. The Court took the matters under advisement and is now prepared to rule.

## I. BACKGROUND

On October 21, 2021, Plaintiffs filed the Complaint [Doc. 1]. "[Plaintiffs] provide health insurance or claim administration services under a variety of plans and policies [*Id*. ¶ 25]. They explain that this case involves "payments made from . . . Plaintiffs' fully insured and self-funded plans" [*Id*.]. "Plaintiffs both fund and administer their fully insured plans[,]" and "pay claims submitted to these plans out of their own assets" [*Id*. ¶ 26]. With respect to "Plaintiffs' self-funded plans, or Administrative Services Only ('ASO') plans[,]" these "are funded by contributions from their respective sponsor employers and member employees" [*Id*. ¶ 27]. Plaintiffs state that they "provide claim administration services for such plans pursuant to Administrative Services Agreements ('ASAs'), which identify the rights and obligations of . . . [Plaintiffs] and the plan sponsors" [*Id*.]. "[T]he ASAs give . . . Plaintiffs the exclusive discretion and authority to monitor and pursue overpayments of plans funds" [*Id*. ¶ 29].

According to the Complaint, "Plaintiffs process (or 'adjudicate') and pay approximately one million claims every day" [*Id*. ¶ 32]. Given that volume, Plaintiffs submit that their employees cannot review every claim they receive and that providers and billing companies generally do not submit medical records with insurance claims to Plaintiffs [*Id*. ¶¶ 32–33]. Plaintiffs' adjudication process is automated, meaning that they "rely on providers to supply truthful and accurate information with insurance claims, and require providers to attest to the accuracy of the claims they submit" [*Id*. ¶ 34].

Plaintiffs claim that Defendants "operate[] one of the largest emergency room staffing and billing companies in the United States" and that they "affiliate[] with or acquire[] medical groups across the country" [*Id*. ¶¶ 2–3]. Plaintiffs state that "[t]hese medical groups have contracts with hospitals or hospital systems under which the medical groups staff hospital emergency

2

departments" [*Id.* ¶ 3]. Plaintiffs claim, however, that "[Defendants] handle everything related to coding and billing of claims from [their] centralized billing centers" [*Id.*]. Plaintiffs contend that "[Defendants] submit[] claims using the standard CM-1500 claim form or its electronic equivalent" [*Id.* ¶ 36]. With respect to the claim forms, Plaintiffs state there are "[c]ertain fields . . . that are particularity important to the amount . . . Plaintiffs pay on claims" [*Id.* ¶ 37]. Plaintiffs submit that "CPT codes are among the most important information included in a claim[,]" explaining that they "are standardized codes that denote the type and degree of care rendered to a patient" [*Id.* ¶ 38]. Plaintiffs further allege that these codes "are the principal way in which providers convey to insurers and claims administrators the services for which they seek payment" [*Id.*]. Also, Plaintiffs state, "The type and degree of care indicated by the CPT code(s) included in a claim is a primary determinate of what the . . . Plaintiffs will pay on the claim" [*Id.* ¶ 39].

According to Plaintiffs, "[Defendants] block[] attempts by insurers and claims administrators to contract directly with [their] affiliated medical-groups, and demand[] independence from hospitals within which [they] operate[] in [their] dealings with insurers and claims administrators" [*Id.* ¶ 48]. They state that recently, "[Defendants have] gained notoriety . . . for [their] aggressive pursuit of profit at the expense of patient and insurers alike" and that "[p]rivate equity firms generally, and Blackstone specifically, apply significant pressure to the companies they acquire (such as [Defendants]) to maximize near-term profits" [*Id.* ¶¶ 50–51]. Plaintiffs allege that "[Defendants'] own compensation structure amplifies this incentive" [*Id.* ¶ 52].

Plaintiffs state that "[t]his lawsuit principally concerns a form of insurance fraud called 'upcoding'" [*Id.* ¶ 55]. They allege that "[u]pcoding occurs when a provider submits a claim to an insurer or claims administrator utilizing an inaccurate billing code in order to obtain higher

3

payment" and that "[t]he provider uses the billing code to deceive the insurer or claims administrator into overpaying by misrepresenting the type or degree of services rendered" [*Id.* ¶ 56]. Plaintiffs contend that "[Defendants] have systematically upcoded claims for emergency room services" [*Id.* ¶ 58]. Plaintiffs state that "providers generally bill emergency room services to insurers using consecutively numbered CPT codes from 99281 to 99285" and that "[h]igher numbers indicate more extensive and complex treatment billed at higher rates" [*Id.* ¶ 59]. "CPT codes 99285 and 99284 denote treatment of especially serious issues, typically requiring the physician's immediate, sustained, and undivided attention" [*Id.* ¶ 61]. The higher "CPT code 99285 is reserved for relatively rare cases in which the patient is at imminent risk of death or loss of physiological function[,]" and "CPT Code 99284 denotes emergency care for particularly severe and complex but non-life-threatening medical issues" [*Id.* ¶¶ 62, 64].

Plaintiffs allege that they began reviewing Defendants' conduct in light of "allegations that [Defendants] engaged in abusive billing practices" [*Id.* ¶ 67]. Plaintiffs focused their review on claims utilizing CPT Codes 99284–99285 [*Id.*]. After finding that Defendants were using CPT Code 99285 at a rate far higher than other providers, Plaintiffs requested and received medical records, which Plaintiffs allege did not support the CPT Code 99285 [*Id.* ¶¶ 68–69].[1]

Plaintiffs claim that "[Defendants] deliberately upcoded claims utilizing CPT codes 99285 and 99284 . . . in order to deceive . . . Plaintiffs into overpaying for emergency room services and to reap windfall profits at the . . . Plaintiffs' and their customers' and members' expense" [*Id.* ¶ 88]. Plaintiffs state that they were damaged by Defendants' upcoding, explaining that it "is a particularly insidious form of fraud that is difficult to uncover and resource-intensive to

---

[1] Plaintiffs cite examples of Defendants' alleged upcoding in paragraphs 73–86 [Doc. 1 ¶¶ 73–86].

4

investigate" and that here, "the number of affiliates through which [Defendants have] carried out [their] scheme, as well as [their] failure to disclose the identities of all of [their] affiliates, further obscured [their] systematic upcoding" [*Id.* ¶ 104].

In addition, Plaintiffs assert that they have been damaged by Defendants "extravagantly high bill[ing] charges" [*Id.* ¶ 111]. They state that Defendants also file litigation against patients "[w]hen insurers have declined to pay" and that they conceal charity care from patients, which "'is a form of financial assistance for low-income patients'" [*Id.* ¶¶ 117–18 (citation omitted)]. Furthermore, Plaintiffs accuse Defendants of billing for services performed by non-physicians as if the service was performed by physicians [*Id.* ¶ 123]. And finally, Plaintiffs state that Defendants also engage in "a practice called pass-through billing in order to maximize payments from insurers" [*Id.* ¶ 131]. Plaintiffs assert:

> Pass-through billing occurs when one provider bills for medical services that were in reality rendered by another provider. Typically, the billing provider has a contract with an insurer while the rendering provider does not. Pass-through billing deceives the insurer into paying for services performed by the non-contracted provider at rates it has negotiated with the contracted provider when it might otherwise pay less or not at all.

[*Id.* ¶ 132].

Based on the above, Plaintiffs allege fraud, negligent misrepresentation, violations of Tenn. Code Ann. §§ 56-53-102, 103, and 107, violations of the Tennessee Consumer Protection Act and other state consumer protection statutes, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), and conspiracy to violate civil RICO, 18 U.S.C. § 1962(d) [*Id.* ¶¶ 137–201, 211–36]. They seek declaratory relief, injunctive relief, unjust enrichment, and other damages [*Id.* ¶¶ 202–10, 237–40; *see also* at 54].

## II. ANALYSIS

Federal Rule of Civil Procedure 26(b)(1) provides as follows:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Courts have explained that the "scope of discovery under the Federal Rules of Civil Procedure is traditionally quite broad." *Meredith v. United Collection Bureau, Inc.*, 319 F.R.D. 240, 242 (N.D. Ohio 2017) (quoting *Lewis v. ACB Bus. Serv., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998)); *see also Burrell v. Duhon*, No. 518CV00141, 2019 WL 5260481, at *2 (W.D. Ky. Oct. 17, 2019) ("The spirit and purpose of the Federal Rules of Civil Procedure demonstrate that the relevance threshold is a relatively low one." (citation omitted)). And courts have defined the term "relevant" as it is used in Rule 26(b)(1) to "encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in in the case." *Barrio Bros., LLC v. Revolucion, LLC*, No. 1:18-CV-02052, 2021 WL 282549, at *3 (N.D. Ohio Jan. 28, 2021) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)).

Courts have cautioned, however, that "[d]iscovery requests are not limitless, and parties must be prohibited from taking 'fishing expeditions' in hopes of developing meritorious claims." *Bentley v. Paul B. Hall Reg'l Med. Ctr.*, No. 7:15-CV-97, 2016 WL 7976040, at *1 (E.D. Ky. Apr. 14, 2016). "[T]he [C]ourt retains the final discretion to determine whether a discovery request is broad or oppressive." *Id.* (citing *Surles v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007)).

Both parties presented discovery disputes for the Court's consideration. As noted above, Plaintiffs argued that Defendants' responses to RFP Nos. 91–93 and 96–98 were inadequate. Defendants asserted that Plaintiffs' responses to RFP Nos. 9 and 10 were inadequate. And finally, Plaintiffs argued that Defendants' response to RFP No. 39 should be supplemented and that there are various documents missing from Defendants' previous productions.

### A. Plaintiffs' RFP Nos. 91–93

These RFPs state:

> RFP No. 91. Documents sufficient to show the coding standard, including any tools for scoring, that [Defendants] used for E/M codes for emergency room services prior to [Defendants] adopting the Desktop Coding Grid.
>
> RFP No. 92. Documents discussing the reasons for changing to the Desktop Coding Grid from the prior standard that Defendants used for E/M codes for emergency room services, before January 1, 2016.
>
> RFP No. 93. Documents relating to the initial adoption or creation of the Desktop Coding Grid by [Defendants], before January 1, 2016, including advice, guidance or modeling provided by any third parties such as Bettinger Stimler and Associates ("BSA").

The parties primarily dispute the relevancy and proportionality of these documents. During the informal discovery dispute, Plaintiffs argued that this case is about coding for emergency room services. They submitted that RFP No. 91 relates to the standards Defendants used, RFP No. 92 relates to the reasons for adopting the Desktop Coding Grid ("Grid"), and RFP No. 93 relates to documents about the guidance and financial modeling provided by third parties, such as BSA. Plaintiffs stated that prior to Defendants adopting their Grid, they used a version of the Marshfield Clinic Tool ("Marshfield"). Plaintiffs noted that their expert, Dr. Shapiro, has opined that Marshfield is the standard for evaluating medical coding, while Defendants' expert has opined that

7

it is not mandatory. Plaintiffs submitted that the parties therefore have a dispute about whether Marshfield is considered the industry standard.

Specifically, with respect to RFP Nos. 92 and 93, Plaintiffs explained that Defendants moved from their version of Marshfield to using the Grid. In that move, Plaintiffs claimed that they worked with a financial advisor, BSA, to determine the financial impact. This information, Plaintiffs asserted, is relevant to their allegation that Defendants upcoded for financial reasons. Although they served a subpoena on BSA, Plaintiffs submitted that BSA responded that they did not have any documents.

Defendants responded by outlining the discovery that Plaintiffs took over the past four years. With respect to RFP No. 91, they argued that any pre-Grid coding standards are not relevant to the issues in this case. They submitted that out of the 500,000 plus claims that are at issue, none of them were coded using the information Plaintiffs seek in RFP No. 91. Further, Defendants noted that they have produced all versions and policies of the Grid, Plaintiffs received production by BSA, and Plaintiffs have taken depositions wherein they asked about pre-Grid coding. Defendants stated, for example, Plaintiffs deposed Dr. Hamilton Lempert ("Dr. Lempert"), the Chief Medical Officer of Coding Policy; Paula Dearolf ("Ms. Dearolf"), the Vice President of Revenue Cycle Management, and Joe Carman ("Mr. Carman"), the Chief Administrative Officer. In addition, Defendants stated that Plaintiffs are also set to take the deposition of Jessica Parks, who is knowledgeable about coding before Defendants implemented the Grid. They explained that Dr. Lempert testified that Defendants used a version of the Marshfield tool because Marshfield did not work well in the emergency services setting. Defendants added that the witnesses explained that Defendants relied on the 1995 CMS coding and CPT manual to code claims. With respect to RFP No. 92, Defendants stated that Dr. Lempert testified that Defendants implemented the Grid because

Marshfield was inaccurate, inefficient, and inconsistent. Pointing to the language in RFP No. 93, Defendants asserted that the parties had agreed that the relevant time period was January 2016, and now Plaintiffs are trying to seek documents before that time.

Plaintiffs replied that they have tried to ask every witness about Marshfield. According to Plaintiffs, Dr. Lempert testified that Defendants used a version of Marshfield and a version of a matrix. Because Plaintiffs are not aware of what matrix Defendants used, they asked Tracy Chancey ("Ms. Chancey"), Defendants' Vice President of Revenue and Coding Analysis. Plaintiffs stated that Ms. Chancey directed them to Ms. Dearolf, but when they asked her, she testified that Defendants used the CMS 1995 guidelines. Plaintiffs argued that her response does not explain what tool they used to score medical decision making. They asserted that whether Marshfield is the industry standard, whether Defendants deviated from Marshfield, and their reasons for doing so are core disputes.

*Analysis.* With respect to RFP No. 91, the Court finds that Plaintiffs have not shown that it seeks relevant information. Instead, it seeks information about the coding standard that Defendants did not use to code any of the claims at issue. At the hearing, Plaintiffs explained that whether Defendants used Marshfield prior to their use of the Grid was a core dispute. But Defendants have acknowledged that they were not using Marshfield—they used a version of it. This is not in dispute as Plaintiffs noted later at the hearing that Defendants developed their own interpretation of Marshfield. Asking Defendants to produce "documents sufficient to show the coding standard . . . prior to [them] adopting the Grid" does not make it more or less likely that Defendants upcoded claims. The Court therefore declines to order Defendants to supplement their response to RFP No. 91.

With respect to RFP Nos. 91 and 92, the Court finds that they seek relevant information. Plaintiffs' theory is that Defendants began using the Grid to upcode claims. Any information about why Defendants began using the Grid, which RFP Nos. 91 & 92 seek, is therefore relevant to the issues in this case. Defendants argued that these RFPs seek duplicative information because Dr. Lempert testified that Defendants changed to the Grid because Marshfield was inaccurate, inefficient, and inconsistent. But the Court does not find that asking for documents renders this inquiry "unreasonably cumulative or duplicative." Fed. R. Civ. P. 26(a)(b)(2)(C)(i). The Court, however, will place a temporal scope on RFP No. 92 to one year before Defendants adopted the Grid. The Court therefore **ORDERS** Defendants to supplement their responses to RFP Nos. 92 and 93 within **fourteen (14) days**.[2]

B.   **RFP Nos. 96 to 98**

RFP Nos. 96 to 98 state:

> RFP No. 96. Documents discussing the Marshfield Clinic Tool (including its other name, the "Medicare Audit Tool"), from January 1, 2007 through December 31, 2023, including but not limited to the following: (i) the Marshfield Clinic Tool coding standard and criteria, (ii) "Average Marshfield" and "Defensible Marshfield" as

---

[2] Defendants argued that the parties had an agreement that they would search only for documents with a date range of January 1, 2026, through the date the Complaint was filed. While the "Court[]will enforce discovery agreements reached between two parties[,]" *J.S.T. Corp. v. Robert Bosch LLC*, No. 15-13842, 2019 WL 1857080, at *5 (E.D. Mich. Apr. 23, 2019), the Court is also "obligate[d] to read any purported written discovery agreement fairly and reasonably, and to place the burden of persuasion on the party asserting that an agreement has been reached." *Libertarian Party of Ohio v. Husted*, 302 F.R.D. 472, 478 (S.D. Ohio 2014) (citation omitted)). Defendants have not met their burden here. They cited to Plaintiffs' counsel's letter dated January 26, 2023, wherein Plaintiffs proposed a date range of January 1, 2016, through the date the Complaint was filed [Doc. 138-3]. But this letter appears to be Plaintiffs' proposed search for responding to Defendants' requests. In a letter dated January 27, 2023, Defendants set forth what they intended to utilize for their searches and objected to Plaintiffs' request to search for information "barred by the applicable statutes of limitations or statutes of repose" [Doc. 138-4 p. 4]. Defendants proposed searching ESI from January 1, 2016, to October 27, 2021, "for initial searches and negotiations" [*Id*. at 4]. It is not clear to the Court whether the parties reached an agreement on this issue.

10

Case 3:21-cv-00364-DCLC-DCP   Document 272   Filed 02/02/26   Page 10 of 19
PageID #: 4676

> used in TH_UHC_EDTN 00158038, (iii) any reasons for not adopting the Marshfield Clinic Tool, (iv) modification of the Marshfield Clinic Tool for use by [Defendants], and (v) the financial impact of adopting or not adopting the Marshfield Clinic Tool by [Defendants].
>
> RFP No. 97. Documents identifying or discussing the coding standards used by FTI and NICKA & ASSOCIATES [hereinafter "Nicka"] to conduct coding audits for [Defendants] of E/M codes for emergency services.
>
> RFP No. 98. Documents discussing the reasons for [Defendants] changing coding auditors from FTI to NICKA & ASSOCIATES.

During the informal discovery dispute conference, Plaintiffs stated that discovery showed that Defendants were trying to develop their own interpretation of Marshfield. They pointed to words, such as "Average Marshfield" and "Defensible Marshfield," noting that only Defendants used these terms. They claimed that Defendants tried to distort the standard when they knew Marshfield was the standard. For example, Plaintiffs stated that Defendants claimed that an X-ray conducted during the initial visit was an "additional workup planned," but that was not properly coded because it occurred during the initial visit. Plaintiffs submitted that while there are no formal guidelines about using Marshfield, everyone in the industry used it, including in the emergency services settings.

Further, Plaintiffs stated that RFP Nos. 97 and 98 seek information about auditing. They explained that sometime in 2016, Defendants used FTI and then from 2017 onward, Defendants used Nicka & Associates ("Nicka"). Plaintiffs acknowledged that the underlying audits have been produced. They submitted that RFP No. 97 seeks the coding standards used to conduct the audits, noting that they know that the auditors were using Marshfield or some version. But Plaintiffs wanted to know more about how the auditors were treating additional workup plans because they allege that this category changed the code to Levels 4 and 5. Plaintiffs stated that the FTI audit

11

found a 20% error rate in Defendants' coding using Marshfield, although Defendants claimed that it was 0%. Plaintiffs argued that Defendants produced an email from Dr. Lempert to Ms. Parks about the 20% error rate from the FTI audit, characterizing the differences as basic philosophical differences. Plaintiffs submitted that they interpret the email to mean that Dr. Lempert interprets Marshfield differently. And with respect to RFP No. 98, Plaintiffs alleged that there was friction between Defendants and FTI because FTI serially downcoded. Plaintiffs stated that Defendants discussed certain criteria for the new auditor, including coding philosophy.

Defendants responded that Plaintiffs have the burden to show relevancy and that they have not done so. They claimed that Marshfield is not the standard, but instead, the CPT guidelines constitute the standard. Further, Defendants argued that the discovery requests seek duplicative information, noting that Plaintiffs asked them to run search terms on ten custodians that would have yielded results for Marshfield from 2016. Defendants asserted that Plaintiffs failed to explain why they needed to look for documents created in 2007. Defendants stated that Plaintiffs asked Dr. Lempert why Defendants moved from Marshfield to the Desktop Grid, and Dr. Lempert testified that Marshfield created variants between coders that were not desirable and that it lacked clear definitions. Defendants argued that it would be burdensome to reopen discovery on document production to produce documents dated 2007.

As to RFP No. 97, Defendants acknowledged that they understood the importance of auditors but stated that Plaintiffs obtained discovery from Nicka and FTI. Defendants submitted that Plaintiffs have the audits and that they have also ran search terms to capture audit related information. They therefore claimed that discovery would be duplicative. Defendants represented that nothing from FTI and Nicka was being withheld, except documents that Defendants claimed were privileged. Defendants stated that while FTI noted 20% coding error, the error rate was

12

Case 3:21-cv-00364-DCLC-DCP   Document 272   Filed 02/02/26   Page 12 of 19
PageID #: 4678

actually about 10%, which represents an acceptable percentage for the year. Dr. Lempert testified that Defendants changed auditors for business reasons in that FTI's work was not satisfactory. They claimed that Plaintiffs deposed Nicka and obtained its auditing framework. Further, Defendants stated they ran search terms that captured audit related information. Defendants later confirmed that the search terms that were selected were broad enough to capture audits. With respect to Plaintiffs' claim about additional work up plans, Defendants argued that there is no industry standard and that there is no clear definition of that phrase.

Plaintiffs replied that Dr. Lempert's testimony is not helpful on RFP No. 96 because he was not working for Defendants when they changed how they code. Plaintiffs acknowledged that they deposed Nicka and that they were able to ask questions about Marshfield. They explained that Defendants changed auditors during the 2016 to 2017 time period but stated that the decision to do so was likely made in 2015. While they acknowledged that they have the audits, they claimed that they did not have the standards.

*Analysis.* Starting with RFP No. 96, the Court finds this discovery request is too broad. Plaintiffs claim that Defendants tried to distort the Marshfield standard and that they were using terms that no one used in the industry. But this explanation does not explain why Defendants need documents discussing Marshfield for the past sixteen years—and nine years before any of the claims at issue in this case. Defendants have acknowledged that they were not using the Marshfield standard as Plaintiffs understand that standard. Further, Defendants stated that they have produced all documents referencing Marshfield since 2016. The Court therefore declines to order Defendants to supplement RFP No. 96.

With respect to RFP Nos. 97 and 98, it does not appear to the Court that Defendants have additional responsive documents. Indeed, at the hearing, Defendants represented that they ran

13

Case 3:21-cv-00364-DCLC-DCP   Document 272   Filed 02/02/26   Page 13 of 19
PageID #: 4679

search terms that were broad enough to capture FTI's and Nicka's audits, including the standards and communications about which auditor would be used. As it relates to RFP No. 97, in their position statement, Defendants represented, "Audit documents Defendants have produced expressly identified the coding standards in conducting the relevant audits." And with respect to No. 98, Plaintiffs stated, "The limited documents that Defendants produce show that Defendants moved on from FTI at the end of 2016 and their CCO had a specific list of criteria for FTI's replacement." The email that Plaintiffs cited from Dr. Lempert regarding search criteria for a new auditor is dated December 1, 2016. And Defendants' change in auditors occurred in 2017. Defendants have produced documents from 2016 and onward. The Court therefore declines to order Defendants to supplement their responses to RFP Nos. 97 and 98.

### C. Defendants' RFP Nos. 9 and 10

RFP Nos. 9 and 10 state:

> RFP No. 9. Produce all agreements between You and Optum for use of any of Optum's software and/or services regarding professional emergency department claims, including, without limitation, Optum's Emergency Department Claims (EDC) Analyzer and/or Optum's Evaluation and Management Professional (E/M Pro) Tool, and services related thereto, as identified in response to Interrogatory No. 4, above.[3]

> RFP No. 10. Produce all documents demonstrating or evidencing the amounts paid by You to Optum for use of any of Optum's software and/or services regarding professional emergency department claims, including, without limitation, Optum's Emergency Department Claims (EDC) Analyzer and/or Optum's Evaluation and Management Professional (E/M Pro) Tool, and services related thereto, as identified in response to Interrogatory No. 4, above.

---

[3] Interrogatory No. 4 states: Identify all contracts between You and Optum for use of any of Optum's software, products, and/or services regarding professional emergency department claims, including, without limitation, Optum's Emergency Department Claims (EDC) Analyzer and/or Optum's Evaluation and Management Professional (E/M Pro) Tool, and services related thereto, and identify the financial compensation arrangements thereunder, including, for example, whether payments are based on the number of claims processed, the number of claims denied, the number of claims downcoded, the savings incurred, or other bases.

During the informal discovery dispute conference, Defendants states that RFP Nos. 9 and 10 ask for contracts and payments records, respectively, between Plaintiffs and Optum. According to Defendants, during the deposition of Jennifer Sobiech, she disclosed that Optum performed annual fraud, waste, abuse, and error services ("FWAE") for Plaintiffs. Defendants submitted that pursuant to these contracts, Optum was paid to detect the very fraud that Plaintiffs claim Defendants engaged in. Defendants represented that Optum performed electronic and manual reviews and met with Plaintiffs to discuss the issues. Defendants stated that these RFPs seek relevant information because Plaintiffs must prove reasonable reliance. Specifically, with respect to RFP No. 10, which seeks the amounts that were paid for those services, Defendants argued that it will show how much effort Plaintiffs used to discover fraud. Defendants claimed that Plaintiffs were paying Optum a certain percentage based on a contingency fee and that dollars equal diligence.

Plaintiffs responded that the agreements with Optum are generalized, and they included all lines of business, not just coding. With respect to RFP No. 10, Plaintiffs stated that they do not have that information at the granular detail Defendants seek. Plaintiffs acknowledged that it was not burdensome to obtain the contracts but insisted that they are irrelevant.

*Analysis.* The Court finds that Defendants have shown that RFP No. 9 seeks relevant information. The parties agree that Plaintiffs must show that they reasonably relied on Defendants' coding when they paid the claims. Defendants contend that Plaintiffs had contracts with Optum for FWAE detection services, and therefore, cannot show reasonable reliance. The Court therefore finds that Defendants have shown that Plaintiffs' contracts with Optum are relevant. The Court **ORDERS** Plaintiffs to produce the contracts within **fourteen (14) days** of this Memorandum and Order.

But with respect to RFP No. 10, Plaintiffs explained that they are not able segment the amounts that were paid on detecting coding services and that there is no way to produce the information outlined in RFP No. 10. *See also Harris v. Advance Am. Cash Advance Centers, Inc.*, 288 F.R.D. 170, 173 (S.D. Ohio 2012) ("[A] party need only produce existing documents, and not create documents, in response to a Rule 34 document request." (citation omitted)). Given that, the Court declines to order Plaintiffs to respond to RFP No. 10.

### D. Plaintiffs' RFP No. 39

Plaintiffs' RFP No. 39 states:

> RFP No. 39 seeks: All Documents You provided to Blackstone in connection with its acquisition of You, relating to Your historical and projected revenue, including financial Documents, Documents discussing revenue growth opportunities, and Documents relating to the impact that coding for emergency room services has on Your annual revenue and profits attributable to ER services.

During the informal discovery dispute conference, Plaintiffs argued that the Court invited the parties to seek additional information if later discovery revealed it was warranted. Plaintiffs stated that they have evidence that Defendants changed codes when there was a financial incentive to do so, but Defendants did not when it was financially detrimental. Plaintiffs claimed that in 2016, Defendants engaged with LogixHealth to evaluate the Defendants' coding. According to Plaintiffs, LogixHealth suggested that Defendants implement ten changes to the coding grid, which would cause Defendants to downgrade all their Level 5 codes. Plaintiffs contended that after Blackstone acquired Defendants, they set up an ad hoc committee that did not implement any of the recommended changes. Plaintiffs submitted that they do not have any documents relating to the ad hoc committee. In their position statement, Plaintiffs stated that Defendants asked their expert Joshua Johnson ("Mr. Johnson") questions that were related to the preacquisition of

16

Blackstone and indicated that Mr. Johnson's opinions were problematic given that he did not consider pre-acquisition materials.

Defendants responded that the Court already addressed this issue and determined that pre-acquisition material was not relevant. Defendants stated that they asked Mr. Johnson about his general opinion that private equity firms are under pressure to create wealth in a short period of time and that they were not using the pre-acquisition material as a sword. Defendants claimed that Plaintiffs' theory was speculative and that Plaintiffs asked witnesses about Blackstone, they served a subpoena on Blackstone, and that they recently noticed another individual from Blackstone for a deposition where they can also ask questions.

Plaintiffs replied that when they ask deponents about why the LogixHealth recommendations were not implemented, they are instructed not to answer. Plaintiffs stated that Dr. Lempert testified that the recommendations went to a committee, but Plaintiffs have no information about this committee. Given Defendants' instructions not to answer questions, Plaintiffs asserted that they are not confident that they will learn this information from future depositions.

*Analysis.* As an initial matter, the Court notes that in May 2025, it allowed some post-acquisition discovery about Blackstone. The Court noted, however, "To the extent this discovery warrants additional discovery relating to Blackstone, Plaintiffs may file an appropriate motion after participating in a good faith meet and confer with Defendants" [Doc. 146 p. 12]. The Court therefore invited the parties to re-visit this issue should the circumstances warrant.

Plaintiffs stated that in January or February 2016, Defendants retained LogixHealth to evaluate their coding and recommend changes. Later, in August 2016, Dr. Lempert criticized these changes. According to Plaintiffs, at the same time, Blackstone made a bid but then decreased its

17

bid a month later. After Blackstone acquired Defendants, the LogixHealth recommendations were denied. Plaintiffs argued that this timeline of events demonstrates the relevancy of Defendants' financial projections to Blackstone for the acquisition. But the Court finds Plaintiffs' argument too speculative to warrant what Plaintiffs request in RFP No. 39. The Court notes, however, that Plaintiffs are taking a deposition of an individual associated with Blackstone, and to the extent this discovery warrants additional discovery, the Court grants them leave to file an appropriate motion on this issue.

### E. Plaintiffs' Claim of Missing Documents

There are six items that Plaintiffs asserted that they were missing from Defendants' document production.

First, Plaintiffs claimed that they do not have the retention letter from LogixHealth. Defendants responded that the memorandum of understanding will be produced on January 23, 2026. They stated that all documents have been produced unless logged on their privilege log. Given that, the Court finds this issue moot.

Second, Plaintiffs claimed that there were documents that referenced the Marshfield Training Guide. Defendants responded that they have looked for those documents and asked their witnesses but are not able to locate them. They represented that if they find such documents, they will produce them. Given Defendants' representation, the Court finds this issue moot.

Third, Plaintiffs stated that they have no documents about the ad hoc committee's review of the LogixHealth recommendation. Defendants responded that to the extent there are responsive documents, they have logged them on the privilege log. Defendants offered to review the privilege log and identify the documents. Given Defendants' offer, the Court **ORDERS** the parties to work together to identify the documents on the privilege log.

Fourth, Plaintiffs asserted that they do not have clinical documentation educators' reports. Defendants stated that a witness referenced such documents but noted that she did not see them regularly. Defendants were uncertain if they possess such documents but offered to produce them if they are able to locate them in the possession of the ten custodians the parties identified. Given that, the Court **ORDERS** Defendants to supplement their production within **fourteen (14) days**, to the extent they can locate such documents.

Fifth, Plaintiffs state that Ms. Chancey testified about a study and a coding key, and Defendants claim such was privileged. Plaintiffs argued that such items cannot be privileged. Defendants responded that they produced Ms. Chancey's complete file and the files of the two people she supervised. Defendants stated that they were not aware of any other documents. Given that, the Court finds this issue moot.

Sixth, Plaintiffs stated that Defendants have not produced a presentation to the CEO that was referenced in several productions. Defendants responded that Dr. Lempert met with the CEO and walked him through the Grid. Defendants stated that they searched Dr. Lempert's and Mr. Murphy's files but could not locate it. Defendants represented that if they locate it, they will produce it. Given that, the Court finds this issue moot.

**IT IS SO ORDERED.**

ENTER:

_Debra C. Poplin_
Debra C. Poplin
United States Magistrate Judge